**LEWIS AND ROCA LLP — LAWYERS**

Sean D. Garrison (#014436)
SGarrison@LRLaw.com
Shane E. Olafson (#024605)
SOlafson@LRLaw.com
**LEWIS AND ROCA LLP**
40 N. Central Avenue
Phoenix, Arizona 85004-4429
Telephone (602) 262-5311

Joel T. Beres
jberes@stites.com
John W. Scruton
jscruton@stites.com
**STITES & HARBISON PLLC**
400 West Market St., Suite 1800
Louisville, Kentucky 40202-3352
Telephone (502) 587-3400
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AFL Telecommunications LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>SurplusEQ.com, Inc., Tech Sales, LLC, and Daniel Parsons and Jane Doe Parsons,<br><br>　　　　　Defendants. | No. 2:11-cv-01086-DGC<br><br>**OPPOSITION OF AFL TELECOMMUNICATIONS LLC TO DEFENDANTS' MOTION TO COMPEL** |

　　　　Plaintiff AFL Telecommunications LLC ("AFL") submits this opposition to the Defendants' Motion to Compel.  By that Motion, Defendants seek to compel disclosure of information that would be of little or no legitimate use in this litigation, but would threaten significant harm to AFL and to Fujikura Ltd. if it were disclosed.  The Court should deny the Motion to Compel under Fed.R.Civ.P. 26(b)(2)(C)(iii), on the ground that the burden of production of the requested documents outweighs any potential benefit.  Moreover, with respect to information such as the source code constituting the software, the documents are not in AFL's possession or control under applicable law, and an order compelling their production would be improper.

2318703.2

Defendants' Motion seems to be directed at either punishing AFL and its Japanese parent corporation, Fujikura Ltd. ("Fujikura") for bringing this action, or at obtaining materials Defendant seeks for reasons unrelated to the litigation.  While the materials Defendants seek would be of little or no value to Defendants in their defense of this action, they could be of great value for other purposes, as shown by Defendants' own testimony and correspondence.

### A. The Court Must Limit Discovery Where the Burden of Production Outweighs the Benefit of the Materials Sought.

Federal Rule 26(b)(2)(C) expressly contemplates a balancing of the burdens of production against the benefits to determine whether discovery is proper.  That rule provides that, "[o]n motion or on its own," the court "must" limit discovery if it determines that:

> the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2)(C)(iii).  Here, because the discovery sought would have little or no importance in resolving the issues in this litigation, it should be denied.

Even before that provision was added by 1993 modifications, the Ninth Circuit in *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) recognized that under Rule 26(c) it is appropriate to limit discovery of trade secrets – including, in that case, source code – to protect parties from undue burden.

The court in *Frank Brunckhorst Co., LLC v. Ihm*, 2012 U.S. Dist. LEXIS 28152 at *2-*4 (S.D. Cal. 2012), applied *Brown Bag Software* in considering whether in-house counsel should be allowed access to confidential documents.  The *Frank Brunckhorst* court noted that:

2318703.2



> When evaluating the risk of inadvertent disclosure of confidential information, the Ninth Circuit employs a balancing test in which (1) the risk of inadvertent disclosure, and (2) the potential harm from inadvertent disclosure is (3) weighed against the prejudice to the other party from denial of access to relevant information. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).

In denying access to the information, the court noted that the key inquiry was whether in-house counsel was involved in "competitive decision-making." If so, "the risk of disclosure may outweigh the need for confidential information." *Intel Corp. v. Via Technologies, Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (citations omitted).

As the court observed in another case involving a software copyright, *Beam Sys. v. Checkpoint Sys.*, 1997 U.S. Dist. LEXIS 8812 at *8, 42 U.S.P.Q.2d 1461 (C.D. Cal. 1997):

> courts have a responsibility to ensure that court-required disclosure of trade secrets for purposes of litigation do not 'become by indirection the means of ruining an honest and profitable enterprise.'), *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 290 (D.Del. 1985), quoting 8 J. Wigmore, Evidence § 2212, at 155 (McNaughton rev. ed. 1961).

