Geoffrey S. Kercsmar (#020528)
Gregory B. Collins (#023158)
Jenessa G. B. Coccaro (#027090)
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
Telephone: (480) 421-1001
Facsimile:  (480) 421-1002
gsk@kflawaz.com
gbc@kflawaz.com
jbc@kflawaz.com

Daniel J. Noblitt (#015221)
THE NOBLITT GROUP PLLC
8800 North Gainey Center Drive, Suite 279
Scottsdale, Arizona 85258
Telephone: (480) 994-9888
dnoblitt@ngtechlaw.com

Co-counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AFL Telecommunications, LLC,<br><br>                        Plaintiff,<br><br>    v.<br><br>SurplusEQ.com, Inc., Tech Sales, LLC, and Daniel Parsons and Jane Doe Parsons,<br><br>                        Defendants. | Case No. 2:11-cv-01086-DGC<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Kercsmar & Feltus PLLC
6263 N. Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Defendants SurplusEQ.com Inc., Tech Sales LLC,[1] Daniel Parsons and Lisa Parsons (collectively, "Defendants") move for summary judgment on AFL Telecommunications LLC's ("AFL's") claims. This motion is supported by the separately filed Plaintiff's Statement of Facts ("SOF") and the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     SUMMARY OF ARGUMENT

Fujikura Ltd. ("Fujikura") is a Japanese conglomerate that sells fusion splicers[2] through its subsidiaries located around the world. Each of Fujikura's subsidiaries sell the exact same fusion splicers loaded with the exact same software and labeled with the exact same trademarks. Although there is no difference between a Fujikura fusion splicer sold in China and one sold in the United States, Fujikura's U.S. subsidiary, Plaintiff AFL sells Fujikura fusion splicers for almost twice the price of Fujikura's Chinese subsidiary. This two-tiered pricing structure has created opportunities for companies, like SurplusEQ, to purchase genuine Fujikura fusion splicers abroad and resell them in the United States, resulting in a substantial savings to SurplusEQ's U.S. customers. Critically, every fusion splicer that SurplusEQ sells was manufactured by Fujikura and originally sold by Fujikura; **every single fusion splicer SurplusEQ sells is a splicer that Fujikura sold.**

In order to combat the resale market for fusion splicers in the United States, AFL and Fujikura considered a number of options. Among these options, AFL and Fujikura considered reducing the price that AFL sells splicers for in the United States. This idea was rejected. Instead, in order to preserve AFL's profit margins, AFL determined that it could enforce Fujikura's two-tiered pricing scheme through lawsuits like this one. Because this pricing scheme is not patented or otherwise protectable, AFL has asserted

---

[1] Tech Sales is a company solely owned by Daniel Parsons that never developed. Any conduct related to Tech Sales is attributable to SurplusEQ.com. (Defendants' Statement of Facts ("SOF") ¶ 1.)

[2] A fusion splicer is an electronic device that connects and fuses two pieces of fiber optic cable.

1  that SurplusEQ's resale of genuine Fujikura fusion splicers infringes upon Fujikura's

2  trademark, infringes upon Fujikura's copyright, and results in false advertising under the

3  Lanham Act. With discovery now complete, the facts simply do not support AFL's

4  attempt to bar the resale of genuine Fujikura fusion splicers. Summary judgment should

5  be entered on all of AFL's claims.

6      **AFL'S UNFAIR COMPETITION CLAIM**: AFL's unfair competition claim is

7  barred by the first-sale doctrine: "the right of a producer to control distribution of its

8  trademarked product does not extend beyond the first sale of the product." *Sebastian*

9  *Int'l, Inc. v. Longs Drug Stores, Corp*., 53 F.3d 1073, 1074 (9th Cir. 1995). Here,

10 Fujikura made the first sale of this product and its wholly owned subsidiary cannot object

11 to a downstream sale. While an exception has been noted for gray-market sales, gray-

12 market sales are only actionable if the plaintiff can show that there are undisclosed

13 "material differences" between plaintiff's goods and the gray-market goods that create a

14 likelihood of consumer confusion. Here, there is no evidence that SurplusEQ sold any

15 Fujikura fusion splicer with an undisclosed material modification. AFL has only

16 identified one Fujikura fusion splicer with any modification at all, the Entergy Splicer.

17 But, for many separate and distinct reasons, the Entergy Splicer is not actionable.[3]

18 Further, from this one sale, AFL is not entitled to assume that all of SurplusEQ's sales

19 involved modified fusion splicers. Additionally, there is a complete lack of evidence in

20 the record regarding consumer expectations; AFL cannot establish that any customer was

21 deceived or confused in any way by SurplusEQ. Accordingly, as explained below,

22 summary judgment is appropriate on AFL's unfair competition claim.

23     **AFL'S FALSE ADVERTISING CLAIM**: Summary judgment is also

24 appropriate on AFL's false advertising claim. AFL's false advertising claim arises from a

25

---

26 [3] First, there is no evidence the Entergy splicer was modified at the time it was sold.
Second, the Entergy splicer was sold prior to AFL obtaining any right in Fujikura's
27 trademark. Third, the only identified changes to the splicer are cosmetic and not material.
Fourth, there is no evidence that these cosmetic changes were not fully disclosed.
28

1    series of blog posts, eBay advertisements, and SurplusEQ invoices. But AFL has

2    completely failed to identify any customer that viewed any of the advertisements it

3    asserts give rise to this claim. Further, there is no evidence that any of these

4    advertisements were sufficiently disseminated. Moreover, all of the advertisements are

5    literally true. There is simply no factual basis for AFL's Lanham Act claims.

6         **AFL'S COPYRIGHT INFRINGEMENT CLAIM**: AFL's copyright

7    infringement claim is similarly unsupported by the factual record. AFL has never

8    disclosed what copyrighted subject matter SurplusEQ has infringed. No AFL witness is

9    competent to testify regarding the allegedly copyrighted software installed or used on any

10   fusion splicer that SurplusEQ sold and no AFL witness has compared the software on any

11   fusion splicer sold by SurplusEQ to Fujikura's allegedly copyrighted software. There is a

12   complete lack of proof on this claim. Moreover, to the extent AFL possess any copyright,

13   that copyright does not allow it to bar the importation of the non-copyrighted fusion

14   splicer. AFL's effort to monopolize the sale of fusion splicers through it copyright is text-

15   book copyright misuse. This Court should not sanction the perversion of the law that

16   AFL endorses here. Indeed, in the seminal gray-market copyright infringement case,

17   *Omega S.A. v. Costco Wholesale Corporation*, after the Ninth Circuit held that the first-

18   sale doctrine does not apply to gray-market goods, the Court found that the plaintiff's

19   efforts to prevent the resale of genuine watches as a result of the inclusion on the watch

20   of a copyrighted symbol constituted copyright misuse.[4] For these reasons, summary

21   judgment is appropriate on AFL's copyright infringement claim.

22        **LACHES:** Summary Judgment is also appropriate here because AFL's claims are

23   barred by laches. AFL has been aware of SurplusEQ's sale of Fujikura fusion splicers

24   since at least 2003. Prior to filing this lawsuit in June 2011, AFL never once objected. As

25   a matter of law, laches applies here.

26

27   _____

28   [4] *Omega S.A. v. Costco Wholesale Corporation,* 2011 WL 8492716 (C.D. Cal Nov. 9, 2011).

**AFL'S DAMAGES**: Summary judgment is also appropriate on many of AFL's damages theories. First, AFL's entire damages theory is speculative. AFL simply assumes that it would have made every single sale that SurplusEQ made here, despite that SurplusEQ sold its products at a substantial discount over AFL and despite that there are several competitors in the market. This is not an assumption that AFL is permitted to make, and AFL's entire damages theory is flawed. Furthermore, the only arguably protected information on the fusion splicers SurplusEQ sold is Fujikura's copyrighted software and Fujikura's trademark. It is improper for AFL to assume that the entire value of every sale SurplusEQ made was directly related to either Fujikura's copyright or trademark.

Second, AFL has wholly failed to break its damages down by claim and refused to disclose any of the underlying documents that support its damages claim. The Court cannot allow AFL to present damages evidence to the jury where it refused to provide the basis for those damages to Defendants. Third, every sale that SurplusEQ made is a sale that AFL's parent company also made. AFL has steadfastly refused to produce any information related to its parent company's sales or costs structure. Instead, AFL has ignored that Fujikura has already made a profit on SurplusEQ's sales. Consequently, without producing information related to Fujikura's profits, cost structure and accounting for this information in their damages opinion, AFL's damages opinion is speculative. Further, AFL cannot seek damages for SurplusEQ's sales that occurred prior to AFL obtaining an exclusive right in Fujikura's intellectual property, and AFL also lacks standing to challenge any sale SurplusEQ made outside the United States; these are not sales that AFL would have made.

*__DAUBERT__*: Finally, AFL's damages opinion is riddled with math errors and based on incorrect data. AFL's disclosed damages witness, its own Chief Financial Officer, cannot testify to numbers that have no connection with the underlying claims.

In sum, as fully set forth below, summary judgment is appropriate on all of AFL's claims and most of AFL's damages theories. AFL cannot preserve Fujikura's two-tiered

pricing structure by arguing that structure is protected by trademark and copyright laws; it is not.

## II.  FACTUAL BACKGROUND[5]

### A.  AFL Brought This Litigation As Part of its Campaign to Stop Competitors from Selling Gray-market Fujikura Fusion Splicers.

AFL has sued Defendants to stifle competition and maintain an artificially high pricing scheme for Fujikura fusion splicers in the United States. Fujikura, Ltd. is a multi-national, Japanese electronics conglomerate that manufacturers fusion splicers. (SOF ¶ 2.) Fujikura fusion splicers are manufactured exclusively at Fujikura's facility in Japan. (SOF ¶ 3.) Fujikura maintains wholly-owned subsidiaries in every region of the world, which Fujikura uses to control pricing and distribution in each global region so as to maximize Fujikura's profits. (SOF ¶ 4.) AFL is Fujikura's wholly-owned subsidiary in North America. (SOF ¶ 5.) Since 2003, AFL has been Fujikura's exclusive distributor of fusion splicers in North America. (SOF ¶ 6.) In the United States, AFL and its network of authorized distributors sell Fujikura fusion splicers at approximately double the price of what Fujikura sells the same products for in Asia. (SOF ¶ 8.)

In approximately 2005, companies in the United States began selling gray-market Fujikura fusion splicers.[6] (SOF ¶ 9.) These American resellers were able to undercut AFL's prices. (SOF ¶ 10.) AFL asked Fujikura to help devise a strategy for eliminating gray-market competition. (SOF ¶ 11.)

In 2009, Fujikura and AFL worked together to create a 21-point strategic plan for stopping gray-market sales. (SOF ¶ 12.) This strategy included such steps as "tak[ing]

---

[5] For brevity, only the general background of this dispute is set forth here in the factual background section of the brief. The entire relevant factual background is set forth in the separately-filled Statement of Facts and where appropriate discussed in the Argument section below.

[6] A "gray-market" product in this case is a good made by a foreign manufacturer and legitimately sold abroad under a trademark or copyright, which is then legally imported into the United State without the manufacturer's consent. *K Mart v. Cartier, Inc.*, 486 U.S. 281, 285 (1998).

legal action against the USA based sellers;" "mak[ing] the S/W/ registration process stronger on a country by country basis such that it is illegal to export out of each country;" "utilize[ing] some technology that can follow wherever the units are in the world;" "chang[ing] the secret menu process, so resellers can't upgrade S/W on their own;" and "reverse sting operation[s]." (SOF ¶ 12.) In the end, Fujikura determined that it would obtain registered copyrights and license its intellectual property rights to AFL in order for AFL to bring suit against companies that sold gray-market fusion splicers. (SOF ¶ 13.) This lawsuit is part of Fujikura's and AFL's plan.

