LEWIS
AND
ROCA
LLP
L A W Y E R S

Sean D. Garrison (#014436)
SGarrison@LRLaw.com
Shane E. Olafson (#024605)
SOlafson@LRLaw.com
**LEWIS AND ROCA LLP**
40 N. Central Avenue
Phoenix, Arizona  85004-4429
Telephone (602) 262-5311

Joel T. Beres
jberes@stites.com
John W. Scruton
jscruton@stites.com
**STITES & HARBISON PLLC**
400 West Market St., Suite 1800
Louisville, Kentucky 40202-3352
Telephone (502) 587-3400
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AFL Telecommunications LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>SurplusEQ.com, Inc., Tech Sales, LLC, and Daniel Parsons and Jane Doe Parsons,<br><br>                    Defendants. | No. 2:11-cv-01086-FJM<br><br><br>**AFL TELECOMMUNICATIONS LLC'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

        Pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, Plaintiff

AFL Telecommunications LLC ("AFL") submits this Response to Defendants' Motion for

Summary Judgment.


## I.     INTRODUCTION

Defendants' motion should be denied.  Defendants have failed to carry the burden necessary to sustain a motion for summary judgment.  Rather, as set forth in AFL's Motion for Partial Summary Judgment, AFL is entitled to resolution of various critical issues as a matter of law, based on the undisputed facts.

## II.    COUNTER-STATEMENT OF FACTS

By now the Court is well aware of the basic facts of this action, so AFL will not again restate those facts.  What AFL considers the critical facts of the case are set forth in its Motion for Partial Summary Judgment and the supporting documents submitted with that Motion (designated herein as "SMF").

As set forth in AFL's Counter-Statement of Material Facts submitted with this Response (designated herein as "C-SMF") AFL has numerous disagreements with what Defendants have listed as undisputed facts.  In many cases, those "facts" are either contradicted by other factual materials, and in many others they are simply unsupported by the materials Defendants have identified.  Because those disagreements are set forth in detail in AFL's C-SMF, AFL will not attempt to catalog them here.

The facts pertinent to the various arguments Defendants have raised are set forth in greater detail in the sections below addressing those arguments.  In summary:

(1)     With respect to the unfair competition claims, the evidence shows that Defendants have imported and sold modified Fujikura fusion splicers that are materially different from those sold by AFL.  As the exclusive authorized distributor of Fujikura fusion splicers in North America since 2003, AFL may enforce rights in the FUJIKURA mark under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

(2)     With respect to the false advertising claims, the evidence shows that Defendants made material misstatements of fact in commercial advertising for their gray market Fujikura fusion splicers, including advertising that the splicers were "guaranteed not modified in any way."

1    (3)    With respect to the copyright claim, the evidence shows that Defendants

2  have distributed splicers incorporating the copyrighted software in violation of AFL's

3  rights under its copyright license from Fujikura.  The software is a work made for hire,

4  owned by Fujikura, and is properly before this Court both because Fujikura has registered

5  the work with the Copyright Office and because the work is a non-United States work that

6  does not require registration.

7    (4)    AFL has appropriately disclosed its damages claims under all theories, and is

8  entitled to recover damages based on Defendants' profits from their infringing activities

9  and based on AFL's lost profits on sales it would have made within its sales territory.

10    Based on the foregoing, and as more fully explained below, Defendants' Motion

11  for Summary Judgment should be denied.

12

13  **III.    SUMMARY JUDGMENT STANDARDS**

14    A motion for summary judgment may be granted only if there is no genuine issue

15  as to any material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

16  (1986).  The moving party has the burden of proving that those conditions are satisfied.

17  *Cline v. Industrial Maintenance Eng'g & Contr. Co*., 200 F.3d 1223, 1229 (9th Cir. 2000).

18  To do so, it must identify the portions of the factual record and submissions which

19  demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

20    An issue is "material" for summary judgment purposes if "its resolution could

21  affect the outcome of the action." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248

22  (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could

23  return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If reasonable

24  minds could differ about the effect of the evidence, summary judgment is improper.  *Id.* at

25  250-51.  The court weighing the motion for summary judgment must view the facts and

26  inferences to be drawn from the facts in the light most favorable to the party opposing the

27  motion.  *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58 (1992).

28



## IV. ARGUMENT

### A. Summary Judgment is Not Appropriate on AFL's Unfair Competition Claim

#### 1. DefendantsCannot Rely on the First-Sale Doctrine Because the Splicers They Sell are Materially Different from those sold by AFL

The first sale doctrine, which holds that "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product," is not applicable "when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1072 (10th Cir. 2009). This is because "[a] materially different product is not genuine and may generate consumer confusion about the source and the quality of the trademarked product." *Id.*

AFL has identified several material differences between the fusion splicers sold by SurplusEQ and the fusion splicers sold by AFL, and the evidence establishing the existence and materiality of those differences is fully detailed in AFL's Motion for Partial Summary Judgment and Memorandum in Support ("Motion") and accompanying Statement of Undisputed Facts. (Doc. 147, 147-1.) *See* Motion, pp. 10-12. Specifically, Fujikura fusion splicers sold by SurplusEQ: 1) may have been physically modified to falsify the unit's serial number, as evidenced by the fact that the only fusion splicer recovered by AFL was physically modified; 2) may have software modifications to allow them to display in the English language despite factory settings intended to limit the display language; 3) do not carry a manufacturer's warranty from Fujikura; and 4) contain operating software that is not licensed for use in the United States and may revert to a foreign language if updated remotely. For purposes of the Defendants' motion, the evidence supporting AFL's arguments must be viewed in the light most favorable to AFL, and therefore Defendants are not entitled to summary judgment on the existence of material differences.



## 2.  AFL's Claim is Not Limited to the Entergy Unit

Defendants have inaccurately cast AFL's claim as being based solely on the Entergy unit.  It is not.  AFL asserts that every Fujikura brand fusion splicer sold by SurplusEQ infringes AFL's trademark rights because every such splicer contains material differences from the fusion splicers sold by AFL.  Defendants obtained the Fujikura splicers they sold from unauthorized vendors in China, who sell splicers intended for markets outside the U.S. – presumably predominantly units intended for the Chinese market.  (C-SMF at ¶ A8.)  Unlike the splicers sold by AFL, none of the fusion splicers sold by SurplusEQ carry a manufacturer's warranty, and none of them contain operating software that is licensed for use in the United States.

Defendants' citation to *SKF USA, Inc. v. Int'l Trade Commission*, 423 F.3d 1307, 1315 (Fed. Cir.), *rehearing en banc denied* (2005), is inapposite because *SKF* focused on whether a significant amount of *plaintiff's own* product had the "material differences" of which plaintiff complained in the defendant's product.  Specifically, the plaintiff alleged that the defendant's gray market bearings were materially different because they did not come with the right to certain post-sale technical and engineering services that purchasers of authorized bearings were entitled to receive.  *Id.* at 1310.  However, over 12% of the plaintiff's *own* sales were through channels that did not offer the post-sale services, so the gray market goods were identical to a significant amount of plaintiff's goods.  *Id.* at 1310-1311.  Because the trademark owner also sold a significant amount of goods containing the supposed material difference, the court refused to allow recovery for confusion to which the trademark owner had contributed.  *Id.* at 1315.

The court acknowledged that a trademark owner may sell some small amount of goods that contain the material difference without defeating a claim for trademark infringement, as long as "substantially all" of the plaintiff's goods have the quality that distinguishes them from the gray market products.  *Id.* at 1316.  The court held that "the 'all or substantially all' benchmark recognizes that something less than 100% compliance will suffice and certainly permits a small amount of nonconforming goods."  *Id.*

5

Contrary to Defendants' arguments, *SKF* does not require AFL to prove that substantially all of the Fujikura splicers Defendants sold carry the material difference.  The case does not hold that trademark law allows a *defendant* to make a small amount of infringing sales.  Even a single sale violating a plaintiff's trademark rights is actionable.  Regardless, because of the nature of the differences, including differences in the warranty, all or substantially all of the Fujikura fusion splicers sold by SurplusEQ are materially different from the authorized units sold by AFL.

### 3.	The Entergy Unit Provides Direct Proof of SurplusEQ's Infringing Sales

As detailed in AFL's Motion, the Entergy unit sold by SurplusEQ has been physically altered.   Specifically, the unit's serial number has been altered and the memory chip has been removed, reprogramed, and re-soldered to the unit.  (SMF at ¶ 30 [Doc. 147-1].)

Because the undisputed evidence establishes that the Entergy unit has been modified, Defendants attempt to avoid liability by arguing that there is no evidence that the unit was modified at the time it was sold to Entergy, pointing to the testimony of Douglas Winters of Entergy.  Presumably because Entergy did not immediately dismantle and inspect the unit for modifications upon receipt, and Mr. Winters did not maintain constant possession of the unit, he could not state with absolute certainty that the Entergy unit had been modified before it was purchased, and he could not absolutely rule out the possibility that it was modified by Entergy personnel.  (C-SMF, ¶ 91.)  Defendants also point to the testimony of AFL personnel, who not surprisingly did not know who modified the unit.

Defendants' arguments strain credulity.  They fail first because the nature of the modification  – alteration of the serial number – strongly implies that it was done by someone with a desire to conceal the unit's true source.  The modifications that caused the unit to display a false serial number did not enhance performance of the unit or otherwise improve its utility, but serve only to conceal the source of the unit.  Defendants offer no

6

LEWIS
AND
ROCA
LLP
LAWYERS

1   reason why a consumer would dismantle and reprogram the unit's memory chip so it

2   would display a false serial number.  It is simply implausible that the owner would make

3   such a modification, because it causes a risk of damaging the unit, and the owner gains

4   nothing from concealing the source of the product.