1. <u>The Burden of Producing the Source Code Would Outweigh Any Benefit.</u>

Here, in the case of the source code for the software, the burden, to Fujikura, would be that its confidential source code is placed at risk. That in turn would threaten AFL because if the source code became available, it could allow easier circumvention of measures intended to prevent infringing gray market sales.

Defendants have steadfastly refused to agree to a protective order providing for production under an "attorneys' eyes only" designation that would preclude Defendants themselves from having access to designated documents and information. The fact that Mr. Parsons, a defendant in this action and the sole owner of the corporate defendants, has served a five-year prison term for offenses relating to sales of controlled substances, does not inspire confidence in his willingness to observe the niceties of confidentiality orders or other legal strictures where there is a profit to be made. (Parsons Depo., pp. 71:11-72:13, Ex. 1 to Scruton Declaration filed herewith.) If he had access to the source code, there

2318703.2



would be a significant risk that he would provide it to his Chinese suppliers, who would use it to more effectively circumvent protective measures Fujikura uses to prevent gray-market importation of modified devices.

On the other hand, the benefit from production of the source code would be minimal. What would it prove? Hiroshi Sugawara, a software engineer who is currently working at AFL in South Carolina but who normally is employed by Fujikura – testified that while he was an employee of Fujikura in Japan, he developed the software that runs the 18- and 60-series Fujikura fusion splicers as part of a team, and that Fujikura installed that software on the splicers before they left the factory. (Sugawara Depo. pp. 22:8-29:9, Ex. 2 to Scruton Decl.) Defendants do not suggest that they have a repository of similar source code against which they could compare the Fujikura source code to determine whether it was copied, nor how they would otherwise prove that the source code was not "original" for purposes of the Copyright Act.

As Defendants acknowledge, Courts have routinely recognized that source code may constitute a trade secret.

> Computer programs have been found to constitute a trade secret where the source code is not easily copied or ascertainable by inspection of the program. *See, e.g., Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 617 (S.D.N.Y. 1984) (finding source code of plaintiff's computer program was not accessible to the public and therefore the program was likely to be a trade secret); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) ("The source code can and does qualify as a trade secret … [because it] is not readily ascertainable by proper means …").

*Linkco, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 499 (S.D.N.Y., 2002). Here, there is no suggestion that the source code is "readily ascertainable by proper means."

Defendants' arguments concerning the limitations of the U.S. registration do not support disclosure of the source code. Because there is no dispute that it was created in Japan, the software is not a "United States work" and is not required to be registered with the U.S. Register of Copyrights in order to support a copyright claim. 17 U.S.C. §411(a) (no action for infringement of the copyright in any *United States work* shall be instituted

1  until registration of the copyright claim has been made . . . .)  Accordingly, while
2  Defendants argue that they must compare the registered version to prior versions to
3  determine whether the Fujikura software was copied from itself, that issue is not only
4  absurd but irrelevant.  Plaintiff is not limited to a claim on the registered version of the
5  software.

6  Defendants' proffered issue as to whether the registered version of the software is
7  protected or is derivative of earlier, unprotected versions is a red herring.  First, a
8  derivative work with sufficient original material supports copyright in its own right,
9  regardless of whether the work from which it is derived may be copyrighted.  17 U.S.C.
10 § 103; *SAS Institute, Inc. v. S & H Computer Systems, Inc*., 605 F. Supp. 816, 827 (M.D.
11 Tenn. 1985) (derivative work was protected by copyright even though underlying work
12 from which it was derived was in the public domain).

13 Second, there is nothing to show that the software as a whole is not protectable,
14 and since it is a foreign work, it is not required to be registered in order to support an
15 infringement claim.  Defendant's claim therefore would have to be that the work as a
16 whole is unprotectable.  Mr. Sugawara testified that he worked on the team that wrote the
17 software, and that the software for each model is special because of differences in the
18 hardware.  (Sugawara Depo., p. 71:8-19, Ex. 2 to Scruton Decl.)  It is not credible that
19 software that had to be specially written for specific hardware is not copyrightable because
20 it was copied in its entirety from earlier software.