### B.    Relevant Agreements Between Fujikura and AFL.

On March 28, 2003, Fujikura and Alcoa Fujikura Ltd. (which previously owned 51% of AFL)[7] entered into a Reseller Agreement. (SOF ¶ 30.) The Reseller Agreement made AFL an exclusive distributor of Fujikura products in North America. (SOF ¶ 31.) The Reseller Agreement prohibits AFL from registering any of Fujikura's marks without Fujikura's prior written consent. (SOF ¶ 34.) The Reseller Agreement also does not give AFL any rights or interest in Fujikura's trademarks, including any right to sue to enforce Fujikura's trademarks and copyrights. (SOF ¶¶ 33, 35.)

For the express purpose of filing this lawsuit, on February 17, 2011, AFL and Fujikura entered into an exclusive copyright license. (SOF ¶¶ 13, 38.) AFL has acknowledged that "it sought, and Fujikura agreed to, an exclusive copyright license to enable AFL's efforts to enforce rights to the copyrights in the Fujikura software, including bringing lawsuits such as this." (SOF ¶ 40.) The Copyright License Agreement grants AFL an exclusive license to distribute "past, current and future versions of the software that supports Fujikura fusion splicer models FSM-60, FSM-60R, FSM-18S, and/or FSM-18R (the 'Work')" in North America, to register such rights with the U.S. Copyright Office in AFL's name, and assign to AFL "all claims for infringement of the

---

[7] Alcoa's relationship with AFL ended on March 31, 2005, and AFL thereafter became Fujikura's exclusive distributor in North America. (SOF ¶ 30 n.2.) Alcoa is hereinafter referred to as "AFL."

1   right of distribution of the Work, including any version of the Work, in the U.S. that may

2   exist as of the date of this license." (SOF ¶ 41.)

3        On March 14, 2011, AFL and Fujikura also entered into an exclusive trademark

4   license. (SOF ¶ 42.) The Trademark License gives AFL the exclusive right in North

5   America to purchase and distribute "optical fiber splicers and parts for such goods

6   bearing the Fujikura mark (the 'Product')" and to use the Fujikura Trademark in

7   connection with the Product, including advertising, promotional and sales material for the

8   Product. (SOF ¶ 43.) It does not give AFL any ownership rights in Fujikura's trademarks.

9   (SOF ¶ 44.) Unlike the Reseller Agreement, the Trademark License gives AFL:

10       the right to take action to redress and/or present such infringement,
         including bringing a lawsuit seeking injunctive and/or monetary relief, and

11       shall pay all expenses and retain all proceeds, including any monetary
         award or settlement proceeds, in connection with any such action.

12

13   (SOF ¶ 46.) Nothing in the license provides AFL any retroactive rights over acts of

14   infringement that occurred prior to the date of signing. (SOF ¶ 47.) The license also does

15   "not extend to the use of the Fujikura Trademark in any place other than North America."

16   (SOF ¶ 45.)

17       **C.    Fusion Splicers Sold by AFL and SurplusEQ.**

18       A Fujikura fusion splicer is made up of two components, hardware and software.

19   (*See* SOF ¶ 56.) The fusion splicer does not operate without the software, the software is

20   not sold separately from the hardware, and no other company in the world sells software

21   that can replace Fujikura's software. (*Id.*) Fujikura manufactures a variety of models of

22   fusion splicers, including the FSM-60S, FSM-60R, FSM-50S, FSM-50R, FSM-18S and

23   FSM-18R models that are at issue in this case. The FSM-18 and FSM-60 series first

24   entered the U.S. market in approximately April 2008, and are still in production today.

25   (SOF ¶ 58.)

26       **D.    SurplusEQ's Sales of Fusion Splicers.**

27       Defendants run a Phoenix-based company called SurplusEQ, which sells fusion

28   splicers and optics testing equipment needed to install fiber optic communications.

7

SurplusEQ sells several brands of fusion splicers, including Fujikura. (SOF ¶ 15.) Prior to 2005, all of Defendants' sales were surplus, used or refurbished splicers purchased from non-AFL sources in the United States. (SOF ¶ 21.) Responding to consumer demand, in about 2005, SurplusEQ began buying genuine Fujikura fusion splicers from distribution channels in Asia and resold them domestically through websites, on eBay, and by phone. (SOF ¶ 22.) Defendants generally purchased gray-market splicers from three foreign suppliers in China and Hong Kong.[8] (SOF ¶ 24.) SurplusEQ also continued to sell used and refurbished splicers, which it purchased mainly from auctions, liquidators and other third parties in the United States. (SOF ¶ 26.) SurplusEQ sold its products directly to consumers, who were primarily small businesses. (SOF ¶ 27.)

In late October 2011, SurplusEQ stopped selling gray-market Fujikura fusion splicers. (SOF ¶ 28.) It still sells other brands of fusion splicers and used Fujikura fusion splicers. (SOF ¶ 29.)

**E.    AFL Has Only Identified One Gray-Market Splicer that SurplusEQ Sold.**

The only gray-market fusion splicer AFL has identified in this lawsuit as having been sold by SurplusEQ is a FSM-60S fusion splicer that was purchased by Entergy Mississippi, Inc. ("the Entergy splicer" or "818 splicer"). (SOF ¶ 61.) Entergy purchased the 818 splicer from SurplusEQ in August 2009. (SOF ¶ 63.) AFL has admitted that in August 2009, it did not have a trademark or copyright license in Fujikura fusion splicers. (SOF ¶ 64.) Nonetheless, AFL claims that this splicer was modified prior to sale, and that it is entitled to recover for unfair competition because SurplusEQ sold this splicer to Entergy.

Yet even AFL's Rule 30(b)(6) designee, Vice President of Sales, Stephen Althoff, admitted that despite its investigation, AFL did not know who made the alleged modifications to the Entergy splicer. (SOF ¶ 77.) Another Rule 30(b)(6) representative,

---

[8] For a while, one of these companies held itself out as an authorized distributor, and SurplusEQ only later discovered that it was not. (SOF ¶ 24 n. 1.)

the Manager of AFL's Repair Department, Greg Pickeral, could not say whether the Entergy unit was working when it was delivered to AFL, or what the extent of the problem was caused Entergy to contact AFL. (SOF ¶ 78.) AFL has not conducted any performance tests on the Entergy splicer to determine whether any of the alleged modifications affected performance of the splicer in any way. (SOF ¶ 81.) AFL's Senior Engineer, Douglas Duke, operated the Entergy splicer. (SOF ¶ 173.) He did not notice any issue with how the splicer performed. (SOF ¶ 172.) AFL also never performed a comparative analysis between the Entergy splicer and any other splicers that AFL sold. (SOF ¶ 82.) Moreover, the only Entergy employee AFL disclosed, Douglas Winters, does not have any personal knowledge regarding the Entergy splicer. (SOF ¶¶ 66-72, 74-75, 85-91.)

### F.   SurplusEQ Does Not Sell Modified Splicers.

There is no evidence that the hardware or software on any gray-market fusion splicer SurplusEQ sold was modified prior to sale. SurplusEQ's technician, Walter Rieble, testified that he never modified a fusion splicer. (SOF ¶ 95.) Daniel Parsons, SurplusEQ's founder has also never personally modified any splicers, and does not know anyone else who did. (SOF ¶¶ 96-98.) SurplusEQ's employees have also consistently testified that they were not aware of ever having purchased or sold Fujikura splicers that were modified by someone else. (SOF ¶ 100.)

SurplusEQ consistently told their suppliers not to sell modified Fujikura splicers to SurplusEQ. (SOF ¶ 106.) After the lawsuit was filed, SurplusEQ contacted its foreign suppliers to find out how they could guarantee that they were not selling SurplusEQ modified Fujikura fusion splicers . (SOF ¶ 108.) The suppliers all swore that none of their units was modified. (SOF ¶ 109.) And indeed, when asked to disclose factual support for AFL's theory that Defendants knowingly sold modified splicers, AFL stated only that "[g]iven SurplusEQ's claimed expertise and its experience in the fusion splicer business, SurplusEQ must have known that the splicers it sells have been altered for resale." (SOF ¶ 101.)

1

### G.    AFL Lacks Evidence of any Material Difference Between SurplusEQ's Splicers and its Own.

2

Fujikura employees have admitted that there is no difference in hardware between

3

the splicers sold in China and the United States. (SOF ¶ 110.) AFL also admitted during

4

depositions that merely having a different country's software on the splicer does not

5

affect performance. (SOF ¶ 115.) The software for each model of fusion splicer is the

6

same no matter where it is sold in the world. (SOF ¶ 111.) Every fusion splicer has every

7

language available on it, and Fujikura simply engages a region lock at the factory to set

8

the language options that are available for a particular region of the world. (SOF ¶ 113.)

9

In around June 2006, Fujikura took English off the Chinese FSM-50S splicers, in part to

10

combat gray-market sales. (SOF ¶ 116.)

11

Further, AFL has not identified any material and undisclosed difference between

12

the splicers AFL sells and the splicers that SurplusEQ sells. Further, the undisputed

13

evidence is that Defendants disclosed all relevant information to customers regarding the

14

gray-market Fujikura fusion splicers they sold prior to purchase. Defendants disclosed to

15

customers that SurplusEQ was not an authorized distributor, that SurplusEQ only sold

16

non-AFL units, that the units were gray-market, and that they were not licensed for use in

17

the United States. (SOF ¶ 139.) Defendants also disclosed that AFL would not repair or

18

warranty the splicers Defendants offered, that the warranty they received was from

19

SurplusEQ, and that they would need to be sent back to SurplusEQ's foreign supplier for

20

all warranty repairs. (SOF ¶ 140.) Defendants also informed customers that they could

21

not upgrade the software on the splicers they sold. (SOF ¶ 141.)

22

SurplusEQ communicated this information to customers on their websites, on

23

eBay, when they purchased items by phone, on invoices, and in SurplusEQ's sales

24

conditions. (SOF ¶ 142.) SurplusEQ's former office manager, Ann Marie Bakker,

25

testified that most customers had already seen SurplusEQ's website before they called in

26

and knew that SurplusEQ was not an AFL-authorized distributor, and that the splicers

27

could not be serviced by AFL. (SOF ¶ 143.) SurplusEQ's sales team told customers that

28

that was part of the reason its prices were lower than AFL's prices. (SOF ¶ 145.)

During depositions, AFL could not identify any customers who contacted AFL assuming that SurplusEQ was affiliated with AFL. (SOF ¶ 146.) SurplusEQ never received any complaints from customers that the warranty or service was not available through AFL or Fujikura. (SOF ¶ 147.) Even AFL acknowledged that some customers who purchased modified gray-market splicers admitted that they knew they were buying a "modified" splicer when they bought it. (SOF ¶ 150.)

**H.   AFL Has Not Performed Any Customer Surveys to Support Its Claims.**

AFL has not conducted a consumer survey on expectations related to gray-market fusion splicers, whether there is any consumer confusion between Defendants' splicers and AFL's splicers, or on SurplusEQ's blog and advertisements. (SOF ¶¶ 160-161, 163-169.) *In fact, AFL has not conducted a consumer survey on anything in this litigation.* (SOF ¶ 159.) AFL has not even contacted any of its customers to ask them for information about the gray-market and their perceptions about it. (SOF ¶ 162.)