5        Notably, Defendants offer no evidence that Entergy modified the splicer.  Rather,

6   the evidence contradicts the notion that Entergy performed such modifications, as an

7   Entergy witness testified that it does not have the electronics capabilities to perform such

8   modifications.  (C-SMF at ¶ A18.)  Accordingly, the fact that the unit was modified in

9   such a way as to deceive consumers as to the true source of the unit leads to only one

10  conclusion, namely, that it was modified before it was sold to a consumer by SurplusEQ.

11  Defendants merely offer the "metaphysical doubt as to the material facts" that the court

12  held was insufficient to *avoid* summary judgment in *Matsushita Elec. Indus. Co. v. Zenith*

13  *Radio Corp.*, 475 U.S. 574, 584-86 (1986).  Certainly such metaphysical doubt is

14  insufficient basis on which to *grant* summary judgment.

15       **4.   SurplusEQ Has Come Forward with no Evidence that it**
             **Did Not Sell Modified Splicers**
16

17       Defendants also argue that there is no evidence that they have sold any other unit

18  that has been modified.  To the contrary, the evidence suggests that *all* splicers sold by

19  SurplusEQ have been modified so that they will display in English.  Testimony of Daniel

20  Parsons and the invoices produced by SurplusEQ establish that it acquires Fujikura fusion

21  splicers exclusively from unauthorized sources in China.  (C-SMF, ¶ 24.)  Fujikura fusion

22  splicers contain language locks, which, depending on the region in which they are to be

23  sold, limit the available languages that the user can select for display. Fujikura splicers

24  intended for sale in China are limited to display of the Chinese language, and units

25  obtained from China would be expected to display the Chinese language unless the

26  software has been modified.  (SMF at ¶ 27, 28 [Doc. 147-1]; C-SMF at ¶ 115, 156.)  The

27  reasonable conclusion drawn from this evidence is that *all* fusion splicers sold by

28  SurplusEQ have been modified.  Units to be sold in the U.S. would be materially different

7



1   from authorized units if they could only display in Chinese, and if they have been

2   modified to display in English are materially different as a result of the unauthorized

3   modification.

4        To support its position, SurplusEQ offers the testimony of its employees who state

5   that they never modified a unit nor received a modified unit.  This testimony is

6   contradicted by the fact that the Entergy unit was modified and it had been purchased from

7   SurplusEQ.  Further, SurplusEQ has not established that its employees have the technical

8   expertise to detect the software modification causing the units to display false serial

9   numbers and display in English.  Nor has SurplusEQ offered evidence that its employees

10  perform any investigation as to whether a specific unit's language setting had been

11  modified.  Instead, the evidence is that they open each unit and perform a splice test before

12  sale.  (C-SMF at ¶ 129-130.)  Because SurplusEQ has not established that its employees

13  have the expertise to know if a unit's language lock has been modified or to confirm that

14  each unit has not been otherwise modified, the cited testimony does not establish that

15  SurplusEQ has not sold modified Fujikura fusion splicers.

16       Although Mr. Parsons testified that his Chinese vendors said the Fujikura splicers

17  he bought had not been modified, his testimony shows that he was aware that those

18  vendors were not trustworthy.  He was aware that there were modified units on the market.

19  (C-SMF at ¶ A41.)  Mr. Parsons testified that he bought "supposedly" new splicers, and

20  that while the vendors would not tell him where they were coming from, he "always

21  assumed China." (C-SMF at ¶ A42.)  Regarding where the units were originally intended

22  for sale, "It's hard to trust the guys in China anyway."  (C-SMF at ¶ A43.)  One of the

23  vendors claimed to be an authorized reseller, but Mr. Parsons later learned otherwise.  (C-

24  SMF at ¶ A44.)  That vendor also said he had certain codes that Fujikura allowed him to

25  use, which Mr. Parsons recognized from the beginning was a "[r]idiculous claim."  (C-

26  SMF at ¶ A45.)

27       SurplusEQ also argues that testimony regarding the performance of its gray market

28  Fujikura fusion splicers establishes that the units are not materially different from

8

1   authorized units.  But the short-term splicing performance is not the primary concern

2   behind AFL's claims.  With respect to the modifications to a unit's language display, the

3   concern is that an end user will update the software remotely and cause it to revert to its

4   original intended language, most likely Chinese.  With respect to any hardware

5   modifications undertaken to display false serial numbers or for other reasons, the primary

6   concern is not short-term performance but long-term reliability.  AFL's technical expert

7   and the Fujikura employee who oversees development of fusion splicers concluded that

8   the modifications to the Entergy splicer could affect a unit's long-term reliability and

9   make it more likely to fail over time.  (C-SMF at ¶ A12, A13.)  As with a used-car

10  "lemon," the short term functioning of a unit, such as that verified by SurplusEQ's alleged

11  quality control testing, is not conclusive evidence of long term performance.

12          More important, the modifications take control of the quality of Fujikura splicers

13  away from Fujikura and AFL, and place that control in the hands of gray marketeers.

14  Regardless of whether a particular modification causes a machine to malfunction, parties

15  with rights in the mark involved should not be subjected to the risk that a unit has been

16  modified in a way that *may* cause later problems.  The mark embodies the owner's

17  goodwill, and gray market sellers are not entitled to risk damaging goodwill that does not

18  belong to them.  *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10 (1st Cir.

19  2004) (holding that the relevant commercial injury that is actionable under Section 43(a)

20  of the Lanham Act includes harm to the trademark holder's goodwill and reputation).

21          Finally, SurplusEQ offers the testimony of its employees who state that the

22  undisclosed third-party suppliers in China "swore" that they never sold a modified unit.

23  To the extent that SurplusEQ relies on these statements to prove the that SurplusEQ did

24  not receive modified units, the statements constitute inadmissible hearsay and do not

25  support summary judgment in Defendants' favor.  *See* Fed. R. Evid. 801, 802.

26

27

28

LEWIS
AND
ROCA
LLP
LAWYERS

1

2
### 5. The Differences Between SurplusEQ's Gray Market Splicers and the Genuine Units Sold by AFL are Material and, Therefore, Actionable

3
Defendants attempt to explain why the differences between the gray market goods

4
sold by SurplusEQ and the genuine splicers sold by AFL are not actionable, but they offer

5
no evidence that the differences would not be material to consumers.

6
Defendants first argue that the physical modifications made to the Entergy unit –

7
removal of the memory chip and re-soldering it to the motherboard – are not actionable

8
because they did not affect the unit's performance.  But the unit's short-term performance

9
is not the issue, as the modifications would be expected to affect the unit's long-term

10
reliability.  (SMF at ¶ 30 [Doc. 147-1]; C-SMF at ¶ A12, A13.)  Further, Defendants have

11
no evidence to refute testimony from actual customers that they consider physical

12
modifications to a unit's hardware to be important and would not knowingly purchase a

13
new unit that had been physically modified.  (SMF at ¶49 [Doc. 147-1]; C-SMF at ¶ 92.)

14
Defendants also argue that there is no meaningful difference between the splicers

15
intended for sale in China as opposed to those that are intended for sale in the U.S., as both

16
units contain the same software and hardware.  This argument fails because it ignores a

17
crucial reality: Fujikura splicers intended for sale in China display the Chinese language.

18
Further, units sold by SurplusEQ that have been modified to display English are materially

19
different from genuine units because they will revert to displaying Chinese if the operating

20
software is updated.  (SMF at ¶ 29 [Doc. 147-1]; C-SMF at ¶ 115, A9, A10.)  If the

21
consumer chooses not to update the operating software so that it will continue to display in

22
English, the unit will not contain the most current updates that are available to the genuine

23
units.  Even SurplusEQ notes the importance of updating the software, as it correctly noted

24
on its blog that the updates allow the units to "maintain peak performance."  (C-SMF at ¶

25
A37.) Accordingly, over time, the gray market splicers sold by SurplusEQ will either no

26
longer be useable by English-speaking consumers or they will not be updated with the

27
software available to genuine units.

28

LEWIS
AND
ROCA
LLP
LAWYERS

Case 2:11-cv-01086-DGC   Document 174   Filed 11/13/12   Page 11 of 41

1    Defendants also argue that there is no material difference between the warranty

2    provided by SurplusEQ and that provided by AFL and Fujikura on genuine splicers sold

3    by AFL because both apply for the same one-year term.  But it is not the length of the

4    warranty that establishes the material difference between the products.  Rather, it is the

5    source of the warranty and the assurance that any needed repairs will be expeditiously

6    performed by factory-trained technicians or the manufacturer itself that distinguishes the

7    gray market and genuine products.  AFL employs Fujikura-authorized technicians to

8    service genuine splicers, and, in the event that it cannot perform necessary warranty

9    repairs, AFL returns the unit directly to Fujikura in Japan.  (C-SMF at ¶ 137, A31.)    In

10    contrast, SurplusEQ's staff is not certified by Fujikura to perform repairs and has no

11    training nor ability to make any beyond rudimentary repairs.  For repairs that its staff

12    cannot perform, SurplusEQ is forced to return the units to its sources in China for repair.

13    (C-SMF at ¶ 119.)    These sources are not authorized Fujikura distributors, and

14    SurplusEQ has no evidence and can offer no guarantee to consumers that its unauthorized

15    sources are competent to perform the needed repairs.  (Given the fact that the units are

16    likely modified in some fashion, it is unlikely that  damaged units would ever be returned

17    to Fujikura for repair.)  An important part of the reputation associated with the Fujikura

18    brand is the level of service provided to those who purchase through authorized channels.

19    (C-SMF at ¶ A30.)    Again, Defendants' unauthorized service channels put that reputation

20    at risk because neither Fujikura nor AFL can control the quality of the service.

21    For these reasons, the differences between the gray market splicers sold by

22    SurplusEQ and the genuine Fujikura splicers sold by AFL are actionable and defendants

23    claim of entitlement to summary judgment on this ground should be rejected.