21 Defendants' argument that somebody else might have an ownership interest in the
22 software because of some English language text dropped into the software
23 mischaracterizes Mr. Sugawara's testimony and is likewise irrelevant.  While Defendants
24 argue that someone outside Fujikura wrote a portion of the software, it is clear from the
25 testimony that rather than source code, Mr. Sugawara was testifying about certain text that
26 was to be displayed to the user.  Mr. Sugawara testified that Fujikura employees developed
27 the function of the software – the source code – and prepared a rough draft of that text in
28 languages other than Japanese and provided that text to native speakers for correction of

mistakes in syntax, grammar, and the like.  Once the corrections were made, the text could simply be cut and pasted into the software.  (Sugawara Depo. pp. 63:23-66:2, Ex. 2 to Scruton Decl.)  It is unlikely that such modest editing would constitute a copyrightable contribution to the work, and even if it did it would apply only to a tiny fraction of the software.

Moreover, even supposing that another party held a joint ownership interest in the software, that fact would not assist Defendants.  Each owner of a joint work has the right to sue for infringement. *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 268, 269 (2d Cir. 1944).

### 2. The Burden of Producing Technical Documents, Schematics, Repair Manuals Would Outweigh Any Benefits.

The Motion to compel production of technical specifications, schematics, and repair manuals should be denied for reasons similar to those applicable to the source code.  Defendants would obtain no legitimate benefit from that production, but AFL would be threatened with significant injury.  Defendants claim that they need the technical specifications and schematics to determine whether machines have been modified.  Defendants have not produced Fujikura splicers and claim not to have any, so the only splicer apparently available for inspection is the splicer in AFL's possession that it obtained from Entergy, bearing serial no. 00818.  AFL's analysis is that a chip was removed and replaced on that splicer and that the serial number was changed.  (See Doc. 06, Ex. D [Kawanishi Decl.], ¶ 18 and Ex. H [Steadman Decl.], ¶ 13.)  Technical specifications and schematics would not reveal whether that unit has been modified, because the contention is not that the unit has been taken apart and reassembled in a different configuration that would differ from schematic diagrams.

Because there is only a single unit in either party's possession, there is no information relevant to the lawsuit to be gained from production of technical drawings and the like.  AFL's contention is that the Entergy unit, and other units purchased from third-party sources outside the U.S. (and particularly from Defendants' Chinese suppliers) are

2318703.2

modified in ways that neither AFL nor Fujikura can control, and that such modifications put the quality of the machines bearing the FUJIKURA mark at the mercy of Defendants and their suppliers. With the exception of the Entergy unit, which would not be contrary to the technical drawings, there is no splicer sold by Defendants to compare to the technical documents.

Moreover, AFL has agreed to produce a genuine splicer for inspection. Any information that could be gained from the technical drawings with respect to visible modifications could also be gained from comparing an allegedly modified splicer to the genuine splicer.

Defendants' documents show that they want technical documents, schematics, and repair manuals to use in their own business. In correspondence with his Chinese supplier, Defendant Parsons wrote that it is "impossible to do much without some sort of technical information" and that:

> I will pay a lot of money if you can get schematics of other technical documents. Any model splicers. We get in all models and need to be able to fix more in-house.

SurplusEQ's employee in charge of repairs, Walter Rieble, wrote to a contact in China asking for secret code so that he could do repairs. SurplusEQ documents show the following exchange between Mr. Rieble and "James" at Fonsun Technologies, a company apparently located in Shenzhen, China, in which Mr. Rieble requests "Why will you not give me the secret code for the FSM-60S splicers so I can do some of this work myself." (Defendants produced the cited documents under a confidentiality designation that AFL believes precludes filing the documents without Defendants' approval. AFL will seek Defendants' permission to file these documents with the Court.)