**I.   Based on These Facts, AFL Asserts it is Entitled to Recover Every Penny of SurplusEQ's Profit and Recover for its Own Hypothetical Lost Sales.**

AFL has offered its own Chief Financial Officer, Robert Crowder, as its expert witness to testify regarding its damages. (SOF ¶ 187.) Mr. Crowder's analysis is attached as Exhibit 13 to the SOF. This damage assessment is nothing more than a spread sheet listing all of SurplusEQ's sales of fusion splicers since 2005. (SOF ¶ 188.) Mr. Crowder then estimates SurplusEQ's profits on these sales, including in this number all sales that SurplusEQ has made of any splicer since 2005 (even sales to customers outside the United States). (*Id.*) According to Mr. Crowder's estimate, SurplusEQ has profited $2,221,310.20 on its sale of fusion splicers. (SOF ¶ 188.) He also estimates the amount that AFL would have earned on each of these sales had AFL made each of the sales instead of SurplusEQ at over $3,000,000. (SOF ¶ 191.) In this analysis, Mr. Crowder assumed that AFL would not have incurred any additional expenses in making the over 500 sales he assumes AFL would have made. (SOF ¶¶ 197-98.) Without any causative

11

1    support in the record, Mr. Crowder concludes that AFL would have made each and every

2    sale that AFL made over a five-year period. (SOF ¶ 193.)

3

4    **III.    THE SUMMARY JUDGMENT STANDARD**

5            Summary judgment is appropriate if the evidence, viewed in the light most

6    favorable to the nonmoving party, shows that there is no genuine issue as to any material

7    fact and that the movant is entitled to judgment as a matter of law. "Material" means that

8    the fact, under governing substantive law, could affect the outcome of the case. *Anderson*

9    *v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735

10   (9th Cir. 1997). For a dispute to be "genuine," a reasonable jury must be able to return a

11   verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The initial burden of

12   establishing the absence of a genuine issue of material fact falls on the moving party.

13   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can carry this burden in

14   two ways: (1) by presenting evidence that negates an essential element of the nonmoving

15   party's case, or (2) by demonstrating that the nonmoving party "failed to make a

16   sufficient showing on an essential element of her case with respect to which she has the

17   burden of proof." *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not

18   preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

19   *Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). The accompanying Statement of Facts and

20   supporting evidence establish the absence of genuine issues of material fact; the burden

21   now shifts to AFL to set forth facts showing that a genuine issue of disputed fact remains.

22   *Celotex*, 477 U.S. at 324.

23   **IV.    ARGUMENT**

24       **A.    The Court Should Grant Summary Judgment On AFL's Unfair Competition Claim.**

25   If [a foreign parent corporation] chooses to sell abroad at lower prices than those it
     could obtain for the identical product [in the United States], that is its business. In
26   doing so, however, it cannot look to United States trademark law to insulate the
     [United States] market or to vitiate the effects of international trade. This country's
27   trademark law does not offer [the plaintiff's parent corporation] a vehicle for
     establishing a worldwide discriminatory pricing scheme simply through the
28   expedient of setting up [a United States'] subsidiary with nominal title to its mark.

*NEC Electronics v. Cal Circuit Abco,* 810 F.2d 1506, 1510 (9th Cir. 1987) (holding that a gray-market reseller did not commit trademark infringement by selling genuine goods.) As fully explained below, just like the gray-market reseller in *NEC*, SurplusEQ is permitted to resell genuine goods it obtains abroad in the United States. AFL's unfair competition claim is unsupported by the factual record.[9]

### 1. *The First Sale Doctrine Bars AFL's Claim.*

The Court should grant summary judgment based on the first sale doctrine alone. Under this doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian Int'l, Inc. v. Longs Drug Stores, Corp.*, 53 F.3d 1073, 1074 (9th Cir.) *cert. denied*, 516 U.S. 914 (1995). "[A] trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain control over who buys, sells and uses the product in its authorized form." *Iberia Foods Corp., v. Romeo*, 150 F.3d 298, 301 n. 4 (3d Cir. 1998) (citing *Sebastian Int'l, Inc.*, 53 F.3d at 1076.

This doctrine applies equally to products purchased through domestic and foreign

---

[9] AFL's "unfair competition claim" includes Count I of AFL's Amended Complaint, titled "Federal Unfair Competition, False Description, False Designation of Origin (15 U.S.C. § 1125(a)", and Count III of and Count III of AFL's Amended Complaint, titled "Common Law Unfair Competition." On September 14, 2011, the Court dismissed AFL's common law unfair competition claim because AFL failed to explain what theory of unfair competition it was asserting. (Dkt.#32 at 3:22-26.) In amending its Complaint, AFL did not resolve this fatal issue. (Dkt.#55 at ¶¶ 70-72.) Moreover, "[i]n the Ninth Circuit, claims of unfair competition and false advertising under state statutory and common law are 'substantially congruent' to claims made under the Lanham Act." *Walker & Zanger*, 549 F. Supp. 2d at 1182 (citing *Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994)); *see also Rice*, 330 F.3d at 1182 (plaintiff conceded that state law unfair competition claim under California law was "dependent" on Lanham Act false advertising claim and they would "rise and fall together"); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1186 (C.D. Cal. 2003) ("The Ninth Circuit has consistently held that state law unfair competition claims are 'congruent' with Lanham Act claims; Plaintiff's putative unfair competition claim would fail for the same reasons his Lanham Act claim fails.") Summary judgment on the state-law unfair competition claims, therefore, is proper for the same reasons explained herein as to AFL's Lanham Act claims.

1    intermediaries. *Summit Tech., Inc. v. Highway Med. Instruments, Inc.,* 922 F.Supp. 299,

2    309 (C.D. Cal. 1996). It is undisputed that the gray-market fusion splicers at issue were

3    sold by Fujikura to companies abroad, and that SurplusEQ then purchased these splicers

4    from a foreign intermediary. Under the first-sale doctrine, AFL's unfair competition

5    claim fails as a matter of law.

6                    **2.      *AFL Cannot Establish That Any Undisclosed Material Difference***

7                            ***Exists Between AFL's Splicers and SurplusEQ's Splicers*.**

8            The mere act of importing gray-market goods into the United States without the

9    trademark holder's consent does not constitute infringement. *American Circuit Breakers*

10   *Corp. v. Oregon Breakers, Inc.,* 406 F.3d 577, 584 (9th Cir. 2005); s*ee also Societe Des*

11   *Produits Nestle v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992). Gray-market

12   sales are only actionable under the Lanham Act if plaintiff can show that there are

13   "material differences" between plaintiff's goods and the gray-market goods that create a

14   likelihood of consumer confusion. *See id.*[10] A material difference is one that consumers

15   would likely consider relevant in deciding whether to purchase a product. *Societe*, 982

16   F.2d at 641.

17          If a plaintiff is able to demonstrate that such a difference exists, a presumption of

18   consumer confusion arises. *Id.*. Defendants, however, may rebut this presumption with

19   preponderant evidence that they explain to consumers the differences between the two

20   products, that consumers are indifferent to the product characteristics that are different, or

21   that the differences between the products are so minimal that consumers who purchase

22   the alleged infringers goods "get precisely what they believed that they were purchasing."

23   *See id.,* 982 F.2d at 644; *see also Weil Ceramics and Glass Inc. v. Dash*, 878 F.2d 659,

24   672 (3rd Cir. 1989). In such a situation, "consumers' perceptions of trademarked goods

25   _____

26   [10]  Under the Lanham Act, the standard for unfair competition based on trademark
     infringement is the same as the standard for trademark infringement. *See American*
27   *Circuit Breakers*, 406 F.3d at 584 (citing *New West Corp. v. NYM Co.,* 595 F.2d 1194,
     1201 (9th Cir.1979) ("Whether we call the violation infringement, unfair competition or
28   false designation of origin, the test is identical: is there a 'likelihood of confusion?'").)

1    are not likely to be affected by the alleged infringer's sales." *Iberia Foods Corp. v.*
2    *Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

3         AFL cannot meet this standard. AFL has no evidence to show that all or even
4    substantially all of Defendants' splicers were materially different. In fact, AFL has only
5    identified one gray-market fusion splicer Defendants sold that AFL alleges was modified,
6    and that splicer cannot support AFL's claim because AFL cannot establish that it was
7    modified **before** SurplusEQ sold it. (SOF ¶¶ 61-109.) On the other hand, the record is
8    unequivocal that Defendants fully disclosed the nature of its products to customers so that
9    they knew exactly what they were buying. (SOF ¶¶ 139-150.) Thus, as explained in detail
10   below, there is no genuine issue of material fact and Defendants are entitled to judgment
11   as a matter of law on AFL's unfair competition claim.[11]

12                    a.     **AFL may not maintain an infringement claim based on**
13                           **the Entergy unit alone.**

14         AFL's claim fails as a matter of law because it is based solely on the Entergy unit.
15   "A plaintiff in a gray-market case must establish that all or substantially all of its sales are
16   accompanied by the asserted material difference in order to show that its goods are
17   materially different." *SKF USA Inc. v. International Trade Commission*, 423 F.3d 1307,
18   1315 (Fed. Cir.), *rehearing en banc denied* (2005). "[I]f it cannot be said that
19   substantially all of a trademark owner's goods are accompanied by the asserted
20   characteristic, then it may properly be concluded that, in effect, there exists no material
21   difference between the trademark owner's goods and the allegedly infringing goods." *Id.*
22   To permit a trademark owner to recover when less than substantially all of the allegedly
23   infringing products are materially different would "allow the owner itself to contribute to

24   _____

25   [11] AFL's disclosed damage analysis does not seek to recover for any of SurplusEQ's sales
26   of used fusion splicers. (SOF ¶ 189.). Sales of used goods cannot possibly infringe AFL's
     trademark rights; the material differences test does not extend to used or refurbished
27   goods unless there is deception as to their origin or condition as used or repaired. 74
     AMJUR. 2D *Trademark* 90 (citing *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67
28   S. Ct. 1136, 91 L. Ed. 1386 (1947)).

1   the confusion by customers that it accuses gray-market importers of creating." *Id*. Thus,

2   trademark law "permits a small amount of nonconforming goods." *Id*. at 1316.

3       AFL cannot show that material differences exist in all or substantially all of the

4   products Defendants sold. In fact, AFL has only identified one unit that it claims was

5   modified. AFL's technical expert, Douglas Duke only analyzed one splicer, the Entergy

6   unit, in his report. (SOF ¶¶ 62.) In his deposition, AFL's Rule 30(b)(6) witness, and

7   Manager of AFL's Repair Department, Greg Pickeral could only identify one unit that

8   had been modified. (SOF ¶ 61.) And AFL's discovery responses only disclose one fusion

9   splicer that AFL claims Defendants modified. (*Id*.) Since AFL's entire claim is based

10  only on this one unit, AFL's unfair competition claim must be dismissed as a matter of

11  law.

12      Moreover, even if AFL could establish a claim based on one unit, AFL's claim

13  still fails because AFL cannot establish that the Entergy splicer was modified before

14  Defendants sold it to Entergy. To establish infringement, AFL must show that the

15  products Defendants sold were materially different from AFL's products *at the time they*

16  *were sold*. *See Societe*, 982 F.2d at 641. This is because there is no infringement when a

17  "genuine," gray-market product is sold. *American Circuit Breakers*, 406 F.3d at 585.

18  Here, there is no evidence in the record that the Entergy splicer was already modified

19  *when* SurplusEQ sold it to Entergy. To the contrary, AFL's Rule 30(b)(6) designee,

20  Stephen Althoff, admitted that despite its investigation, AFL did not know who made the

21  alleged modifications to the Entergy splicer. (SOF ¶ 77.) Another Rule 30(b)(6) witness,

22  Pickeral could not say whether the Entergy unit was working when it was delivered to

23  AFL, or what the extent of the problem was that caused Entergy to contact AFL. (SOF ¶

24  78.)

25      In addition, the only Entergy witness AFL disclosed is Douglas Winters. Winters

26  does not have any personal knowledge of the Entergy splicer. Winters testified that he

27  had never seen the 818 splicer, and could not say whether it had been modified before or

28  while it was at Entergy. (SOF ¶¶ 68, 85-88.) Winters did not personally verify whether

the Entergy splicer worked when it arrived, but others at Entergy had told him it worked. (SOF ¶ 89.) Winters did not know whether anyone at Entergy opened the Entergy splicer, or whether any Entergy personnel modified the 818 splicer. (SOF ¶ 91.) Winters did not know how long the splicer worked for, and did not remember what the issue was that caused Entergy to send the splicer in for repair. (SOF ¶ 90.) He also testified that he was not aware of any of the alleged modifications before he was questioned about them in the deposition, and did not know whether anyone else at Entergy was aware of them. (SOF ¶¶ 85-88.) Without any evidence suggesting that SurplusEQ sold a materially different product, AFL's claim fails as a matter of law for this reason as well.