24          **6.    SurplusEQ's Disclosures Are Insufficient and Do Not**
25          **Prevent Consumer Confusion**

26    Defendants claim that consumers are not confused by the material differences

27    between the gray market and genuine products because SurplusEQ fully discloses all

28    relevant facts about the fusion splicers it sells.  However, to avoid liability under the

11

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1    Lanham Act for gray market sales, the disclosure must explain *all* material differences

2    between the gray market and genuine products in sufficient detail to avoid any consumer

3    confusion.  *See Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067,

4    1074 (10th Cir. 2009) (noting that adequate disclosure can alleviate consumer confusion

5    and prevent injury to a trademark's goodwill, but upholding district court's finding that

6    disclosure that manufacturer would not honor warranty were insufficient where

7    defendants' products did not bear legitimate serial numbers); *Bel Canto Design, Ltd. v.*

8    *MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 224 (S.D.N.Y. 2011) ("[I]f the defendant sufficiently

9    discloses the existence of the difference alleged to be material, then the possibility of

10   confusion arising from the difference is dispelled.").

11          Defendants have not established that SurplusEQ sufficiently discloses the material

12   differences between genuine and gray market products to avoid consumer confusion.

13   Indeed, the evidence supporting AFL's false advertising claim demonstrates that

14   SurplusEQ deceives its customers as to the key features of the fusion splicers it sells.  The

15   documentation indicates that SurplusEQ disclosed, in at least some instances, that AFL

16   would not perform warranty service.  (C-SMF at ¶ 140.)  That is the extent of the written

17   disclosure.  Otherwise, SurplusEQ claims to have made oral disclosures, but the testimony

18   indicates that at most, those disclosures were only made to customers who asked the right

19   questions.  (C-SMF at ¶ 140.)

20          Nowhere does SurplusEQ point to disclosure of matters that would be material to

21   consumers, such as the fact that the units they sell may have been physically modified, or

22   that the software on the units may have been modified to allow it to display English, or

23   that the serial number may have been changed.  Rather, SurplusEQ's promotional

24   materials state that the Fujikura splicers are "Guaranteed not modified in any way."  (C-

25   SMF at ¶ A24.)  Nowhere does SurplusEQ point to any written disclosure of the fact that

26   warranty service will be performed by persons who have no training in repair of Fujikura

27   splicers, or that they will be sent to unauthorized vendors in China for any significant

28   repairs, or that the software cannot be updated, or that inability to update the software

12

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1   limits the capabilities of the splicer, or that attempts to update the software may cause the

2   unit's display to revert to the Chinese language.  (C-SMF at ¶ 139, 140.)  The failure to

3   systematically disclose matters concerning the software is particularly deceptive in light of

4   advertising on SurplusEQ's blog advertising the Fujikura FSM-60S and stating: "New

5   software included provides the ability to . . . download splicer operating software via the

6   internet to maintain peak performance . . . ."  (C-SMF at ¶ 141, A29.)

7          Further, because SurplusEQ's disclosures are insufficient, the existence of the

8   material differences between the genuine and gray market products causes actual

9   consumer confusion and survey evidence is not necessary for AFL to maintain its claims.

10  In gray market cases, the existence of material differences establishes actual consumer

11  confusion necessary to support a claim under the Lanham Act and survey evidence is not

12  required.  *See Societe des Produits Nestle , S.A. v. Casa Helvetia , Inc.*, 982 F.2d 633, 640

13  (1st Cir. 1992) (noting that "liability necessarily turns on the existence *vel non* of <u>material</u>

14  <u>differences</u> between the products of a sort likely to create consumer confusion") (emphasis

15  added), *American Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577, 584-85

16  (9th Cir. 2005) (*quoting Nestle* materiality standard); *see also PepsiCo Inc. v. Reyes*, 70 F.

17  Supp. 2d 1057, 1059 (C.D. Cal. 1999) (same).

18          **B.    AFL's False Advertising Claim**

19          **1.    SurplusEQ's Statements Constitute Commercial**
                    **Advertising or Promotion Under the Lanham Act**

20

21                 a.    The Blog Posts Were Sufficiently Disseminated to
                        SurplusEQ's Customers to Constitute Commercial

22                      Advertising or Promotion

23  Defendants argue that AFL cannot maintain a false advertising claim because the

24  allegedly false statements do not constitute "commercial advertising or promotion" under

25  the Lanham Act.  Specifically, Defendants argue that the blog posts do not satisfy the

26  fourth element of "commercial advertising or promotion," which requires that the

27  statements be "disseminated sufficiently to the relevant purchasing public to constitute

28

13

LEWIS
AND
ROCA
LLP
— LAWYERS —

1    'advertising' or 'promotion' within that industry." *Coastal Abstract Serv., Inc. v. First*

2    *Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (*quoting Gordon & Breach Science*

3    *Publishers, Ltd. v. American Inst. of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994)).  This

4    argument fails, however, because SurplusEQ established the blog as a forum for

5    advertising its products, and its own blog posts demonstrate that it uses the blog to

6    communicate with its customers.[1]

7            SurplusEQ's blog contains multiple posts relating to buying and selling new, used,

8    and gray market fiber optic equipment.  (C-SMF at ¶ A35.)  Many of the individual posts

9    discuss specific products sold by SurplusEQ through its online store and contain

10   hyperlinks directed to SurplusEQ's online store.  (C-SMF ¶ A36.)  In fact, SurplusEQ used

11   its blog to announce the arrival of Fujikura FSM-60S fusion splicers – the same fusion

12   splicers at issue in this case – to its online store.  (C-SMF at ¶ A37.)  The announcement

13   touts the advantages of the FSM-60S model and it includes a product description followed

14   by the following hyperlink: Purchase Fujikura FSM-60S Here.  (C-SMF at ¶ A37.)  Any

15   doubt that SurplusEQ used the blog to communicate directly with its customers is

16   dispelled by one post specifically thanking them for their patronage:

17              And we want to send out a big **THANK YOU** to everyone
                who's stuck around and continued to support us over the years.
18              As we move forward we promise to continue staying
                committed to excellent customer service while providing
19              competitive pricing and equipment to fulfill your project
                needs!  So spread the word and keep coming back as we have
20              lots more in store for you.

21   (C-SMF at ¶ A38) (emphasis in original).

22           Defendants argue that AFL has not provided any evidence that anyone saw the blog

23   or advertisements, that any consumer attributed it the defendants, or that AFL lost any

24   customers as a result of the post.  But Defendants do not dispute that the blog is offered on

25   the internet and available to readers worldwide, and they offer no explanation as to why

26   SurplusEQ would post a comment thanking its customers if it didn't believe they read the

---

[1] Defendants first argue that the Entergy invoice does not constitute a commercial
27   advertising or promotion.  AFL's false advertising claim is not based on statements
included in the invoice.
28

14

blog.  Further, the blog containing the false advertising is attributed to SurplusEQ, as it concludes with "Regards  SurplusEQ.com." (C-SMF at ¶ A39.)  Finally, at least with respect to Fujikura FSM-60S fusion splicers, any U.S. sales by SurplusEQ resulting from the blog are sales lost by AFL because AFL is the only authorized seller of such products in the U.S.  (C-SMF at ¶ 6.)   Accordingly, each of these arguments can be rejected.[2]

Because SurplusEQ established its blog on the internet and as a forum for advertising its products and communicating with its customers, statements made on its blog are necessarily disseminated to the relevant purchasing public to the same extent as its advertising efforts.  Accordingly, the false statements made on SurplusEQ's blog were sufficiently disseminated to the relevant purchasing public to satisfy the fourth element of commercial advertising or promotion under the Lanham Act.  An online business cannot legitimately argue that statements it made in an online forum that links directly to its online store are not sufficiently disseminated to constitute advertising or promotion in a market of online shoppers.

> b.  SurplusEQ's Blog Posts Are Actionable as Commercial Speech Under *Bolger v. Youngs Drug Prods. Corp.*

Defendants also argue that the blog post is not a commercial advertisement because, as a general information blog, it is not the kind of speech actionable under the Lanham Act.  However, the proper analysis involves consideration of multiple factors related to the content of a communication. Specifically, the factors to be considered are:

---

[2] Further, the case cited by defendants, *Cornelius v. Bodybuilding.com, LLC*, 2011 U.S. Dist. LEXIS 59005, 100 U.S.P.Q.2D (BNA) 1483 (D. Id. June 1, 2011), is factually distinguishable because the blog posts were not originally associated with the owner of the website.  The statements at issue were made by an individual who was not associated with the defendant until a year and a half after the posts were made.  *Id*. at *19.  Once the individual because a moderator for the blog, the signature associated with his earlier posts appeared in bold, indicating his status as a moderater (and thus someone with authority to speak on behalf of the defendant).  *Id*. at *8.  However, this was significantly removed in time to create an issue regarding whether anyone went back and read the original posts and attributed them to the defendant.  *Id*. at *18 ("Moreover, INGENIUM did not become a moderator until a year and a half after the post was made. And there is even less evidence to suggest that a forum member went back and retrieved the post a year and a half later and saw INGENIUM's name in boldface type indicating his moderator status.").  In this case, by contrast, SurplusEQ has always been identified as the source of the statements at issue.

15

1   (1) whether the statements are in a typical advertising format; (2) whether the statements

2   refer to a commercial product; and (3) whether the defendant had an economic or

3   commercial motivation for making the statements. *Bolger v. Youngs Drug Prods. Corp.*,

4   463 U.S. 60, 66-68 (1983).  Not all three factors need to be present to conclude that speech

5   is commercial, though no single factor is sufficient to establish that a statement is

6   commercial speech.  *Id.* at 67 n.14.