These exchanges show that Defendants are desperate to obtain information that will allow them to repair Fujikura splicers. Those documents are corroborated by Mr. Parsons's deposition testimony, which reflect Defendants' difficulties as a result of not having that technical information:

7

2318703.2



> We'd call for - in the beginning I didn't understand how it all worked with these guys, and we'd try to get - you know, normally you have a car, you have a TV, you can get technical information if you want to try to repair something yourself. Not with splicers. They don't give anything out.

(Parsons Depo. p. 28:5-11, Ex. 1 to Scruton Decl.)

> Q   When did you stop selling gray market?
>
> A   Understand the last one probably went out in October - October last year.
>
> Q   And was that a conscious decision made by you?
>
> A   Yes.
>
> Q   And can you tell me what - why you made that decision?
>
> A   Well, primarily because we can't re - re - repair them . . . .

(Parsons Depo. pp. 149:17-150:2, Ex. 1 to Scruton Decl.)

Defendants argue that AFL wants to deny access to documents used in the evaluation of the Entergy splicer, citing the depositions of Steve Althoff and Dan Lanahan, but neither witness says anything of the sort. In fact, the documents the witnesses apparently refer to in that questioning were produced as Exhibits 1, 3, and 4 to the Declaration of Noriyuki Kawanishi, submitted in support of AFL's Motion for Preliminary Injunction in this action. (Doc. 06, Ex. D.)

      3.    <u>The Burden of Production of Repair Logs Would Outweigh Any Benefit</u>.

Defendants also seek to compel production of repair logs relating to the splicer models at issue. Again, such information would be of little or no use to Defendants. Defendants do not indicate that they have repair information that would allow them to compare frequency of repair for units they sold against frequency of repair for authorized units, apparently because they do not maintain such records. In the absence of such records relating to units Defendants have sold, Defendants have nothing to compare against AFL's repair records to determine whether there is a material difference reflected in repair frequency.

2318703.2

### B. AFL Does Not Have Control of the Source Code.

Defendants' argument that AFL is obligated to produce documents in the possession of Fujikura is incorrect. Defendants cite to cases from the Second and Third Circuits, but notably ignore the controlling authority from the Ninth Circuit. Under that authority, it is clear that Defendants are not entitled to an order compelling production of Fujikura documents that are not in AFL's possession.

The main cases dealing with the issue in the Ninth Circuit are *United States v. International Union of Petroleum & Industrial Workers, AFL-CIO*, 870 F.2d 1450 (9th Cir. 1989) and *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999). In *International Union*, the court considered a request to compel the international union to produce documents in the possession of its affiliated union locals. Rejecting that request, the court held: "Control is defined as the legal right to obtain documents upon demand," and concluded that the requesting party had failed to show that the international had such a legal right. 870 F.2d at 1452. In reaching that conclusion, the court held:

> Control must be firmly placed in reality, [citation omitted], not in an esoteric concept such as "inherent relationship." We do not look to whether the International theoretically controlled the local; rather, we inquire whether actual control existed.

*Id.* at 1453-54. Further, the court held that "[t]he party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." *Id.* at 1452.

The court in *In re Citric Acid Litig.*, 191 F.3d 1090, upheld the district court's denial of motion to require Coopers & Lybrand LLP to turn over documents in the possession of Societe Fiduciare Suisse Coopers & Lybrand, following the holding in *International Union*. In doing so, it rejected the appellant's argument that it should "define 'control' in a manner that focuses on the party's practical ability to obtain the requested documents . . . ." *Id.* at 1107.