**b.      There is no evidence that defendants sold any other units that were modified prior to sale.**

Even though AFL has only disclosed one allegedly modified, gray-market splicer that Defendants' sold, AFL maintains its claim that every gray-market splicer Defendants sold infringed Fujikura's marks. From a single example (that AFL cannot prove was modified), AFL boldly asks the Court to extrapolate that all other splicers Defendants sold also contained physical and/or software modifications. (SOF ¶ 79.) This request flies in the face of the fundamental principle that plaintiff has the burden of proving its claims with admissible evidence. The uncontroverted evidence is that Defendants have never sold a modified splicer. SurplusEQ's employees uniformly testified that no one at SurplusEQ had ever modified a unit, or purchased or sold a splicer that was modified by someone else. (SOF ¶¶ 95-100, 102-109.) In fact, SurplusEQ employees inspected the units when they arrived, and testified that they had never even *received* a modified unit. (SOF ¶¶ 100, 102-103.) SurplusEQ's employees testified that they had never sold a gray-market splicer that did not perform as well as a new unit. (SOF ¶ 103.) Weems also testified that he did not recall ever having a customer call SurplusEQ and say that a new FSM-60S splicer was not working. (SOF ¶ 105.)

SurplusEQ consistently told its gray-market sellers not to sell modified Fujikura splicers to SurplusEQ. (SOF ¶ 106.) Parsons also emphasized to his employees that he

17

"absolutely did not want to sell" modified gray-market splicers. (SOF ¶ 107.) After the lawsuit was filed, both Rieble and Parsons contacted SurplusEQ's foreign suppliers to find out how they could guarantee that they were not selling SurplusEQ modified units. (SOF ¶ 108.) The suppliers all swore that none of their units were modified. (SOF ¶ 109.) AFL does not have any evidence to refute these facts. For this reason as well, the Court should grant summary judgment on AFL's unfair competition claim.

### c.   Any differences in the splicers SurplusEQ sold were not actionable.

Moreover, even if the Court were willing to infer from the Entergy splicer that other SurplusEQ splicers were modified, any differences in the splicers SurplusEQ sold were not actionable. AFL has offered evidence that the Entergy unit was altered by someone, but the evidence in the record shows that these changes were only cosmetic and did not affect performance in any way. (SOF ¶¶ 80-84.) Defendants' expert recently tested the Entergy unit for performance discrepancies, and concluded that the unit performed exactly as it should. (SOF ¶ 80.) AFL, on the other hand, has not conducted any performance testing of any gray-market machines, including the Entergy unit. (SOF ¶ 81-82.) AFL's expert tested the splicer and it performed splices. (SOF ¶ 172.) AFL speculated during depositions that the changes that were made to the Entergy unit could shorten the lifetime of the splicer, but could not quantify this guess, and has not offered any evidence since to suggest that the Entergy unit was any less reliable than any splicer AFL sold. (SOF ¶ 84.)

Besides physical or software modifications, there is also no evidence of any meaningful difference between splicers manufactured for China and the United States. Fujikura's engineers and AFL have admitted that there is no difference in hardware between Chinese and American Fujikura splicers. (SOF ¶ 110.) AFL has also admitted that the software for each model of fusion splicer is the same no matter where it is sold in the world. (SOF ¶ 111.) Each FSM-60S fusion splicer Fujikura produces contains every language Fujikura offers globally, and Fujikura simply engages a region lock at the

1 factory to set the language options that are available for a particular region of the world.[12]

2 (SOF ¶¶ 112-113.)

3   AFL also cannot demonstrate any meaningful difference between Defendants and

4 AFL's splicers based on warranty or service. The splicers Defendants sold came with

5 equivalent quality control testing, warranty and service to the units AFL purchased from

6 Fujikura. (SOF ¶¶ 119-121, 124-131.) Fujikura offered a 1-year warranty on fusion

7 splicers sold in both China and North America. (SOF ¶ 119.) Defendants also offered a 1-

8 year warranty on the splicers. (SOF ¶ 121.) The terms of the warranties were similar: if a

9 SurplusEQ customer had a problem with a splicer, it could return the splicer free of

10 charge to SurplusEQ, who would either repair the splicer in-house or return it to its China

11 supplier for service. (SOF ¶¶ 132-135.) Fujikura's warranty in North America was the

12 same: AFL would either repair the splicer itself, or send it back to Japan for repair.[13]

13 (SOF ¶¶ 137-138.)

14   The service AFL and SurplusEQ provided was also equivalent. Both AFL and

15 Defendants testified that they were only capable of performing basic repairs in-house.

16 (SOF ¶¶ 133, 137-138.) Anything complicated had to be sent overseas. (*Id.*) Both AFL

17 and SurplusEQ provided a loaner splicer while the unit was being repaired, and if the

18 splicer could not be repaired, both companies would provide a replacement unit. (SOF ¶¶

19 135-136, 138.) AFL has no evidence that the service customers actually received through

20 Defendants was any different from the service received through AFL. Thus, AFL's claim

21 fails on this ground too.

22

23 [12] In around June 2006, Fujikura actually took English off the Chinese FSM-50S splicers as part of its attempt to combat gray-market sales. (SOF ¶ 116.) Fujikura also added a

24 "splash screen" to the FSM-60S/R and FSM 18-S/R models that states what region the splicer is licensed for. (SOF ¶ 117.) Prior to that time, the splicers did not state that they

25 were only licensed for a particular country or region. (SOF ¶ 118.)

26 [13] Starting with the FSM60S/R models, AFL did offer an additional 1-year warranty on top of Fujikura's warranty, but it did not make the splicers AFL bought from Fujikura

27 any different than the Fujikura splicers Defendants sold. (SOF ¶ 122.) AFL attempted to change the trademark analysis by artificially adding its own warranty term, but this did

28 not make SurplusEQ's splicers different from Fujikura's splicers.

1

### 3. *AFL Also Cannot Show a Likelihood of Consumer Confusion Because SurplusEQ Disclosed Any Differences About the Splicers it Sold, and Customers Received Exactly What They Expected.*

2

3   AFL also cannot establish that any differences give rise to a likelihood of consumer

4   confusion because Defendants disclosed these differences and customers knew what they

5   were receiving. There is no likelihood of consumer confusion where (1) the alleged

6   infringer disclosed to consumers the differences between the two products prior to sale,

7   (2) where consumers are indifferent to differences that exist, or (3) where differences are

8   so minimal that the consumer's "perceptions of trademarked goods are not likely to be

9   affected by the alleged infringer's sales." *See Societe*, 982 F.2d at 644; *Iberia Foods,150*

10  F.3d at 302; *see e.g., Matrix Essentials, Inc. v. Emporium Drug Mart*, Inc., 988 F.2d 587,

11  591 (5th Cir.1993); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc*., 879

12  F.2d 1005, 1023 (2d Cir. 1989). The purpose of trademark law is "to prevent sellers from

13  confusing consumers about the origin or make of a product," *NEC Electronics,* 810 F.2d

14  at 1509; such confusion does not occur when consumers know what they are getting.

15  In order to maintain a claim for infringement based on gray-market sales, plaintiff

16  must show that there are material differences between plaintiff's goods and the gray-

17  market goods that create a likelihood of consumer confusion. *American Circuit Breakers*,

18  406 F.3d at 584 (citing *Societe Des Produits Nestle*, 982 F.2d at 640). AFL has no

19  evidence that would suggest a likelihood of consumer confusion in this case. AFL has

20  only disclosed evidence regarding one SurplusEQ customer, Entergy, and Entergy's

21  representative testified that he did not have personal knowledge of why Entergy

22  purchased the unit from SurplusEQ. (*See* SOF ¶¶ 66-72.) In fact, he did not even know

23  who SurplusEQ or Daniel Parsons was. (SOF ¶ 66.) Winters did not know what

24  information was disclosed by SurplusEQ prior to sale, whether anyone at Entergy had

25  questions about the warranty or had reviewed the terms of sale on the invoice (which

26  described the warranty) before Entergy purchased it. (SOF ¶¶ 71-72.)

27  As to the market generally, AFL also has not conducted a single consumer survey

28  in this litigation. (SOF ¶ 159.) AFL has not performed a customer survey on consumer

1   confusion between gray-market splicers and AFL's splicers. (SOF ¶¶ 160-161.) AFL has

2   not conducted a consumer survey to determine whether consumers were misled by gray-

3   market retailers, or a survey related to SurplusEQ's advertisements. (SOF ¶¶ 163-164.)

4   AFL has also not contacted any of its customers to ask them for information about their

5   perceptions of the gray-market. (SOF ¶ 162.) And no effort has been made to survey

6   attendees at trade shows about gray-market sales, or how much they value AFL's

7   warranty. (SOF ¶¶ 169-169.) AFL's claim is barred based on these facts alone.

8           As the undisputed evidence demonstrates, Defendants fully disclosed all relevant

9   facts about the Fujikura splicers they sold. Defendants told its customers that SurplusEQ

10  was not an authorized distributor and not affiliated with AFL, that it sold non-AFL units,

11  that the splicers it sold were purchased abroad and resold here, that they could not

12  upgrade the software, and that the splicers came with a 1-year warranty and repair service

13  that SurplusEQ provided. (SOF ¶¶ 139-141.) SurplusEQ also told customers that any

14  repairs would be made by SurplusEQ or sent back to its foreign suppliers in Asia. (SOF ¶

15  140.) Defendants provided this information on their websites, in advertisements, in email

16  and phone communications with customers, and on invoices. (SOF ¶¶ 142-143, 157-158.)

17  Even SurplusEQ's name informed customers that they were buying from a reseller and

18  not a direct source. *See Adobe Sys. Inc. v. Christenson*, No. 2:10-CV-00422, 2012 WL

19  3994285   (D.   Nev.   Sept.   10,   2012)   (finding   that   defendant's   domain

20  name,"softwaresurplus.com" notified a reasonably prudent consumer that defendants

21  were merely resellers of "surplus" software, and did not falsely suggest sponsorship or

22  endorsement by trademark holder); *see also Toyota Motor Sales, U.S.A., Inc. v. Tabari*,

23  610 F.3d 1171, 1810 (9th Cir. 2010) (finding reasonable consumers arriving at the sites

24  "buy-a-lexis.com" and "buyorleaselexus.com" would not be confused as to sponsorship

25  or endorsement giving the content of the website). And indeed, AFL admitted that it

26  could not identify any customers who contacted AFL assuming that SurplusEQ was

27  affiliated with AFL. (SOF ¶ 146.)

28          Because of this disclosure, Defendants' customers received exactly what they

expected. There is also no evidence that customers expected something different than they received. (SOF ¶¶ 147-149.) AFL's claim for unfair competition fails for this reason as well.

**B.    The Court Should Grant Summary Judgment on AFL's False Advertising Claim.**

AFL cannot maintain a claim for false advertising under 15 U.S.C. § 1125(a). To prove false advertising under 15 U.S.C. § 1125(a), a plaintiff must show that (i) the defendant made a false statement in a commercial advertisement about its own or another's product; (ii) the statement deceived or has a tendency to deceive a substantial portion of its audience; (iii) the deception was material in that it was likely to influence purchasing decisions; (iv) the defendant caused the false statement to enter interstate commerce; and (v) the plaintiff has been or is likely to be injured due to a diversion of sales or a lessening of goodwill as a result of the false statement. 15 U.S.C. § 1125(a)(1)(B); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 n. 4 (9th Cir. 2002).