7           In this case, analysis of all three factors supports the conclusion that SurplusEQ's

8   blog posts constitute commercial speech.  First, in the context of SurplusEQ's on-line

9   business, SurplusEQ has established that its blog is a forum for advertising the products it

10  sells in its on-line store.  Indeed, SurplusEQ announced the arrival of Fujikura FSM-60

11  series fusion splicers, which are among the products at issue in this case, on its blog in an

12  entry dated December 5, 2008.  (C-SMF at ¶ A37.)  That post touts the advantages of the

13  new model and it announces that SurplusEQ has such splicers in stock.  (C-SMF at ¶

14  A37.)   The blog contains a link to SurplusEQ's online store.  (C-SMF at ¶ A36.)

15  Accordingly, SurplusEQ's use of its blog as a means for advertising its products supports

16  the conclusion that, in the context of SurplusEQ's on-line business, the blog is a typical

17  advertising format.

18          The false statements in SurplussEQ's July 21, 2009 blog also constitute commercial

19  speech because they refer to a commercial product.  Specifically, the statements reference

20  new fusion splicers, which fall within the category of fiber optic products.  (C-SMF at ¶

21  A40.)  Though Fujikura fusion splicers are not identified specifically by name, such

22  specificity is not required.  *See Bolger*, 463 U.S. at 67 n.13 ("That a product is referred to

23  generically does not, however, remove it from the realm of commercial speech.").

24          Finally, SurplusEQ's blog post constitutes commercial speech because SurplusEQ

25  has a significant economic motivation for making the statements.  The blog post, which is

26  titled "Buying Your Test Equipment Through Gray Market Channels," is intended to

27  "inform" the public of the benefits of purchasing fiber optic equipment through gray

28  market channels.  (C-SMF at ¶ 40.)   The post discusses advantages of purchasing fiber

                                              16

1  optic products through gray market channels (lower prices, a full Manufacturer's warranty,

2  a not illegal business model), and it identifies SurplusEQ as a gray market source.  (C-

3  SMF at ¶ 40.)  The blog concludes by offering the sales and services of SurplusEQ's

4  online store for interested consumers.  (C-SMF at ¶ 39.)  In short, each aspect of the blog

5  demonstrates SurplusEQ's significant financial motivation.  Combining this motivation

6  with the other factors relevant to the analysis, the facts establish that SurplusEQ's blog

7  post is commercial speech and subject to regulation under the Lanham Act.

8         **2.**    **Undisputed Evidence Establishes that the Allegedly False**

9                  **Statements are in Fact False**

10       As described in greater detail in Section II(D) of AFL's Motion for Partial

11  Summary Judgment, the undisputed evidence shows that the statements of which AFL

12  complains are false.  In its blog post, SurplusEQ advertises that with respect to the new

13  fusion splicers that it sells, SurplusEQ buys "direct from the manufacturer," that its prices

14  are lower because it does not purchase through a middleman, and that the purchaser gets

15  the "same machine," "[n]ot to mention a full Manufacturers Warranty."

16       Those representations are false in that buys from "middle men," namely distributors

17  in countries other than the U.S., rather than from Fujikura (SMF at ¶ 37 [Doc. 147-1]); its

18  Fujikura splicers do not come with a full manufacturer's warranty and are not eligible for

19  manufacturer's authorized warranty service in the U.S. (SMF at ¶ 23 [Doc. 147-1]), and

20  the Fujikura splicers it sells are not "the same machine" as authorized products in that they

21  have been altered and incorporate software not licensed for use in the U.S. and that cannot

22  safely be upgraded to the current version.  (SMF at ¶ 5, 27-30 [Doc. 147-1].)

23       SurplusEQ also advertises on its website and on eBay that the Fujikura Fujikura

24  FSM-60S and FSM-60R fusion splicers it sells are "new" and "[g]uaranteed not modified

25  in any way."  (SMF at ¶ 37, 42 [Doc. 147-1].)  In fact, they have been modified – in some

26  cases physically, and in others in their software to allow display of English – and so

27  cannot be fairly characterized as "new" – particularly under eBay's definition of the term

28



1   "new," which means  "A brand-new, unused, unopened, undamaged item in its original

2   packaging (where packaging is applicable)."  (SMF at ¶ 27-30, 44 [Doc. 147-1].)

### 3. Direct Testimony From Actual Consumers Establishes that the False Statements Were Material

5         The direct testimony of purchasers of Fujikura fusion splicers establishes that the

6   false statements are material to consumer purchasing decisions.  Consumers want a

7   warranty providing for service by factory-trained personnel, so a statement regarding a

8   manufacturer's warranty is likely to influence a purchaser's decision.  (SMF at ¶ 50 [Doc.

9   147-1].)  Consumers want products that have not been modified in any way, and a

10  statement that a product is "new" or that it has not been modified is likely to influence a

11  purchaser's decision.  (SMF at ¶¶ 49, 51 [Doc. 147-1].)  It is important to at least some

12  consumers that the operating software on the products they purchase can be updated over

13  time, and that the operating software on the products they purchase be properly licensed

14  for the region where it is to be used.  (SMF at ¶ 52 [Doc. 147-1].)  With regard to the

15  ability to update the software, the fact that SurplusEQ itself chose to highlight the fact the

16  FSM-60 splicer allows the user to "download splicer operating software via the internet to

17  maintain peak performance . . . ." shows that Defendants recognized that as a valuable

18  feature.  (C-SMF, ¶ 141, A29.)

### C. AFL's Copyright Claim

### 1. The First Sale Doctrine Does Not Preclude AFL's Claim.

21        Defendants accurately report that current Ninth Circuit authority holds that the first-

22  sale doctrine does not apply to this case, where the Fujikura splicers SurplusEQ sold (and

23  which bear the copyrighted software) were manufactured and first sold outside the U.S.

24  *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 983 (9th Cir. 2008), *aff'd per*

25  *curium* 131 S.Ct. 565 (2010).  While the *Kirtsaeng v. John Wiley & Sons* case currently

26  pending before the Supreme Court is expected to address that issue, it is premature to draw

27  any conclusions about how that case may affect the current action.

28

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2.      AFL Has Established Ownership of a Valid Copyright that SurplusEQ has Infringed**

Defendants erroneously contend that AFL has not produced any witness who can testify concerning ownership, and that AFL cannot show infringement because it has not compared the Fujikura software code to the code on a Fujikura splicer sold by SurplusEQ. Neither contention has merit.

Defendants have taken the depositions of two witnesses with knowledge concerning the software code.  First, they took the deposition of Hiroshi Sugawara, a software engineer who worked on the team that created the software at Fujikura.  (C-SMF, ¶¶ 174-75.)  Mr. Sugawara's declaration demonstrates that the software was created by Fujikura employees within the scope of their employment (and is therefore a "work made for hire" owned by Fujikura). *Id.*; 17 U.S.C. § 101 (a "work made for hire" is "a work prepared by an employee within the scope of his or her employment;") 17 U.S.C. § 201(b)  ("[i]n the case of a work made for hire, the employer . . . is considered the author for purposes of this title . . . .")  Second, they took the deposition of Noriyuki Kawanishi, Fujikura's Splicer Research and Development Manager, who oversees the creation of the software. Both Mr. Sugawara and Mr. Kawanishi confirm that the code from the original version of the software was incorporated into later versions of the software.  (C-SMF at ¶ A26.)

The suggestion that in order to prove its claim, AFL must laboriously compare the software code that is owned by Fujikura against the code on the splicers sold by SurplusEQ is also without merit.  SurplusEQ does not deny selling Fujikura splicers, which it has advertised as "100% Fujikura" and "guaranteed not modified in any way." (C-SMF at ¶ 139, A24.)  It is undisputed that the splicers are sold with the software and require the software to operate.  (C-SMF at ¶ A27.) SurplusEQ does not contend that the Fujikura splicers it sells do not work, nor does it contend that the splicers bear some third-party software that replaces the Fujikura software.  In short, there is no serious dispute that the software on the splicers SurplusEQ sold is in fact the Fujikura software.  Defendants' argument is based, at most, on the "metaphysical doubt" that is insufficient to sustain even

LEWIS
AND
ROCA
LLP
L A W Y E R S

1    an opposition to summary judgment, much less a grant of summary judgment.  *Matsushita,*

2    *supra*, 475 U.S. at 584-86.

3                    **3.    The Registration Requirement Does Not Bar AFL's Claim.**

4           Defendants' contention that registration stands as a hurdle to AFL's infringement

5    claim is incorrect.  The registration requirement applies only to "United States work[s]."

6    17 U.S.C. § 411(a).  Because the software at issue was created in Japan, an issue arises

7    whether it is a United States work.  According to 17 U.S.C. § 101, determination of that

8    issue depends in part on whether the work is "published" or not: in the case of a published

9    work, a work is a United States work if it is first published in the United States, or

10   published "simultaneously in the United States and another treaty party or parties, whose

11   law grants a term of copyright protection that is the same as or longer than the term

12   provided in the United States . . . ." In the case of an unpublished work, it is a United

13   States work if "all the authors of the work are nationals, domiciliaries, or habitual residents

14   of the United States . . . ."  17 U.S.C. § 101.

15          Whether, under circumstances such as these, a work has been "published" is a

16   difficult legal issue, but whether published or not, the software is not a United States work.

17   If unpublished, it is not a United States work because, as a work made for hire, the

18   "author" of the work is Fujikura, which is a Japanese company.  (C-SMF, ¶ 3; SMF ¶ 6

19   [Doc. 147-1].)  If published, it was simultaneously published in the United States and a

20   number of different treaty parties, namely Chile, China, Morocco, and the European

21   Union.  All of those countries are "treaty parties" under 17 U.S.C. § 101.  (See Copyright

22   Office Circular 38, Ex. A to the Declaration of John W. Scruton submitted herewith.)  The

23   duration of a copyright in a computer program created as a work made for hire in Chile is

24   70 years from publication (Chile Law No. 17336, Arts. 8 and 10), in China is 50 years

25   from publication (Copyright Law of the Peoples' Republic of China, Art. 21), in Morocco

26   is 70 years from publication (Morocco Law No. 2 00 on Copyright and Related Rights,

27   Articles 10, 27, 35), and in the European Union is 70 years from publication (Directive

28   2006/116/EC of the European Parliament and of the Council of 12 December 2006 on the

term of protection of copyright and certain related rights).  None is as long as the duration

95 years from publication provided by 17 U.S.C. § 302(c).  Accordingly, the software is

not considered a United States work, and registration is not required as a prerequisite to

filing suit.