2318703.2



Later district court decisions in the Ninth Circuit have followed *International Union* and *In re Citric Acid* and their progeny. For example, in *Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften v. MDL Info. Sys.*, 2006 U.S. Dist. LEXIS 98747 (N.D. Cal. 2006), the court denied a motion to compel a party corporation to produce documents in possession of a non-party sister corporation. In so doing, it followed *Micron Technology, Inc. v. Tessera, Inc.*, 2006 U.S. Dist. LEXIS 42072, 2006 WL 1646133, at *1 (N.D. Cal. June 14, 2006), which it described in part as follows:

> [T]he court [in *Micron*] followed *Citric Acid* in refusing to compel party SPIL to produce documents under the control of non-party SUI. The court did so even though "SUI is 100% owned by SPIL, . . . SUI would in the ordinary course of business have access to the documents," "SPIL created SUI to engage as SPIL's sales agent in North America," and "SUI and SPIL have overlapping management teams." 2006 U.S. Dist. LEXIS 42072, [WL] at *2. Despite this evidence of agency, the court found that "SUI and SPIL are separate legal entities. There is no evidence of any contract between the two companies that gives SUI the right to demand documents from SPIL." *Id.*

2006 U.S. Dist. LEXIS 98747 at *6-7.

In *Ehrlich v. BMW of N. Am., LLC*, 2011 U.S. Dist. LEXIS 90215 (C.D. Cal. 2011), the court refused to order a domestic subsidiary to produce documents in the foreign parent's possession under circumstances similar to those here. In that case, BMW NA was owned by a company that was owned by BMW AG, which had the documents. The court held: "[n]othing about this relationship suggests that BMW NA has the power to order BMW AG to turn over documents to BMW NA. Nor has Plaintiff presented any evidence that BMW AG is under a contractual obligation to turn over documents requested by BMW NA." *Id.* at *2.

Moreover, the court in *Ehrlich* rejected the argument made by Defendants here that the domestic subsidiary had the practical ability to obtain the documents:

> Plaintiff argues, it seems, that, based on the inherent relationship between the two companies, BMW NA must have access to these documents. This theory has been rejected by the Ninth Circuit and is rejected here. *See In re Citric Acid Litig.*, 191 F.3d at 1107-08 (rejecting the practical-ability-to-

2318703.2



       obtain-documents test); *U.S. v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d at 1453-54 ("Control must be firmly placed in reality, not in an esoteric concept such as 'inherent relationship.'" (internal citation omitted)).

Id. at *2-3.

      Defendants have not carried their burden under the applicable law to show that AFL has the legal right to obtain documents from Fujikura upon demand.  Although they have been provided the Reseller Agreement between AFL and Fujikura and have questioned multiple AFL witnesses about it, they point to nothing that gives AFL such a right – because there is nothing.  Accordingly, even if the Court were inclined to grant any portion of Defendants' Motion, it should deny the motion to compel AFL to produce documents that are not in AFL's possession but are in the possession of Fujikura.

    **C.**    **Conclusion**

      Production of the documents Defendants seek would cause significant harm to AFL because they would allow Defendants access to documents that they have long desired for business purposes.  In short, the documents would assist Defendants in their attempt to compete with AFL in that they would help Defendants to repair Fujikura splicers and, in the case of the source code, would threaten to greatly increase gray market activity in violation of AFL's rights.  Defendants' rationales for why they need the documents for use in the litigation do not hold up to scrutiny.  Further, in the case of the source code, AFL does not have "possession or control" of the documents and therefore cannot properly be compelled to provide them.

      Should the Court be inclined to require production of any of the documents that are the subject of Defendants' Motion, AFL requests that any such production be conditioned upon entry of a protective order allowing AFL to designate documents as "Attorneys' Eyes Only" so as to prohibit Defendants themselves from obtaining access to the confidential documents.

2318703.2

1   RESPECTFULLY SUBMITTED this 29th day of June, 2012.

**STITES & HARBISON PLLC**

By   /s/ John W. Scruton
    Joel T. Beres
    John W. Scruton

**LEWIS AND ROCA LLP**
Sean D. Garrison
Shane E. Olafson
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that on June 29, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/EF registrants:

Geoffrey S. Kercsmar
gsk@kflawaz.com
Gregory B. Collins
gbc@kflawaz.com
Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suit 320
Scottsdale, Arizona  85250

Daniel J. Noblitt
dnoblitt@ngtechlaw.com
The Noblitt Group PLLC
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251

Attorneys for Defendants

/s/ John W. Scruton

14173N:101210:887753:1:LOUISVILLE