AFL has disclosed three factual bases for its claim:

- AFL alleges that Defendants made false statements in a July 21, 2009 blog post;
- AFL alleges that Defendants advertised some of its fusion splicers as "new" and "guaranteed not modified in any way" on eBay and their websites; and
- AFL alleges that Defendants described the Entergy unit as "new" on an invoice.

(SOF ¶ 151.) None of these statements constitutes false advertising.

**1.    *SurplusEQ's Statements do not Constitute a "Commercial Advertisement" Under the Lanham Act.***

There is no evidence in the record that any of the statements at issue was sufficiently disseminated so as to constitute "commercial advertising" under the Lanham Act. "Commercial advertising" is (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) [made] for the purpose of influencing

consumers to buy defendant's goods or services;" and (4) that is "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Coastal Abstract Serv. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir. 1999).

The Entergy invoice is not a commercial advertisement under the Lanham Act. A single, private communication from one party to another that is not an inducement to buy does not constitute commercial advertising under the Lanham Act. *Midwest Canvas Corp. v. Commonwealth Canvas, Inc*., 2008 WL 162757, at *4 (N.D. Ill. 2008) *(citing American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc,* 820 F.Supp. 1072, 1078 (N.D. Ill. 1993)). An invoice sent to an individual customer "can hardly be construed to have been 'disseminated sufficiently to the relevant purchasing public' because it lacks the element of publicity required by the Lanham Act." *Midwest Canvas*, 2008 WL 162757, at * 3. It is also not an inducement to buy, but rather reflects an agreed-upon transaction. *Id.* The invoice that AFL claims is a false statement was a single, private communication between SurplusEQ and Entergy to memorialize the agreement they had for Entergy to purchase the 818 splicer from SurplusEQ. There is no evidence that the invoice was disseminated to any consumer other than Entergy and was not a communication sent to induce Entergy to buy the product. It cannot support a false advertising claim.

Furthermore, there is no evidence in the record of sufficient dissemination regarding Defendants' July 21, 2009 blog post and advertisements. AFL has not provided any evidence that anyone saw the blog or advertisements, that any consumer attributed it to Defendants, and AFL has not identified a single customer or prospective customer that AFL lost as a result of the post and advertisements. *See Cornelius v. Bodybuilding.com, LLC*, No. 1:10-cv-027, 2011 WL 2160358, at *6 (D.Id. June 1, 2011) ("Lanham Act claim against [defendant] fails because [plaintiff] cannot prove it suffered any damages. Indeed, [plaintiff] does not even have evidence that anyone saw the [message board] post."). AFL cannot satisfy this requirement by simply claiming that visitors to the

1   message boards might have been potential customers and might have been dissuaded

2   from doing business with AFL. *Id.*("Without some proof that someone saw the [message

3   board] post and attributed it to [defendant], there is no injury that can be readily traced

4   back to [defendant].") Thus, AFL cannot demonstrate that these statements are

5   commercial advertisements under the Lanham Act.

6        Moreover, Defendants' blog post is not a commercial advertisement because

7   although press releases and promotional literature are advertisements under the Lanham

8   Act, general informational articles and blogs are not. *See Hoffman v. Capital Cities/ABC,*

9   *Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001) (noting that commercial speech requires a

10  proposed transaction and holding that doctored photo of actor in fashion magazine did not

11  constitute commercial speech despite the fact that the photo was published to increase

12  magazine sales). An analogous example was present in *Fashion Boutique of Short Hills v.*

13  *FENDI USA*, 314 F.3d 48 (2nd Cir. 2002), where a salesperson allegedly made numerous

14  disparaging statements about a competing store. There, the Second Circuit ruled that

15
16       the touchstone of whether a defendant's actions may be 'commercial
         advertising or promotion' under the Lanham Act is that the contested
         representations are part of an ***organized campaign*** to penetrate the relevant
17       market…. Thus, ***businesses harmed by isolated disparaging statements do***
         ***not have redress under the Lanham Act.***
18

19  *Id.* at 57 (emphasis added). In this case, the post does not attempt to sell a product, does

20  not link to or promote any products, and does not reference Fujikura products. (SOF ¶¶

21  152-153.) It only provides general information to potential consumers about the fusion

22  splicer market. It is posted on a blog created by Defendants that discusses a wide variety

23  of topics, including information about gray-market goods. (SOF ¶ 155.) AFL's effort to

24  take a portion of generic informational text—which never mentions AFL or Fujikura—

25  out of context and recast it as a commercial advertisement for Fujikura-branded fusion

26  splicers is not supported by the evidence. AFL's false advertising claim fails on this

27  ground as well.

28       **2.    *There Is No Evidence That Any of the Alleged Statements Is False.***

24

1    AFL also cannot establish that the statements at issue are false. To show falsity,

2    plaintiff must demonstrate that either a challenged advertisement was literally false, or

3    that it was literally true but likely to mislead or confuse consumers. However, "[w]here a

4    statement is not literally false and is only misleading in context . . . proof that the

5    advertising actually conveyed the implied message and thereby deceived a significant

6    portion of the recipients becomes critical." *Cke Rest. v. Jack in the Box, Inc.*, 494 F.

7    Supp. 2d 1139, 1143 (C.D. Cal. 2007); *see also Walker & Zanger, Inc. v. Paragon Indus.,*

8    *Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) ("[I]f an advertisement is not false on

9    its face, as here, plaintiff must produce evidence, usually in the form of market research

10   or consumer surveys, showing exactly what message ordinary consumers perceived.").

11   There is no evidence that any of the statements is literally false or misleading.

12   AFL alleges that the blog posting "falsely advertised its Fujikura products as

13   'new', purchased directly from Fujikura, and covered by a manufacturer's warranty when,

14   in fact, they are not." (FAC ¶ 43.) The blog post, however, ***never mentions Fujikura,***

15   ***AFL, or any other manufacturer by name***. It only discusses the gray-market for fusion

16   splicers in general terms:

17   
18   > When it comes to new fusion splicers companies like www.SurplusEQ.com
     > buy direct from the manufacturer and don't have to be an authorized seller.
19   > Also be aware at [sic] the prices you will pay are lower because we do not
     > do [sic] through a middle man, therefore resulting in a lesser price you pay
20   > for the same machine and actually you get the whole kit. Not to mention a
     > full Manufacturer's Warranty."

21   (SOF ¶ 152.) Even AFL admitted during depositions that the post does not mention

22   Fujikura by name. (SOF ¶ 153.) Thus, as an initial matter, AFL cannot show that the

23   statements on the blog post relate to the Fujikura splicers SurplusEQ sells.

24   Moreover, none of the statements in the blog is false. The inference that

25   Defendants sell "new" fusion splicers is literally true. SurplusEQ purchases Fujikura

26   splicers through an intermediary, but the splicers are new and have never been used. (SOF

27   ¶ 156.) When they arrive, Rieble unwraps them from the packaging tests them to make

28

1  sure that they perform correctly before sending them to customers—just like AFL. (SOF
2  ¶¶ 124-131.)

3        Also literally true is the statement that "companies like www.SurplusEQ.com buy
4  direct from the manufacturer" and the suggestion that SurplusEQ sells splicers with a "full
5  Manufacturers Warranty." There are a number of manufacturers other than Fujikura that
6  make fusion splicers. (SOF ¶ 15.) Many of these manufacturers sell directly to resellers
7  like SurplusEQ, and many provide a full manufacturer's warranty with these splicers.
8  (SOF ¶¶ 17, 19.) Defendants sell a variety of these brands, and buy splicers directly from
9  some of these manufacturers. (SOF ¶ 18.) Many of the splicers Defendants sell do come
10 with a manufacturer's warranty. (SOF ¶ 19.) Also, other web pages show that SurplusEQ
11 neither states nor even implies that the Fujikura-branded fusion splicers are "bought 'direct
12 from the manufacturer.'" (SOF ¶ 20.)

13       Defendants' statements on eBay and their websites that certain Fujikura splicers
14 for sale were "new" are also literally true. Defendants sell new, unused fusion splicers,
15 and AFL has no evidence to refute this fact. Similarly, AFL cannot establish that the
16 statement that the 818 splicer was "new" on the Entergy invoice was false because there
17 is no evidence that the Entergy unit was already modified when SurplusEQ sold it to
18 Entergy. *See supra*, IV.2.a. Thus, AFL cannot establish literal falsity.

19          **3.    *There Is Also No Evidence That Any Statement Was Material*.**

20       There is also no evidence in the record that any of these statements influenced
21 consumer purchasing decisions. While a survey is not required to establish materiality, this
22 element is "'typically' proven through consumer surveys." *Skydive Arizona, Inc. v.
23 Quattrocchi*, 673 F.3d 1105, 1111-12 (9th Cir. 2012). At a minimum, plaintiff must
24 produce some evidence that the alleged statements influenced a consumer's purchasing
25 decisions. *See Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.,* 299 F.3d
26 1242, 1250 (11th Cir. 2002); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284
27 F.3d 302, 312 n.10 (1st Cir. 2002). AFL has failed to produce either. Thus, there is no

28

genuine issue of material fact, and AFL's false advertising claim should be dismissed based on this element as well.

In summary, AFL's false advertising claim fails to satisfy any element of the tort.

### C.   Summary Judgment Should be Entered on AFL's Copyright Infringement Claim.

In addition to its Lanham Act claims, AFL asserts that SurplusEQ has infringed upon AFL's copyright by importing and reselling genuine Fujikura fusion splicers. As an initial matter, while Ninth Circuit law currently holds that the first-sale doctrine does not apply when the first sale occurs outside the United States,[14] the United States Supreme Court has accepted certiorari of a case that will likely decide this issue, *Kirtsaeng v. John Wiley & Sons, Inc.,* 132 S.Ct. 1905 (April 16, 2012). For purposes of preserving the argument here, SurplusEQ notes that the first-sale doctrine should apply here because the Fujikura fusion splicers it sold where first sold outside the United States by Fujikura. Should the United States Supreme Court hold that first sale doctrine applies to bar copyright infringement claims where the product is resold in the United States after being purchased abroad, AFL's copyright infringement claim would fail as a matter of law.

AFL's copyright infringement claim here is fatally flawed for many reasons other than the first-sale doctrine. First, AFL cannot make out the elements of its claim. Second, even if AFL could establish copyright infringement occurred, AFL's claim constitutes copyright misuse; *i.e.,* AFL improperly seeks to use its copyright to prevent the sale of un-copyrighted material.

### 1.   *AFL has Failed to Identify Ownership of a Valid Copyright that is Infringed.*

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991). The only

---

[14] *Omega v. Costco,* 541 F.3d 982, 985 (9th Cir. 2008), *aff'd per curiam*, 131 S. Ct. 565 (2010).

1  allegedly copyrighted information on the Fujikura fusion splicers is the computer code

2  for the software that runs on Fujikura's 60 series fusion splicers. (SOF ¶ 181.) AFL has

3  not produced any witness that can testify regarding the software code.[15] (SOF ¶ 174.)

4  With no witness able to testify regarding the first element of its claim, ownership of a

5  valid copyright, AFL cannot support its claim.[16] Further, even if AFL had a witness that

6  could testify regarding the allegedly copyrighted software code at issue, AFL has failed

7  to disclose any witness that can testify regarding infringement. (SOF ¶ 176.) No witness

8  has compared the software code on the fusion splicers that SurplusEQ sold and the code

9  that AFL asserts is protected by a valid copyright. (SOF ¶ 179.) Without these facts, AFL

10  cannot prove its copyright infringement claim.