Even if registration were required, it is undisputed that Fujikura registered Version

1.32b of the software.  As discussed in AFL's Motion for Partial Summary Judgment,

Fujikura owns all versions of the software as works made for hire, because the works are

original works, created by Fujikura employees within the scope of their employment

duties.  (SMF at ¶ 6 [Doc. 147-1].)

Defendants' contention that AFL has produced no witness who can testify as to the

software is incorrect.  Defendants have taken the depositions of both Hiroshi Sugawara, a

software engineer who was part of the team that created the software, and Noriyuki

Kawanishi, who oversaw the creation and revision of the software for Fujikura.  AFL

submitted Mr. Sugawara's declaration in support of its Motion for Partial Summary

Judgment [Doc. 147-6].  AFL submits with this response Mr. Kawanishi's declaration

confirming that there was no substantial rewrite of the software after Mr. Sugawara ceased

working on it.  (C-SMF, ¶ A26.)  Because the registered version is a derivative work of the

preceding versions, and Fujikura created and owns all versions, registration of Version

1.32b is sufficient to maintain an action for infringement for all.  *See Religious Tech. Ctr.*

*v. Netcom On-Line Commun. Servs.*, 923 F. Supp. 1231, 1241-1242 (N.D. Cal. 1995)

("Where, as here, the author of a collection or derivative work is also the author of the

preexisting work, registration of the collection is sufficient."); *Streetwise Maps, Inc. v.*

*VanDam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998) (registration of pre-existing work was

sufficient for infringement action on derivative work when plaintiff was copyright owner

of both).

21

LEWIS
AND
ROCA
LLP
LAWYERS

Case 2:11-cv-01086-DGC   Document 174   Filed 11/13/12   Page 22 of 41

1

### 4.   AFL's Copyright Claim does Not Constitute Copyright Misuse.

Defendants' argument that AFL's copyright claim constitutes copyright misuse is an attempt to distort that defense beyond all recognition.  Defendants' assertion of misuse must be rejected because there is no serious question as to the legitimacy including the software on the Fujikura splicers at issue here.  Defendants' argument, if accepted, would preclude enforcement of copyright protection well beyond what has been recognized as copyright misuse.

Defendants base their argument primarily on *Omega S.A. v. Costco Wholesale Corp.*, 2011 U.S. Dist. LEXIS 155893, 2011 WL 8492716 (C.D. Cal Nov. 9, 2011).  In that case, after receiving complaints from authorized retailers about Costco's discounting, "Omega's legal department suggested that Omega use a copyrighted design to control the importation and distribution of its watches into the United States," *Id*. at *2, and Omega conceded that "a purpose of the copyrighted Omega Globe Design was to control the importation and sale of its watches containing the design."  *Id*. at *4.  It registered the copyright in the "Omega Globe Design" and thereafter began engraving it - at a size of about 1/8 inch - on the backside of its Seamaster watches.  *Id*. at *2.  Then it asserted a copyright claim against Costco based on distribution of the watches bearing the design.  Given the tiny size of the design and the fact that it was on the back of the watch, where it would not normally be visible, it is difficult to conceive of any reason for using the design *other than* to try to control importation.  "In other words, Omega used the defensive shield of copyright law as an offensive sword" to take advantage of import limitations.  *Id*. at *3.

This case is very different.  There is no evidence that Fujikura incorporated the software in the current splicers in order to create a basis for asserting a copyright claim.  Rather, it is undisputed that prior Fujikura splicers also incorporated (different) software, and that the software on the current FSM-60 splicers is critical to their operation.  (C-SMF, ¶ A27.)  Unlike in *Omega*, there is no basis for a claim that the purpose of loading

1    the copyrighted work on the splicers was to manufacture a copyright claim, and

2    Defendants have not even attempted to make that claim.

3           Rather, Defendants focus not on the reason for placing the software on the splicers,

4    but rather on the reason for registering the copyright and assigning exclusive distribution

5    rights to AFL.  But that criticism would apply any time the owner of a copyright registers

6    the copyright.  AFL's claims here are no less legitimate here than any other case of

7    copyright infringement.

8           Given that the software was included on the splicers not for any improper purpose

9    but to operate the splicers, there is nothing improper about either registering the copyright

10   or licensing certain rights under the copyright to AFL.  Nor is there anything improper

11   about AFL's asserting the exclusive rights in this lawsuit.  If there were, a copyright owner

12   would be precluded from asserting its rights merely because the copyrighted work had

13   been incorporated in a useful article.  There is no such preclusion.  *See, e.g. Lakedreams v.*

14   *Taylor,* 932 F2d 1103, 1105 (5th Cir. 1991) (copyrighted design incorporated on t-shirt;

15   upholding preliminary injunction).

16          This case is unlike other cases cited by Defendants.  For example in *Lasercomb*

17   *America, Inc. v. Job Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990), the court found misuse

18   because the plaintiff had licensed its software with provisions prohibiting the licensee

19   from engaging in the development of competing software for 99 years.  In *Apple Inc. v.*

20   *Psystar Corp.*, 658 F.3d 1150, 1160 (9th Cir. 2011), the court found there was no misuse

21   where the plaintiff's license, limiting the use of Apple software to Apple computers, left

22   the defendant "free to develop its own computer software."

23          Here, there would be no copyright violation if  Defendants were to create software

24   that would operate the Fujikura splicers and distribute the splicers with that software rather

25   than the Fujikura software.  They have chosen not to do that.  There is nothing about

26   incorporating operating software in a useful device that strips the software of its protection

27   under the Copyright Act.

28

LEWIS
AND
ROCA
——LLP——
LAWYERS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.     AFL's Claims are Not Barred by the Doctrine of Laches

Broadly claiming that AFL has known of their advertising and sales of Fujikura fusion splicers since 2003, Defendants argue that AFL's claims are barred by the doctrine of laches because AFL did not pursue this litigation until 2011.  But Defendants' argument fails because no evidence establishes that AFL knew or had reason to know of its claims until, at the very earliest, the end of 2008, and AFL did not unreasonably delay the investigation into the underling facts supporting its claims or filing this suit.  Further, Defendants' defense of laches can be rejected outright as they offer nothing more than conclusory allegations of prejudice and they cannot tie the alleged prejudice to a business built on their use of Fujikura – as opposed to other manufacturer's – marks.

### 1.     AFL is Entitled to a Strong Presumption *Against* Laches Because it Promptly Investigated the Underlying Facts and Filed Suit.

In determining whether the equitable defense of laches is applicable,  courts first examine whether a plaintiff filed suit within the statute of limitations period for the analogous action at law. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  "If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable."  *Id.*  In this case, the appropriate limitations period for AFL's claims under the Lanham Act is Arizona's three-year period applicable to actions for fraud.  *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1140 (9th Cir. 2010) ("We agree and hold that Arizona's three-year statute of limitations for fraud applies to Lanham Act claims."); *Ranch Realty, Inc. v. DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 989-990 (D. Ariz. 2007) ("Given that trademark infringement claims and claims of unfair competition are 'substantially congruent,' the Court will apply a three-year limitations period to Plaintiff's unfair competition claim.") (citation omitted).  Claims for copyright infringement are likewise governed by a three-year limitations period, which is provided by the Copyright Act.  17 U.S.C. § 507(b).

24

In assessing a presumption for or against laches, the limitation period begins when the plaintiff knew or reasonably should have known of the facts giving rise to the cause of action. *Jarrow Formulas*, 304 F.3d at 838.

Contrary to Defendants' contentions, AFL did not delay from 2003 in filing this suit. SurplusEQ's early sales involved used splicers and other products intended for the U.S. market that are not at issue in this case. (C-SMF at ¶ 184.) Because those sales did not give rise to this action, AFL's knowledge of SurplusEQ's activities in 2003 does not begin the running of the limitations period.

Defendants have produced no evidence establishing that AFL knew or should have known of facts giving rise to the claims in this suit more than three years before this action was filed on June 1, 2011. In fact, the evidence supports a presumption *against* laches because AFL pursued each claim asserted within the applicable three-year period.

Specifically, AFL's unfair competition claim is based on the existence of material differences between the gray market goods sold by SurplusEQ and the genuine Fujikura fusion splicers sold by AFL. AFL first learned that SurplusEQ was selling modified goods when it inspected the Entergy unit, which was physically modified and had been sold by SurplusEQ, in August of 2010. (C-SMF at ¶ A28.) This was less than a year before AFL brought this action, which was filed on June 1, 2011. Further, AFL had no reason to believe that SurplusEQ was selling modified splicers, especially as SurplusEQ advertised its splicers as "guaranteed not modified in any way."

Regarding AFL's claim for false advertising, the claim primarily rests on SurplusEQ's blog post dated July 21, 2009, which was posted less than two years prior to the filing of this suit, well within the limitations period. To the extent that AFL's claim also rests on SurplusEQ's statements that its Fujikura fusion splicers are "new" and "guaranteed not modified in any way," AFL did not have knowledge that these statements were false until it recovered the modified Entergy unit over a year later.

Finally, AFL's claim for copyright infringement was also asserted in a timely manner, at it is founded on SurplusEQ's distribution of copyrighted operating software

25

1  preloaded onto Fujikura FSM-60 series fusion splicers.  SurplusEQ first announced that it

2  had Fujikura FSM-60S series in stock on its blog through a post on December 5, 2008.