---

[15] To the extent AFL contends that its copyright is unregistered and it is entitled to bring a claim based on an unregistered work because the copyrighted software is a foreign work under 17 U.S.C. § 411, AFL must prove that the first publication of the work occurred abroad. "[T[o proceed with a copyright infringement action, a plaintiff that claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad. This requires the plaintiff to first prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. Once the plaintiff has proven publication, he must then prove that the publication was, in fact, the first publication, and that the geographic extent of this first publication diverges from the statutory definition of a 'United States work.'" *Kernel Records Oy v. Mosley*, 2012 WL 40400695 (11th Cir. Sept. 14, 2012). AFL has no evidence to support any argument that first publication of whatever work it contends is copyrighted and infringed occurred abroad.

[16] To the extent AFL intends to rely on its Copyright Registration to prove a valid copyright, Registration No. TX-7-400-942, the registration specifically disclaims prior versions of the copyright registered software. (SOF ¶ 180.) AFL has not disclosed any witness that can testify regarding the changes that were made between the previous versions of the software and the copyright registered version, version 01.32b.

2. *AFL's Copyright Infringement Claim Constitutes Copyright Misuse.*

To the extent AFL could meet the elements of its copyright infringement claim, that claim is barred by the doctrine of copyright misuse. The Copyright Act gives the owner of a copyright the exclusive right to distribute copies of a copyrighted work; however, "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). Therefore, in the case of software, while the underlying code itself may be protected, the product in which the software is installed is not protected under the Copyright Act.

"The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them to control areas outside their monopoly." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1026 (9th Cir. 2001); *see also Apple Inc. v. Psystar Corp*., 658 F.3d 1150, 1157 (9th Cir. 2011); *Altera Corp. v. Clear Logic, Inc*., 424 F.3d 1079, 1090 (9th Cir. 2005); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516, 521 (9th Cir. 1997). The doctrine of copyright misuse applies to bar copyright owners from exploiting their copyrights to protect the unprotectable. *See Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 978 (4th Cir. 1990).

The Court is familiar with the seminal gray-market copyright infringement case, *Omega v. Costco,* 541 F.3d 982, 985 (9th Cir. 2008), *aff'd per curiam*, 131 S. Ct. 565 (2010). There, Omega brought a copyright infringement claim against Costco alleging that Costco committed copyright infringement by reselling in the United States Omega watches that Costo had obtained abroad. The watches at issue all included a copyrighted globe symbol. In the Ninth Circuit, the appellate court concluded that the first sale doctrine did not apply to bar a copyright infringement action brought against Costco related to its sales of Omega watches that were first purchased by Costco oversees and then imported into the United States for resale. After concluding that the first-sale doctrine did not bar Omega's claim, the Ninth Circuit remanded the case for further

1   proceedings in the district court.

2        After remand, Costco sought summary judgment arguing that Omega's copyright

3   infringement claim was barred by copyright misuse. *Omega S.A. v. Costco Wholesale*

4   *Corp.,* 2011 WL 8492716 (C.D. Cal Nov. 9, 2011). Costco asserted that Omega could not

5   bar the sale of its watches, which were not protected by any intellectual property right,

6   simply because the watches all included a copyrighted symbol. *Id.* at *1. The trial court

7   agreed and entered summary judgment in favor of Costco. *Id.* at *2. The court noted that

8   prior applications of copyright misuse in the Ninth Circuit had all involved situations of

9   antitrust tying agreements and restrictive licensing agreements; nonetheless, the Court

10  found that the Ninth Circuit had "deliberately chose a broad rule for copyright misuse so

11  the rule could be applied to new situations as they arose." *Id.* As the court explained,

12  "'copyright misuse is an equitable defense to copyright infringement, the contours of

13  which are still being defined.'" *Id.* (quoting *MDY Industries, LLC v. Blizzard*

14  *Entertainment, Inc.,* 629 F.3d 928, 941 (9th Cir. 2010)). Because Omega conceded that

15  one of the purposes of the copyrighted globe symbol was to control the importation of the

16  watches into the United States—even though the copyrighted globe promoted the

17  aesthetics of the watch and increased the value of the watch—the Court found that

18  Omega had committed copyright misuse. Omega could not rely on its copyright over one

19  distinct portion of the watch to prevent resale of the watch as a whole. As the court held,

20  Omega improperly sought to leverage its copyright rights to control the sale of its un-

21  protectable watches and, therefore, summary judgment was entered against Omega.[17] *Id.*

22       As in *Costco*, the plaintiff here instituted this lawsuit to prevent the importation

23  and resale of products that were otherwise un-protectable. Fujikura's fusion splicers, like

24  the watches in *Costco*, include copyrighted material on them. Like the copyrighted globe

25  on Omega's watches, the copyrighted software on Fujikura's fusion splicers cannot be

26

27  _____

28  [17] Of particular note, copyright misuse was found despite the fact that the Copyright Act
    allows a copyright holder to reproduce a pictorial, graphic, or sculptural work on useful
    articles. *See* 17 U.S.C. § 113(a).

used separate from the un-copyrighted fusion splicer.[18] As in *Costco*, the plaintiff here admits it sought intellectual property protection for the express purpose of preventing the importation of its products. Here, this avenue to enforce the plaintiff's two-tiered pricing scheme was only instituted after more extreme measures, like installing a "bomb" in the software, were rejected. Moreover, like the copyrighted globe in *Costco*, the allegedly copyright software here has no value outside its inclusion on the un-copyrighted fusion splicer. This is a clear case of copyright misuse. Like the *Costco* court, this Court should enter summary judgment in favor of Defendants on Plaintiff's copyright infringement claim.

## D.    Laches Bars AFL's Claims as a Matter of Law.

In addition to the reasons set forth above, AFL's claims are also barred by the doctrine of laches. AFL has known of Defendants' advertising and sale of Fujikura fusion splicers since approximately 2003. (SOF ¶ 184.) But AFL utterly failed to take any action against these sales until it filed the instant complaint in June 2011. In the intervening nine years, AFL did not contact Defendants or otherwise alert Defendants to any issue involving Fujikura's intellectual property. (SOF ¶ 184.) Furthermore, AFL failed to use the federal copyright symbol or any other method of putting users on notice that the software was protected by copyright despite having knowledge of Defendant's sales activity. (SOF ¶ 186.) During that same nine year period, Defendants expended substantial resources developing their business based on the sales of Fujikura fusions splicers, including costs of developing a sales website and other business expenses. (SOF ¶ 185.) Because AFL has delayed its suit while Defendants invested in their business,

---

[18] Although not characterizing its decision as an application of the copyright misuse doctrine, in *Lexmark International, Inc. v. Static Control Components*, 387 F.3d 522 (6th Circuit 2004), the Sixth Circuit Court of Appeals held that Lexmark could not use a copyrighted software that it had installed on its computer printers and printer ink to bar non-Lexmark ink from being used with its printers. This was an improper use of copyright law and not protectable by copyright. Like the computer program in Lexmark, AFL's software cannot be used with any other fusion splicer. Like the printer software in Lexmark, AFL cannot use the allegedly copyrighted software installed on its fusion splicers to improperly control the use of the fusion splicer.

1   laches bars the current suit.

2      "'Laches is an equitable time limitation on a party's right to bring suit,' . . . resting

3   on the maxim that 'one who seeks the help of a court of equity must not sleep on his

4   rights.'" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)

5   (quoting *Boone v. Mech. Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979) and *Piper*

6   *Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 936, 949 (7th Cir. 1984) (Posner, J.,

7   concurring)). "It is well established that laches is a valid defense to Lanham Act claims,

8   including those for false advertising." *Id.* Laches also applies to bar copyright claims. *See*

9   *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). Importantly, "[i]t is well

10   established that laches is a valid defense to Lanham Act claims for both monetary

11   damages and injunctive relief." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975,

12   997 (9th Cir. 2006); *see also Jarrow Formulas*, 304 F.3d at 836; 6 McCarthy on

13   Trademarks and Unfair Competition § 31:1 (4th ed.) ("In trademark infringement cases, it

14   is almost always laches, not the statute of limitations, that is invoked to determine the

15   availability of both injunctive and monetary relief").

16      "In order to succeed on a defense of laches, a defendant must prove both: (1) an

17   unreasonable delay by plaintiff in bringing suit, and (2) prejudice to himself." *Glenn*

18   *Miller*, 454 F.3d at 997. "In considering whether a plaintiff's delay was unreasonable,

19   courts consider: (1) the length of the delay, measured from the time the plaintiff knew or

20   should have known about his potential cause of action, and (2) whether the plaintiff's

21   delay was reasonable, including whether the plaintiff has proffered a legitimate excuse

22   for his delay." *Id.* (citing *Jarrow Formulas*, 304 F.3d at 838. Here, AFL delayed taking

23   any action, or even contacting Defendants, for nine years after it became aware of

24   Defendants' sales and advertisements. Under established Ninth Circuit precedent, AFL's

25   claims are subject to a laches defense.

26      The Ninth Circuit has determined that "if a § 43(a) claim is filed within the

27   analogous state limitations period, the strong presumption is that laches is inapplicable; if

28   the claim is filed after the analogous limitations period has expired, the presumption is

1    that laches is a bar to suit." *Jarrow Formulas*, 304 F.3d at 837. Here, regardless of the

2    statute that the Court deems analogous, AFL's nine year delay leads to the presumption

3    that laches applies. Importantly, "the presumption of laches is triggered if any part of the

4    claimed wrongful conduct occurred beyond the limitations period. To hold otherwise

5    would 'effectively swallow the rule of laches, and render it a spineless defense.'" *Id.*

6    (quoting *Danjaq*, 263 F.3d at 953). Accordingly, the presumption applies here even

7    though the conduct is continuing. The Ninth Circuit explained its rationale: "The plaintiff

8    should not be entitled to the strong presumption against laches simply because some of

9    the defendant's wrongful conduct occurred within the limitations period. Laches

10   penalizes dilatory conduct; as such, the presumption is that a § 43(a) plaintiff is barred if

11   he fails to file suit promptly when the defendant commences the wrongful conduct." *Id.* at

12   837-38; *see also Glenn Miller*, 454 F.3d at 997 ("If any part of the alleged wrongful

13   conduct occurred outside of the limitations period, courts presume that the plaintiff's

14   claims are barred by laches"). Instead, "in determining the presumption for laches, the

15   limitations period runs from the time the plaintiff knew or should have known about his §

16   43(a) cause of action." *Jarrow Formulas*, 304 F.3d at 838.

17       As for the second element, Defendants would suffer significant prejudice if this

18   case is allowed to continue. In the nine years between when AFL became aware of

19   Defendants' sales and the time AFL filed suit, Defendants invested considerable time and

20   money into building their business. (SOF ¶ 185.) The Ninth Circuit holds that a "defendant

21   may establish prejudice by showing that during the delay, it invested money to expand its

22   business or entered into business transactions based on his presumed rights." *Glenn Miller*,

23   454 F.3d at 999; *see also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §

24   31:12 (4th ed.) ("Laches is a good defense if plaintiff's long failure to exercise its legal

25   rights has caused defendant to rely to its detriment by building up a valuable business

26   around its trademark"). The Ninth Circuit has also held that the prejudice to a defendant

27   who has built a business during plaintiff's delay bars injunctive relief. *See Jarrow*

28   *Formulas*, 304 F.3d at 840 ("[defendant] has made the challenged claims a central part of

1   [product's] identity in the minds of the public. . . . [Defendant] would be prejudiced if

2   forced to abandon its long-term investment in its presentation of [the product] to the

3   public. Therefore, laches bars [plaintiff's] claim for prospective injunctive relief").

4   Accordingly, summary judgment should also be entered in favor of Defendants because

5   AFL has unjustly delayed bringing suit here and laches bars AFL's lawsuit.

6           **E.      AFL Cannot Establish Damages Here.**

7           As explained above, summary judgment is appropriate on each of AFL's claims.

8   Summary judgment is also appropriate here on many of AFL's damage theories. AFL has

9   offered its own Chief Financial Officer, Robert Crowder, as its expert witness to testify

10  regarding AFL's damages. (SOF ¶ 170.) Mr. Crowder concludes that AFL has suffered

11  over $3,000,000 in lost sales. As explained fully below, AFL's damage analysis pure

12  speculation, erroneous, and inadmissible.