3  (C-SMF, ¶ 152.)  There is no evidence that AFL knew or should have known that

4  SurplusEQ had these splicers before then.  As AFL's claim is based on distribution,

5  neither AFL nor Fujikura had a claim until SurplusEQ actually began selling 60 series

6  splicers.  Because AFL's claim only arises as a result of the copyright license from

7  Fujikura, AFL could not have asserted a claim before that license was executed February

8  17, 2011, even though the license granted the right to bring a claim for preexisting

9  infringements.  (SMF at ¶ 15, 16 [Doc. 147-1].)   Though the December 5, 2008 blog post

10  provided notice that SurplusEQ might have been infringing Fujikura's copyrights, AFL

11  did not have actual evidence of such infringement until it recovered the 60 series unit sold

12  to Entergy.  In any event, SurplusEQ's December 5, 2008, announcement is well within

13  the three-year limitations period applicable to AFL's claim for copyright infringement.

14       Because the AFL did not know and could not have known of SurplusEQ's conduct

15  that gave rise to this lawsuit more than three years before it filed this suit, AFL is entitled

16  to a presumption that the defendants' asserted defense of laches in inapplicable.

### 2.  Defendants Offer Only Conclusory Allegations of Prejudice that are Not Specifically Related to Fujikura's Trademarks

19       In order to prove a laches defense, a defendant must not only show that the plaintiff

20  delayed in filing suit, but also must establish that it was prejudiced because of the delay.

21  Indeed, "[l]aches is not a doctrine concerned solely with timing. Rather, it is primarily

22  concerned with prejudice." *In Re Beaty*, 306 F.3d 914, 924 (9th Cir. 2002).  Further, a

23  defendant cannot establish prejudice simply by simply showing that it incurred expenses in

24  promoting products bearing a plaintiff's mark. *Internet Specialties West, Inc. v. Milon-*

25  *Digiorgio Enters.*, 559 F.3d 985, 991 (9th Cir. 2009) ("If this prejudice could consist

26  merely of expenditures in promoting the infringed name, then relief would have to be

27  denied in practically every case of delay.") (*citing Tisch Hotels, Inc. v. Americana Inn*,

28

1    Inc., 350 F.2d 609, 615 (7th Cir. 1965)).  Instead, a defendant must establish that it built its

2    business around its use of the plaintiff's mark.  *Id.* at 992.

3            In this case, the defense of laches fails because Defendants have offered no

4    evidence of actual prejudice they suffered because of any delay that is related to the

5    specific use of the Fujikura trademark.  Defendants offer only the conclusory allegation

6    that they have invested considerable time and money into their business in time between

7    when AFL first became aware of their business and filed suit.  However, beyond this

8    statement, they provide no evidence that this investment is related to their use of the

9    Fujikura mark as opposed to the marks identifying the other products they sell.  Further, as

10   SurplusEQ operates an online store, the costs of stocking additional products and posting

11   them among its inventory online are minimal.  SurplusEQ cannot point to any significant

12   expense in advertising, storage, or retail display space incurred because of its sales of

13   infringing Fujikura products, and it has not identified any savings it enjoyed since it

14   stopped carrying Fujikura products in 2011.  (C-SMF at ¶ 185.)  Defendants' conclusory

15   comments fall significantly short of the undisputed evidence needed to establish their

16   entitlement to summary judgment on this issue.  AFL's claims cannot be barred as a matter

17   of law on defendants' unsupported theory of laches.

18   **E.    Defendants Have Not Established That AFL Cannot Recover**
19   **       Damages in this Action**

20        **1.    AFL Properly Seeks Recovery of its Lost Profits on**
     **              SurplusEQ's Infringing Sales**
21
22           Defendants argue that AFL's damages theory is entirely speculative and contrary to

23   Ninth Circuit law.  But the Lanham Act, the Copyright Act, and Ninth Circuit precedent

     plainly support each element of AFL's claims for damages.
24
             AFL's claims for unfair competition and false advertising arise under Section 43(a)
25
     of the Lanham Act.  When a violation of Section 43(a) is established, the successful
26
     plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff,
27
     and (3) the costs of the action."  15 U.S.C. § 1117.  With respect to "damages sustained by
28

L E W I S
AND
R O C A
LLP
L A W Y E R S

1   the plaintiff," such damages "are typically measured by any direct injury which a plaintiff

2   can prove, as well as any lost profits which the plaintiff would have earned but for the

3   infringement."  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

4   With respect to the defendant's profits,

5          A prevailing plaintiff in a civil case for trademark infringement
            under 15 U.S.C. § 1125(a) is entitled, subject to the principles of
6          equity,  to recover the defendant's profits. 15 U.S.C. § 1117(a). The
            plaintiff need only prove defendant's sales, while the defendant
7          bears the burden of proving all elements of costs or deductions
            claimed. *Id.*
8

9   *Harry v. Pathak*, 2010 U.S. Dist. LEXIS 126887 at *15-16 (D. Ore. Oct. 29, 2010); *see*

10  *also Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 123 (9th Cir.

11  1968).

12         In this case, AFL seeks to recover its lost profits for all infringing sales made by

13  SurplusEQ, as well as SurplusEQ's profits on such sales (to the extent the two do not

14  overlap).  As explained above, every gray market Fujikura fusion splicer sold by

15  SurplusEQ violates AFL's trademark rights because all such splicers are materially

16  different from the units offered by AFL. Accordingly, AFL seeks damages for each sale

17  made by SurplusEQ.  Consistent with the Ninth Circuit's opinion in *Lindy Pen*, with

18  respect to sales that AFL would have made, AFL can recover its lost profits it would have

19  earned but for the infringement.  *Lindy Pen Co.*, 982 F.2d at 1407.

20         Defendants argue that AFL cannot recover its lost profits for each sale made by

21  SurplusEQ because AFL has no evidence that it would have made each of the those sales.

22  Though AFL cannot say with absolute certainty that it would have made each infringing

23  sale made by SurplusEQ but for SurplusEQ's infringing sale, it is a reasonable inference

24  that AFL would have made those sales because SurplusEQ claimed to be selling new

25  Fujikura fusion splicers and AFL has the exclusive right to sell such splicers within AFL's

26  territory.  Indeed, the only evidence of actual consumer behavior in this case is that

27  SurplusEQ's customers intended to purchase new Fujikura fusion splicers.  AFL is the

28

only authorized source for such units in the U.S. and within the territory defined by the Reseller Agreement.  (C-SMF, ¶ 6.)  Accordingly, the only available evidence is that AFL is the sole source of the products that SurplusEQ's customers purchased in the complained-of transactions, and therefore that AFL would have made each of SurplusEQ's infringing sales but for SurplusEQ's infringement.  SurplusEQ's sales provide a reasonable forecast of AFL's lost sales and support AFL's computation of damages.  *Lindy Pen Co.*, 982 F.2d at 1407 ("'[D]amages are not rendered uncertain because they cannot be calculated with absolute exactness,' yet, a reasonable basis for computation must exist.").

Moreover, because all of SurplusEQ's sales of gray market Fujikura fusion splicers infringe AFL's trademark rights, the defendants' citation to *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704 (9th Cir. 1999), is misplaced.  There, the Ninth Circuit upheld the district court's rejection of damages because the plaintiff sought to recover damages for infringing and non-infringing sales.  Specifically, the defendant sold altered Rolex watches that had been modified with non-genuine Rolex parts.  *Rolex*, 179 F.3d at 707. The district court concluded that these sales infringed Rolex's trademarks and enjoined further infringement by the defendant.  *Id.*  However, some of the defendant's business involved reconditioning Rolex watches at the request of individual owners, and Rolex had not asserted that such alterations infringed its rights.  *Id.* at 710 n.8 ("Rolex noted at oral argument that it did not seek, and had not sought in the district court, an injunction preventing individual owners of Rolex watches from altering their watches with non-Rolex parts.").  Accordingly, the district court denied Rolex's claim for damages because it "rejected Rolex's suggestion that [the defendant's] testimony that thirty percent of his business involved reconditioning used Rolex watches was adequate to show [his] gross sales attributable to altered 'Rolex' watches."  *Id* at 712.  The Ninth Circuit affirmed, because the "thirty percent estimate did not isolate those alterations that [the defendant] makes at the request of a specific customer [non-infringing], through a retail jeweler [infringing], from his other general sales [infringing]."  *Id.*

29

1    In the same manner, AFL can properly recover its lost profits for any sales made by

2  SurplusEQ that infringe AFL's copyright in the operating software pre-loaded onto

3  Fujikura 60 series fusion splicers.  *See* 17 U.S.C. § 504(b) ("The copyright owner is

4  entitled to recover the actual damages suffered by him or her as a result of the

5  infringement, and any profits of the infringer that are attributable to the infringement and

6  are not taken into account in computing the actual damages."); *Polar Bear Prods. v. Timex*

7  *Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("Actual damages are usually determined by the

8  loss in the fair market value of the copyright, measured by the profits lost due to the

9  infringement or by the value of the use of the copyrighted work to the infringer.") (*quoting*

10  *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)).

11    In this case, the evidence establishes that each gray market sale by SurplusEQ

12  infringes AFL's trademark rights because AFL has the exclusive right to sell Fujikura

13  fusion splicers in the U.S.  Each of SurplusEQ's sales a sale to a purchaser located within

14  the territory established by the Reseller Agreement constitutes a sale that would most

15  likely have been made by AFL but for SurplusEQ's infringement.  AFL acknowledges that

16  it is unlikely that it would have made sales to purchasers located outside AFL's territory,

17  and does not seek lost profits for such sales.  (C-SMF, ¶ 187, 190, 193, A32.)

18    Additionally, all sales by SurplusEQ of Fujikura 60 series fusion splicers infringe

19  AFL's copyright in the operating software pre-loaded onto those units.  Accordingly, AFL

20  is entitled seek recovery of its lost profits, or Defendants' profits, for each gray market

21  fusion splicer sold by SurplusEQ.