13          **1.      *AFL's Damages Theory is Pure Speculation.***

14          AFL's disclosed damages theory is purely speculative. Without justification in the

15  evidence, AFL seeks every cent of profit from Defendants' sales. AFL presents no

16  evidence that it would have made every alleged infringing sale if not for the infringing

17  activity. (SOF ¶ 188.) AFL does not seek a percentage of the profit that it can tie to the

18  trademark or copyright. (SOF ¶ 193.) AFL presents a case that is black and white. It

19  alleges that Defendants are 100% wrong so AFL should get 100% of the profits

20  regardless of whether AFL has any evidence proving its damages. This is not the law.

21          "When awarding profits, the court is cautioned that the 'Plaintiff is not . . .

22  entitled to a windfall.'" *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th

23  Cir. 1993) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 918 (Fed.Cir.

24  1984)). It is AFL's burden to prove Defendants' profits that occurred to due infringing

25  activity. *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999). At

26  bottom, "[t]o award profits in this situation would amount to a punishment in violation of

27  the Lanham Act which clearly stipulates that a remedy 'shall constitute compensation not

28  a penalty.'" *Lindy Pen*, 982 F.2d at 1407 (quoting 15 U.S.C. § 1117(a)).

1    Simply put, AFL provides no rational basis for its disclosed lump sum damages

2    figure. AFL's "we'll just take all of the profits" damages theory is wholly contrary to

3    Ninth Circuit law. For example, in *Rolex*, the defendant sold refurbished Rolex watches

4    that used "replacement parts . . . not authorized or provided by Rolex. The altered 'Rolex'

5    watches retain their original Rolex trademarks on their dials and bracelets, except when

6    [the defendant] replaces the bracelet. Some examples of the replacement bracelets used

7    by [the defendant] bear an imitation of the Crown Device logo." *Rolex*, 179 F.3d at 707.

8    Despite finding that the defendant's conduct infringed on Rolex's trademarks, the Ninth

9    Circuit upheld the district court's decision to "den[y] Rolex's request for [the

10    defendant's] profits because it concluded that Rolex had not adequately demonstrated

11    what portion of [the defendant's] sales were attributable to altered 'Rolex' watches." *Id.*

12    at 712. The Ninth Circuit upheld the ruling even though the defendant testified "that

13    thirty percent of his business involved reconditioning used Rolex watches . . . ." The

14    Ninth Circuit concluded that "[i]t was Rolex's burden to show with reasonable certainty

15    [the defendant's] gross sales from counterfeit altered 'Rolex' watches." *Id.* (citing *Lindy*

16    *Pen*, 982 F.2d at 1408). The Court should hold AFL to the same standard. AFL has not

17    and cannot produce any evidence demonstrating its damages with a reasonable certainty.

18    The Court should grant summary judgment for that reason alone.

19    Similarly, AFL has not presented any evidence demonstrating a connection

20    between Defendants' alleged use of Fujikura's intellectual property and Defendants'

21    profits. (SOF ¶ 188.) AFL's lump sum damages figure is pure speculation meant to

22    punish Defendants. It is undeniable that AFL has the burden to prove its damages. As the

23    Ninth Circuit held in *Lindy Pen*, "plaintiff must prove both the fact and the amount of

24    damage. . . . Damages are typically measured by any direct injury which a plaintiff can

25    prove, as well as any lost profits which the plaintiff would have earned but for the

26    infringement." *Lindy Pen*, 982 F.2d at 1407 (citing 2 J. Thomas McCarthy, TRADEMARKS

27    AND UNFAIR COMPETITION § 30:27, at 509-11 (2d ed. 1984)). In addition, the Ninth

28    Circuit stated that "[w]hen fashioning a remedy in a given case, the court must rely 'not

merely on the legal conclusion of liability, but [must] also . . . consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party.'" *Id.* at 1405 (quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 918 (Fed.Cir. 1984)).

AFL can only rely on legal conclusions of liability. Its disclosed damages theory assumes, without any credible evidence, that it would have made every single one of Defendants' sales. As the Ninth Circuit held in *Lindy Pen*, "Lindy's calculations contained items in which no likelihood of confusion existed and therefore were inappropriately included. The district court reasoned that it had no rational basis upon which to estimate an award as to the infringing items . . . ." *Id.* at 1407. In addition, Lindy "declined to provide the court with any evidence of its loss caused by Bic's wrong doing. Although Lindy offers excuses for this deficiency, its explanations do not negate the fact that Lindy never furnished the court any reasonable estimate of its own sales. It would have been error for the district court to select an arbitrary percentage of total sales to represent the more narrow submarket of [actually infringing] sales." *Id.* at 1408. "Lindy instead brought forth proof of Bic's total sales." *Id.* The Ninth Circuit denied Lindy Pen's request for damages. The same result should hold here.

*Lindy Pen* also stands for the proposition that "'[t]he equitable limitation upon the granting of monetary awards . . . would seem to make it clear that such a remedy should not be granted as a matter of right.'" *Id.* at 1404-05 (quoting *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 120 (9th Cir.)). In examining the facts, the Court found that "Lindy's trademark was weak and Bic's infringement was unintentional. . . . Accordingly, the policy considerations announced by *Playboy Enterprises* would be trivialized by insisting on an accounting in this case." *Id.* at 1406. In examining the circumstances of the alleged infringement, the Ninth Circuit, held that "[t]o award profits in this situation would amount to a punishment in violation of the Lanham Act which clearly stipulates that a remedy 'shall constitute compensation not a penalty.'" *Id.* at 1407 (quoting 15 U.S.C. § 1117(a)).

The same result holds true here. Here, AFL has presented no evidence that it put Defendants on notice of infringement and Defendants continued to make the allegedly infringing sales. (SOF ¶ 184.) There is absolutely no evidence from which the Court could conclude that Defendants' infringement, if any, was willful. AFL has presented no evidence connecting use of Fujikura's intellectual property to Defendants' profits. AFL, like Lindy Pen, simply assumes it would have made every single one of Defendants' sales. But AFL has zero evidence lending any credence to this theory. Accordingly, AFL has failed to present any evidence that damages are warranted or appropriate or even a plausible figure for its damages. At most, this case calls for an injunction that has already been rendered moot. Based on the evidence in the case, AFL's insistence on damages serves only as punishment that would lead to a windfall for AFL. Neither is appropriate as a matter of law. For this reason, the Court should enter summary judgment and hold that at most AFL is entitled to an injunction.

### 2.     *AFL Has Failed to Properly Disclose Its Computation of Damages.*

In addition to being purely speculative, AFL's damages are also improperly disclosed. Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires that each party automatically disclose "a computation of any category of damages" in its initial disclosure statement and produce all materials on which it bases its computation. Thereafter, each party has a continuing duty to supplement or correct its initial disclosure statement to the extent necessary to ensure completeness and accuracy. Fed. R. Civ. P. 26(e). AFL has advanced four claims that involve different intellectual property rights, different contracts, and different time periods of alleged infringement. Despite these differences, AFL has produced only one damages figure based on a spreadsheet of undifferentiated sales that they allege infringe unspecified rights. (SOF ¶ 188.) AFL has made no effort to distinguish which sales infringed which rights. (SOF ¶ 188.) This disclosure is woefully insufficient and cannot support an award of damages.

"[B]y its very terms Rule 26(a) requires more than providing-without any explanation-undifferentiated financial statements; it requires a "computation," supported

by documents." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006). This means that "the plaintiff should provide more than a lump sum statement of the damages allegedly sustained." *City & County of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003); *see also Allstate Ins. Co. v. Nassiri*, 2:08-CV-00369, 2010 WL 5248111 (D. Nev. Dec. 16, 2010) ("The court further stated that the word 'computation' contemplates some analysis beyond merely setting forth a lump sum amount for a claimed element of damages"). "Plaintiff's initial disclosure, therefore, should disclose a computation of each category of damages attributable to each cause of action." *Frontline Med. Associates, Inc. v. Coventry Health Care*, 263 F.R.D. 567, 569 (C.D. Cal. 2009). AFL has failed on all counts.

A party who breaches its duty of disclosure may not introduce any undisclosed evidence at trial unless it proves that the failure to disclose was harmless or substantially justified. Fed. R. Civ. P. 37(c). This sanction is "self-executing" and "automatic." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); Fed. R. Civ. P. 37 advisory committee's note (1993). Courts regularly prohibit parties from seeking damages at trial that were not properly disclosed. *See, e.g., Hoffman v. Construction Protective Services, Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (affirming exclusion of damages evidence at trial for failure to disclose a damages calculation).

Here, the prejudice is clear. As discussed above, each of AFL's claims have substantial issues. It is attempting to enforce Fujikura's intellectual property rights based on contracts that were signed contemporaneously with this lawsuit. It has failed to show causation. It seeks damages for sales occurring prior to the licensing agreements and outside of its territorial limits. As damages, AFL has disclosed one lump sum in hopes that the Court will ignore these foundational problems. AFL clearly is hoping that the Court works backwards and ignores the overwhelming deficiencies in AFL's case. In doing so, however, AFL has violated the disclosure rules. Its lump sum damages figure is insufficient and should be stricken, leaving AFL without any means of proving damages at trial. Accordingly, summary judgment is appropriate on these grounds as well.

1
2

### 3.   *AFL has Failed to Disclose the Documents Upon Which its Damages Opinion is Based; Summary Judgment is Appropriate for this Reason as Well.*

3      In addition to improperly disclosing one lump sum damages number, AFL has also

4   refused to provide SurplusEQ the basis for the damages number it has disclosed. A party

5   must disclose documents that it relied upon in formulating its damages opinion. Fed. R.

6   Civ. P. 26(a)(1)(A)(iii) ("[A] party must, without awaiting a discovery request, provide to

7   the other parties . . . a computation of each category of damages claimed by the

8   disclosing party−*who must also make available for inspection and copying as under*

9   *Rule 34 the documents or other evidentiary material, unless privileged or protected*

10   *from disclosure, on which each computation is based* . . . ." (emphasis added)); *see also*

11   *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295-96 (2d Cir. 2006) (quoting

12   Fed.R.Civ.P. 26 Advisory Committee Notes to 1993 Amendments). The defendant

13   should not have to guess or accept the plaintiff's word regarding its damage. *Lindy Pen*

14   *Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993); *see also Underpinning &*

15   *Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 348

16   (S.D.N.Y. 2010) ("The purpose of this rule 'is to prevent the practice of "sandbagging"

17   an opposing party with new evidence.'" (quoting *Fleming v. Verizon New York Inc.*, No.

18   03 Civ. 5639(WHP), 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006)). The plaintiff

19   may not seek to recover damages based on documents that the plaintiff has refused to

20   produce in discovery. Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or

21   identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that

22   information or witness to supply evidence on a motion, at a hearing, or at a trial, unless

23   the failure was substantially justified or is harmless").

24      AFL's damages are based on an assumption that AFL would have made every

25   single sale that SurplusEQ made over a five year time period. After making this

26   unwarranted assumption, AFL then computes the amount it would have earned on each

27   hypothetical sale. (SOF ¶ 188.) In order to make this determination, AFL relied on its

28   own internal documents to determine the amount of revenue AFL earned from fusion

1    splicer sales in each year. (SOF ¶ 192.) Despite SurplusEQ's extensive document

2    requests, AFL refused to produce these internal documents to SurplusEQ. (SOF ¶ 194.)