22      **2.    Alternatively, AFL is Entitled to Recover SurplusEQ's**
               **Profits on Each Infringing Sale**
23

24    In the event that it is determined that AFL cannot establish that it should  recover its

25  lost profits, AFL is entitled to seek recovery of SurplusEQ's profits on each infringing

26  sale.  Under both the Lanham Act and the Copyright Act, a defendant's profits provide an

27  appropriate measure of damages for all infringing sales.  *See* 15 U.S.C. § 1117 (allowing

28

LEWIS
AND
ROCA
——— LLP ———
L A W Y E R S

1   recovery of "defendant's profits"); 17 U.S.C. § 504(b) (allowing recovery of "any profits

2   of the infringer that are attributable to the infringement").

3          Defendants challenge AFL's damages theory on the grounds that AFL improperly

4   seeks to recover all of SurplusEQ's profits on infringing sales.  But Defendants have not

5   cited any authority suggesting that something less than 100% of an infringer's profits are

6   properly awarded under the facts of this case.  Though the Copyright Act recognizes that

7   some measure of a defendant's profit may be attributable to factors other than the

8   copyrighted work, it is clearly the defendant's burden to prove the amount by which the

9   damages award should be reduced.  17 U.S.C. § 504(b) ("In establishing the infringer's

10  profits, the copyright owner is required to present proof only of the infringer's gross

11  revenue, and the *infringer* is required to prove his or her deductible expenses and the

12  elements of profit attributable to factors other than the copyrighted work.") (emphasis

13  added).  Defendants have offered no such proof in this case, and, therefore, they cannot

14  claim any reduction in the amount of profits that AFL can recover for infringing sales.  It

15  is undisputed that the FSM-60 splicers SurplusEQ sold will not function without the

16  operating software.  (C-SMF at ¶ A27.)  Because earlier models do not contain the

17  software that is the subject of AFL's claim, AFL seeks Defendants' profits only on sales of

18  FSM-60S and 60R splicers.  (C-SMF at ¶ A32.)

19         Moreover, Defendants have identified no authority supporting their position that

20  anything less than 100% of an infringer's profits is appropriate in the context of Lanham

21  Act claims.  Because the FUJIKURA mark encompasses the goodwill of the brand and

22  symbolizes the well-known quality of the devices, it would be impossible to determine

23  what portion of Defendants' profits are related to the mark versus other aspects of the

24  goods: they simply are not separable.  For any measure of damages based on SurplusEQ's

25  profits, AFL is entitled to recover the full of amount of such profits.

26

27

28

### 3.    AFL Has Fully Disclosed its Calculation of Damages

AFL fully disclosed its calculation of damages in three documents, which include a summary of the damages calculations performed by AFL's expert, Robert Crowder,  Mr. Crowder's analysis, and a rebuttal report, which was provided in response to analysis provided by SurplusEQ's expert, Andrew Short.  (C-SMF, ¶¶ 187, A32.)  Additionally, Mr. Crowder fully explained his analysis of AFL's damages in his deposition.  Taken together, these documents fully disclose each category of AFL's damages and they provide the underlying data upon which each computation of damages is based.  Accordingly, AFL's disclosure satisfy the requirements of Rule 26(a)(1)(A)(iii).

AFL's damages claim proceeds on the following theory:

(1)    All of SurplusEQ's sales of "new" Fujikura FSM-50S, FSM-50R, FSM-60S, FSM-60R, FSM-17S, and FSM-17R fusion splicers listed on Mr. Crowder's spreadsheet are infringing sales under AFL's unfair competition and false advertising claims;

(2)    All of SurplusEQ's sales of "new" Fujikura FSM-60S and FSM-60R fusion splicers listed on Mr. Crowder's spreadsheet are infringing sales under AFL's copyright claim (the other models listed in item 1 are not included in the copyright claim because they used different software);

(3)    Because SurplusEQ is located in Arizona and receives orders in Arizona, receives all of its Fujikura splicers in Arizona, and ships all of its Fujikura splicers from Arizona, all of SurplusEQ's sales are subject to U.S. law;

(4)    AFL is entitled to recover all of Defendants' profits on sales of infringing splicers under any of its claims;

(5)    AFL is entitled to recover its lost profits only on sales made to purchasers located within AFL's sales territory as established by the Reseller Agreement.

Defendants incorrectly claim that AFL has disclosed "only one damages figure based on a spreadsheet of undifferentiated sales."  (Defendants' Motion, p. 37).  To the contrary, AFL has disclosed specific damages figures for each line of Fujikura fusion splicers sold by SurplusEQ. (C-SMF at ¶ 187, A32.)  Specifically, AFL disclosed damages

1    amounts for each line of fusion splicers sold by SurplusEQ that are broken down

2    according to AFL's theories of recovery.  AFL's spreadsheets separate sales by model and

3    by whether they were made to purchasers located within AFL's territory (designated "NA"

4    for "North America") or outside that territory (designated "Non-NA").

5           As discussed above, on its unfair competition theory (including false advertising),

6    AFL seeks to recover its lost profits for all infringing sales SurplusEQ made to purchasers

7    located within AFL's territory.  AFL also seeks to recover SurplusEQ's profits for all

8    infringing sales, other than those that would duplicate an award based on AFL's lost

9    profits.  AFL maintains that all Fujikura fusion splicers sold by SurplusEQ violate AFL's

10   trademark rights under the Lanham Act, thus, AFL's damages calculations are based on all

11   sales made by SurplusEQ and cover all models of fusion splicers sold.

12          AFL also maintains that SurplusEQ's sales of 60-series fusion splicers infringe

13   AFL's rights under the Copyright Act.  AFL seeks recovery of damages consisting of lost

14   profits for all sales of those models within AFL's territory, and seeks to recover

15   Defendants profits on all sales of those models on which AFL is not awarded lost profits.

16          All of this information is disclosed in Mr. Crowder's analyses.  (C-SMF at ¶ 187,

17   A32.)  All was available for exploration at Mr. Crowder's deposition.

18          Accordingly, AFL has disclosed an amount of damages for SurplusEQ's profits and

19   AFL's lost profits for each line of fusion splicer at issue in this case.  Therefore,

20   SurplusEQ can easily determine the amount of damages AFL seeks under each theory of

21   recovery for each of AFL's claims.

22          The computations of each item of damages sought is fully disclosed.  All

23   computations of profits simply involve multiplying an average profit figure by the number

24   of infringing sales.  For AFL's lost profits, the average profit figure is determined by

25   reference to an exhibit to Mr. Crowder's analysis, the "AFL Material Margin" report.  This

26   report identifies AFL's profit margin per unit by model number for each year in which

27   SurplusEQ made infringing sales.  That per-unit margin is multiplied by the number of

28

LEWIS
AND
ROCA
LLP
L A W Y E R S

1   units of the appropriate model sold in AFL's territory in each year, and those figures are

2   totaled to determine the total lost profits claim.

3          To calculate SurplusEQ's profits, average sales and cost data were calculated from

4   SurplusEQ purchase orders, as explained in the summary of AFL's damages disclosure

5   and Mr. Crowder's deposition.  The information disclosing SuplrusEQ's sales is disclosed

6   in spreadsheet form in the analysis provided by Mr. Crowder.  From this, each infringing

7   sale made by SurlpusEQ that supports AFL's theory of damages can be identified.  After

8   Defendants' expert criticized aspects of the initial explanation, AFL provided a table in

9   which the claimed damages are broken down by model and by claim. (C-SMF at ¶ A32.)

10  Accordingly, the computation of each amount of damages sought by SurplusEQ was

11  properly disclosed.

12         Defendants also criticize AFL for seeking damages for sales that allegedly occurred

13  outside of AFL's sales territory and before AFL's licensing agreements.  But AFL clearly

14  disclosed the specific amounts of SurplusEQ's profits that AFL seeks for sales of products

15  made to consumers outside of AFL's territory in its damages summary and in Mr.

16  Crowder's analysis, and the dates of each sale by SurplusEQ are provided.  Should

17  SurplusEQ establish that AFL is not entitled to damages during certain time periods, or for

18  sales outside AFL's territory, AFL's damages can be re-calculated without need for any

19  additional disclosure.  Accordingly, these challenges to AFL's disclosures fail as well.

20         **4.     AFL Fully Disclosed the Underlying Documents Supporting**
21              **its Computations of Damages**

22         Defendants also challenge AFL's disclosure of the documents upon which its

23  claims for damages rest.  Defendants' argument fails, however, because it focuses on

24  documents that were not relied upon by AFL's damages expert in calculating AFL's

25  damages.  AFL disclosed the documents that AFL's damages expert relied upon in

26  determining AFL's damages.

27         Defendants challenge the documents relied on by Mr. Crowder in calculating

28  AFL's lost profits, and they claim that AFL improperly withheld documents relied upon

34

1    by AFL to determine the revenue earned from fusion splicer sales in a given year.

2    Defendants also argue that AFL has failed to produce internal documents supporting the

3    "Material Margin" that AFL relied upon to calculate its lost profits.  These argument fail,

4    however, because they ignore AFL's actual damages analysis and the documents upon

5    which the analysis rests.  AFL did not rely on fusion splicer revenue and cost documents

6    to calculate its lost profits.  Rather, AFL relied on an internal computer report to determine

7    the material margin for each line of fusion splicers at issue in this case, and the

8    information provided from that report is incorporated in Mr. Crowder's report as the table

9    showing material margin.  (C-SMF at ¶ 187, A32.)  AFL produced Mr. Crowder's files at

10   the deposition.  AFL fully disclosed the documents upon which it bases its calculation of

11   damages, and the documents that Defendants suggest that AFL withheld simply were not

12   part of Mr. Crowder's analysis.  AFL has not failed in disclosing the documents

13   supporting its claim for damages and its damages should not be dismissed.