3    Accordingly, SurplusEQ can only take AFL's word for this revenue number. At

4    deposition it was revealed that this revenue number includes not just revenue earned on

5    sales of fusion splicers, but also revenue earned on fusion splicer accessories that are sold

6    separate and apart from fusion splicers and revenue earned on repair work for fusion

7    splicers. (SOF ¶ 195.) These numbers are not properly included in any damages

8    computation. (SOF ¶ 196.) Regardless, even if these numbers were properly included in

9    AFL's revenue, AFL has wholly failed to provide its internal documents that support its

10   revenue number. (SOF ¶ 194.) SurplusEQ has no way of verifying or testing these

11   numbers; for this reason, its damages disclosure is improper and should be excluded.

12       In addition to failing to properly disclose its revenues, AFL has not disclosed its

13   costs. In order to determine its hypothetical profit on SurplusEQ's sales of fusion

14   splicers, AFL has relied on its internal documents to calculate what AFL terms its

15   "Marginal Costs." (SOF ¶ 197.) These costs consist of the cost that AFL pays Fujikura

16   for each fusion splicer it sells and AFL's shipping costs. (SOF ¶ 197.) These are costs

17   that AFL has refused to provide the underlying documentation for. (SOF ¶ 198.) AFL has

18   not produced a single document disclosing how much it pays Fujikura for fusion splicers

19   nor has AFL produced a single document disclosing its shipping costs. (SOF ¶ 199.)

20   Again, SurplusEQ is not forced to take AFL at its word. Further, AFL must have

21   additional costs that are not included in its "Marginal Costs." (SOF ¶ 200.) Among these

22   costs are the costs that AFL incurs for warranty repair work on fusion splicers.[19] (SOF ¶

23   200.) Despite that AFL must incur some warranty repair costs related to fusion splicers,

24   AFL has failed to deduct these costs. (SOF ¶ 200.) At deposition, AFL's Chief Financial

25   Officer contended that he had analyzed AFL's books and determined that AFL had no

26

27   _____

[19] AFL offers a two-year warranty on all fusion splicers its sells. (SOF ¶ 122.) During the
first year of this warranty, Fujikura pays AFL for any repair that is necessary. (SOF ¶
28   123.) During the second year of the warranty, AFL pays for all repairs. (SOF ¶ 123.)

1 warranty costs. (SOF ¶ 200.) This is simply impossible; but, more fundamentally, this is

2 again not something that SurplusEQ must accept AFL's word for. The documents AFL's

3 Chief Financial Officer reviewed to render his opinion on damages should have been

4 produced. These documents were not produced; therefore, AFL should be precluded from

5 seeking its lost profits at trial.

6 **4.** ***AFL's Entire Damages Theory is Speculative Because it Fails to***

7 ***Consider Fujikura's Sales and Costs.***

8 AFL's damages theory is also entirely speculative and unreliable because AFL

9 fails to account for Fujikura's revenue and costs. At any time, Fujikura could cause AFL

10 to dissolve and remit all of its revenue directly to Fujikura. As a wholly owned

11 subsidiary, AFL's revenue and costs cannot be considered in a vacuum. For every sale

12 SurplusEQ made of a Fujikura fusion splicer, Fujikura at one point must have earned

13 revenue on that sale through one of its subsidiaries. (SOF ¶ 202.) AFL has made no effort

14 to determine the revenue that Fujikura already earned on these sales. (SOF ¶ 202.) Any

15 revenue Fujikura earned on these sales is properly deducted from AFL's lost profits here.

16 Fujikura is not permitted to profit twice on the same sale.

17 Further, AFL has made no effort to determine whether the cost that it pays

18 Fujikura for the fusion splicers its sells is Fujikura's cost to manufacture the splicer. (It

19 may be that Fujikura sells fusion splicers to AFL at a loss. If this is the case, then the

20 amount that AFL pays Fujikura for each fusion splicer is not the appropriate number to

21 use in calculating lost profit. Without knowing Fukikura's costs for manufacturing and

22 selling any specific fusion splicer and the revenue that Fujikura has already earned from

23 each fusion splicer, it is impossible to know whether Fujikura has lost any revenue here.

24 (SOF ¶ 202.) AFL and Fujikura wholly refused to produce any information related to

25 Fujikura's financials. (SOF ¶ 201.) AFL is not entitled to seek an award of lost profits

26 that is based on less than the full picture of Fujikura's revenues.

27

28

41

1
2

### 5. *AFL Lacks Standing to Pursue Damages for Infringement of Fujikura's Trademarks that Occurred Prior to License to Use Fujikura's Trademarks, March 14, 2011.*

3      In addition to fatal flaws in AFL's damages disclosures identified above, AFL also

4  improperly seeks to recover for SurplusEQ's sales that were made prior to AFL holding

5  any right in the relevant intellectual property. AFL brings this case in order to enforce

6  Fujikura's intellectual property interests. Accordingly, in order to demonstrate that it has

7  standing, AFL must demonstrate its own interest. *See Althin CD Medical, Inc. v. West*

8  *Suburban Kidney Center, S.C.,* 874 F.Supp. 837 (N.D. Ill. 1994) (holding that a non-

9  exclusive copyright license has no standing to sue for copyright infringement); *see also*

10  *Nova Wines, Inc. v. Adler Fels Winery, LLC,* 467 F.Supp.2d 965 (N.D. Cal. 2006)

11  (holding that non-exclusive trademark licensee lacked standing to bring claims for unfair

12  competition that were related to a registered mark). But AFL seeks damages that far

13  exceed the scope of its interests in Fujikura's intellectual property. In its sparse damages

14  disclosure, AFL has pointed to a lengthy spreadsheet wherein AFL lists SurplusEQ's

15  infringing sales. These sales date as far back as 2006. Relatively few of the sales listed in

16  the spreadsheet occurred after AFL obtained its limited license rights to Fujikura's

17  intellectual property, on March 14, 2011.[20] In other words, AFL is seeking damages for

18  sales that predated AFL's interest in the trademarks and predated AFL's right to bring a

19  lawsuit to protect those trademarks. Simply put, AFL lacks standing to remedy its alleged

20  damages. Accordingly, summary judgment is appropriate limiting AFL to claims to

21  SurplusEQ's sales made on or after March 14, 2011.

22

### 6. *AFL Lacks Standing to Pursue Damages for Sales That Occurred Outside of the Territorial Limits in the Trademark Licensing Agreement.*

23

24      Even if AFL's license does grant it standing to claim damages from SurplusEQ's

25

26  _____

27  [20] For purposes of this litigation, AFL has already stipulated that prior to the Trademark License Agreement, AFL does not claim any rights in Fujikura's trademarks under 15 U.S.C. § 1125(a). (SOF ¶ 32.) AFL does not contend that the rights created by the

28  Reseller Agreement make AFL a "registrant" under 15 U.S.C. § 1114. (SOF ¶ 32.)

1   sales, AFL oversteps the plain language of its agreements in alleging damages for sales to

2   customers outside of AFL's limited territorial rights. Both the Reseller Agreement and

3   the Trademark License Agreement restrict AFL's rights to Fujikura products and

4   trademarks to North America. Despite these limitations, AFL seeks damages related to

5   several sales to persons and entities outside of North America. (SOF ¶ 53.)

6       In the patent context,[21] courts have held that "[a] licensee under an exclusive

7   license for a limited territory has the right to maintain an action, in the name of the

8   patentee, for an unauthorized use of the patent ***within the territory covered by his***

9   ***license***." *Pratt & Whitney Co. v. United States*, 153 F. Supp. 409, 410 (Ct. Cl. July 12,

10  1957) (emphasis added). Other courts have put it more bluntly: "It should be stressed,

11  however, that it is not enough that the [licensing] agreements grant [licensee] certain

12  exclusive rights. It is also necessary that the infringement have occurred within

13  [licensee's] 'stated area of exclusivity.'" *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 808 F.

14  Supp. 894, 901 (D. Mass. 1992) (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*,

15  269 U.S. 459, 466 (1926)).

16      Here, SurplusEQ's international sales did not occur within AFL's "stated area of

17  exclusivity." Accordingly, summary judgment is appropriate on AFL's international

18  sales.

19         **7.**    ***AFL Lacks Standing to Pursue Damages for Infringement of***

20             ***Fujikura's Copyrights Prior to February 17, 2011.***

21      Like all of the rights that AFL seeks to enforce, its only interest in Fujikura's

22  copyright is a Copyright License dated February 17, 2011.[22] But the problem with AFL's

23  copyright claim extends beyond the problem with the license-the real problem is that

24  Fujikura never registered its copyrights until it sought to have AFL file this law suit. The

---

[21] Courts use established patent and copyright law in evaluating trademark licensing law. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).

[22] The Copyright License states: "Fujikura hereby assigns to AFL all claims for infringement of the right of distribution of the Work, including any version of the Work, in the U.S. that may exist as of the date of this license." (SOF ¶ 41.) Notably, no similar provision exists in the Trademark License Agreement.

1    law is clear: "Except for an action brought for a violation of the rights of the author under

2    section 106A(a), and subject to the provisions of subsection (b), no civil action for

3    infringement of the copyright in any United States work shall be instituted until

4    preregistration or registration of the copyright claim has been made in accordance with

5    this title." 17 U.S.C. § 411.

6          Here, Fujikura did not register its copyright until April 14, 2011. (SOF ¶51.)

7    Compounding the issue, in the Application for that copyright, under the heading

8    "Limitation of Copyright Claim," Fujikura stated: "Previous version." (SOF ¶ 52.) In

9    other words, Fujikura never registered its copyrights until April 14, 2011 and when it did,

10   it disclaimed any registration of the previous versions of its software. Accordingly, AFL

11   has no standing to sue for any infringing activities prior to April 14, 2011. Summary

12   judgment should be entered barring any claim for copyright infringement prior to April

13   14, 2011.

14
15                   **8.    *AFL's Damage Opinion is Inadmissible Under Daubert.***

16          As explained above, AFL's expert damages opinion has many flaws. As a result of

17   the issues set forth above, Defendants intend to file a motion to exclude this testimony

18   under *Daubert v. Merrell Dow Pharm, Inc.,* 43 F.3d 1311, 1317-18 (9th Cir. 1995). As

19   fully explained in Defendants to be filed *Daubert* motion, AFL's damages expert, its own

20   CFO, is not qualified to offer the opinion AFL offers. Moreover, his opinion is not based

21   on facts of this case, not verifiable, and his damages numbers have no connection to

22   AFL's claims. *See Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002); *Bracco*

23   *Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 449–50 (D.N.J. 2009)

24   (collecting cases concerning failing to independently verify); *See Greer v. T.F. Thompson*

25   *& Sons, Inc.*, No. CV-10-0799-PHX-SMM, 2011 WL 5290154, at *5 (D. Ariz. Nov. 3,

26   2011) (excluding expert testimony as unreliable in part because it "[did] not adequately

27   account for alternative explanations"); *Heck v. City of Lake Havasu*, No. CV-04-1810-

28   PCT-NVW, 2006 WL 2460917, at *10–11 (D. Ariz. Aug. 24, 2006) (excluding expert

testimony when expert "provided no scientific explanation for ruling out any alternative possible causes"). Since AFL has no admissible damages opinion here, the Court should issue summary judgment in favor of Defendants.

## V.     CONCLUSION

For the foregoing, the Court should enter summary judgment in favor of Defendants. Defendants have done no wrong and AFL has no evidence to support any other conclusion.

RESPECTFULLY SUBMITTED this 5th day of October, 2012.

KERCSMAR & FELTUS PLLC


*s/ Greg Collins*
Geoffrey S. Kercsmar
Gregory B. Collins
Jenessa G. B. Coccaro
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250

### **CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2012, I electronically transmitted the foregoing document to the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of Notices of Electronic Filing to the following CM/ECF registrants:

Joel T. Beres
John W. Scruton
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
*Attorneys for Plaintiff*

Sean D. Garrison
Shane E. Olafson
LEWIS & ROCA LLP
40 North Central Avenue
Phoenix, Arizona 85004
*Attorneys for Plaintiff*


 *s/ Greg Collins*