14        Defendants also challenge specific details of AFL's costs, including shipping costs

15   and warranty costs.  Again, shipping costs were cumulated in a computer report and

16   reflected in the Material Margin reports; Mr. Crowder did not rely on individual

17   documents to determine shipping costs.  Mr. Crowder produced an analysis of warranty

18   costs.  Although Defendants question the accuracy of those costs, those arguments go to

19   the methodology and credibility of Mr. Crowder's analysis, not AFL's disclosure of the

20   documents underlying his analysis.

21        Moreover, even if all of Defendants' arguments were accepted with respect to

22   disclosure of documents, those issues only go to calculation of AFL's lost profits.  Those

23   matters are irrelevant to AFL's claim based on SurplusEQ's profits from infringement.

24   AFL calculated those profits based on SurplusEQ's invoices and purchase orders, and

25   Defendants have not questioned those calculations, nor are they in a position to do so.  Mr.

26   Parsons, who Defendants provided as SurplusEQ's corporate representative under

27   Fed.R.Civ.Pro. 30(b)(6), testified that he had "no idea" of the profits or revenues

28


1   SurplusEQ had earned on sales of Fujikura splicers.  (C-SMF at ¶ A33.)  Defendants'

2   damages expert did not opine on SurplusEQ's profits from infringing sales.

### 5.   Fujikura's Sales and Costs are Irrelevant

4   Defendants also challenge AFL's theory of damages as speculative because it fails

5   to account for Fujikura's revenues and costs.  But Defendants have cited no legal authority

6   for the proposition that AFL's profits should be reduced by the profits earned by Fujikura.

7   AFL seeks to recover the profits it lost because SurplusEQ sold infringing products, and

8   Trademark and Copyright law establish that AFL may properly recover these profits as a

9   measure of damages.  For purposes of the damages analysis, Fujikura and AFL are

10  independent entities, and evidence regarding Fujikura's profits is not relevant to this

11  dispute.  The lack of evidence regarding Fujikura's profits does not render AFL's damages

12  speculative or uncertain because it is not part of AFL's damages claim, and AFL's

13  damages claim cannot be dismissed based on a lack of irrelevant evidence.

14  Defendants' argument regarding Fujikura's profits represents a transparent attempt

15  to complicate the calculation to the degree that AFL could never demonstrate lost profits.

16  That complication is unwarranted and unsupported by either logic or legal authority.

17  In connection with argument that AFL's damages should be reduced by Fujikura's

18  profits, Defendants speculate that Fujikura may sell fusion splicers to AFL at a loss.  Such

19  speculation, which completely lacks any evidentiary or legal support, cannot support

20  dismissal of AFL's claims for damages.

### 6.   AFL Has Standing Under the Lanham Act to Pursue Damages for Infringement of Fujikura's Trademarks

23  Section 43(a) of the Lanham Act grants broad standing to bring an action for unfair

24  competition or false advertising, providing for liability to any "person who believes that he

25  or she is or is likely to be damaged" by the violation.  15 U.S.C. § 1125(a).  To establish

26  standing to pursue claims under Section 43(a), a plaintiff must demonstrate (1) a

27  commercial injury due to the alleged violation, and (2) that the injury is competitive.  *Jack*

28  *Russell Terrier Network of Northern California v. American Kennel Club, Inc.*, 407 F.3d

1027, 1037 (9th Cir. 2005).  When a plaintiff is in direct competition with a defendant, a violation of Section 43(a) gives rise to a presumed commercial injury that is sufficient to establish standing.  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011).

In this case, AFL has standing to pursue damages for all sales by SurplusEQ that infringe the Fujikura trademarks because AFL has been in commercial competition with SurplusEQ at all relevant times and SurplusEQ's infringement caused AFL competitive injury.  Pursuant to the terms of the Reseller Agreement, AFL has been the exclusive authorized distributor of Fujikura fusion splicers in North America since 2003.  (C-SMF, ¶ 6.)  Since SurplusEQ began selling gray market Fujikura fusion splicers that it advertised as new, SurplusEQ and AFL have been in direct competition for sales of new Fujikura fusion splicers.  AFL asserts that all sales of gray market Fujikura fusion splicers made by SurplusEQ infringe AFL's rights in the Fujikura trademark under the Reseller Agreement and the later Trademark License, and these sales caused AFL a competitive injury by displacing a sale that AFL would have otherwise made.

Courts recognize that an exclusive distributor has a claim under Section 43(a), 15 U.S.C. § 1125(a) against a competitor who uses a confusingly similar mark.  *See, e.g., Ferrero U.S.A. Inc. v. Ozak Trading Inc.,* 753 F.Supp. 1240 (D.N.J. 1991) (exclusive distributor of TIC TAC mints in the U.S. had standing to assert trademark rights against competitor importing gray market TIC TACs); *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1268 (S.D.N.Y. 1970) ("The broad use [in Section 43(a)] of the words "any person" rather than a narrower designation appears clearly to reflect a legislative purpose to protect competitive users of trademarks whether or not they are owners of the mark.") .  Accordingly, AFL has standing under Section 43(a) of the Lanham Act to recover damages against SurplusEQ for all infringing sales identified in AFL's disclosures.

Moreover, Defendants' citation to *Nova Wines, Inc. v. Adler Fels Winery, LLC*, is misplaced, as that case dealt with a plaintiff's standing under Section 32 of the Lanham

LEWIS
AND
ROCA
LLP
L A W Y E R S

Act, while AFL's claim is under Section 43(a).  *See Nova Wines, Inc. v. Adler Fels Winery, LLC*, 467 F. Supp. 2d 965, 973 n.2 (N.D. Cal. 2006) (noting that although plaintiff lacked standing under Section 32 of the Lanham Act, the plaintiff "clearly has standing under [Section 43(a)]").

**7.    AFL Has Standing to Recover SurplusEQ's Profits for All Infringing Sales of Products Shipped Outside of AFL's Sales Territory**

Defendants argue that AFL lacks standing to pursue damages for sales made by SurplusEQ to customers outside of AFL's sales territory, which covers North America. This argument fails, however, because although SurplusEQ may have ultimately shipped a product outside of AFL's sales territory, SurplusEQ's infringing conduct occurred within the U.S. and AFL is entitled to recover damages for those infringing sales.  Defendants have cited no authority for the proposition that AFL cannot recover for infringing activity that occurs in the U.S.  The purposes of the Lanham Act are accomplished through making trademark infringement unprofitable, and, accordingly, a plaintiff can recover a defendant's profits even when the plaintiff and defendant do not directly compete.  *See Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968).

In this case, the facts demonstrate that SurplusEQ's infringing conduct occurs in the U.S. and therefore AFL may recover damages for sales resulting from this conduct. Specifically, SurplusEQ's place of business is in Arizona.  (C-SMF at ¶ 15, A1.) SurplusEQ sells its products through eBay and websites that are hosted by a company located in Virginia.  (C-SMF at ¶ 22, A2, A3, A4.)  The fusion splicers sold by SurplusEQ were shipped from overseas suppliers to SurplusEQ's facility in Arizona.  (C-SMF at ¶ A5.)  When SurplusEQ sold fusion splicers to customers located overseas, those products were shipped from SurplusEQ's facility in Arizona.  (C-SMF at ¶ A6.)  Accordingly, the facts demonstrate that SurplusEQ's trademark violations occurred in the U.S. and that these sales constitute a U.S. distribution of the copyrighted software.  AFL is therefore



entitled to damages, including SurplusEQ's profits, for these infringing sales under the Lanham Act and the Copyright Act, as described above.

### 8. AFL Is Not Precluded from Recovering Damages for Infringement Prior to Registration of the Copyright

Defendants misinterpret the registration requirement: while registration is a requirement for instituting a civil action for infringement of a United States work (see *infra*, Section II(C)(3)), it does not follow that a plaintiff cannot recover damages for infringement that occurred before the work was registered.  Section 412 of the Copyright Act – entitled "Registration as prerequisite to certain remedies for infringement" – limits recovery of *statutory* damages and attorneys' fees for infringements that occurred before registration.  That section states that, with certain exceptions:

> no award of statutory damages or of attorney's fees . . . shall be made for –
>
> > (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
> >
> > (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration . . . .

Section 412 does not preclude recovery of *actual* damages or infringer's profits, and the fact that precludes some damages but not others must be understood to mean that recovery of the others is not precluded.  Defendants cite no authority supporting their contention that damages are not recoverable for pre-registration infringements.

### 9. The Admissibility of AFL Damages Expert Has Not Yet Been Challenged

Finally, the defendants argue that the Court should issue summary judgment on AFL's claims for damages because the opinions of AFL's damages expert is inadmissible and the defendants intend to file a motion to exclude his testimony.  The defendants have not filed such a motion, and any response to the defendants arguments is, at this point, premature.  For purposes of the present motion, however, the defendants have cited no



1    authority supporting their position that the Court should grant summary judgment based

2    upon the presupposed result of a motion that has not yet been filed.

3

4    **V.    CONCLUSION**

5           Despite asserting every imaginable contention for why AFL cannot recover on its

6    claims, Defendants have failed to carry their burden of showing that any of AFL's claims

7    is deficient as a matter of law.  Accordingly, Defendants' Motion for Summary Judgment

8    should be denied in its entirety.

9

10

11          RESPECTFULLY SUBMITTED this 7th day of November, 2012.

12

                                    **STITES & HARBISON PLLC**

13

14                                  By   ___/s/ John W. Scruton_____
                                         Joel T. Beres
15                                       John W. Scruton

16                                  **LEWIS AND ROCA LLP**
                                         Sean D. Garrison
17                                       Shane E. Olafson
18                                       *Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28



**Certificate of Service**

I hereby certify that on October 5, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/EF registrants:

Geoffrey S. Kercsmar
gsk@kflawaz.com
Gregory B. Collins
gbc@kflawaz.com
Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suit 320
Scottsdale, Arizona  85250

Daniel J. Noblitt
The Noblitt Group PLLC
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona  85251

Attorneys for Defendants

                                    /s/ John W. Scruton
                                    Attorney for Plaintiff