Geoffrey S. Kercsmar (#020528)
Gregory B. Collins (#023158)
Jenessa G. B. Coccaro (#027090)
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
Telephone: (480) 421-1001
Facsimile:  (480) 421-1002
gsk@kflawaz.com
gbc@kflawaz.com
jbc@kflawaz.com

Daniel J. Noblitt (#015221)
THE NOBLITT GROUP PLLC
8800 North Gainey Center Drive, Suite 279
Scottsdale, Arizona 85258
Telephone: (480) 994-9888
dnoblitt@ngtechlaw.com

Co-counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AFL Telecommunications, LLC, | Case No. 2:11-cv-01086-DGC |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMAMRY JUDGMENT** |
| v. | |
| SurplusEQ.com, Inc., Tech Sales, LLC, and Daniel Parsons and Jane Doe Parsons, | |
| Defendants. | |

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

At first glance, this case turns on the novel legal issue of whether sales of grey-market products infringe intellectual property rights that have been assigned to the plaintiff solely for the purpose of filing this lawsuit. With both sides having moved for summary judgment on their claims and defenses, the Court has before it hundreds of pages of argument and a mountain of "undisputed" evidence, some of which attempts to resolve that novel legal issue. But the mountain of evidence before the Court has revealed that this case is far simpler than it initially appeared. Resolution on summary judgment requires only that the Court apply seven well-settled rules of law and some common sense.

**Rule 1 (Evidence):** A party must rely on admissible evidence in opposing summary judgment; without evidence sufficient to prevail at trial, summary judgment is appropriate in favor of the defendant.

**Rule 2 (Consumer Confusion):** The bedrock of trademark infringement and false advertising is consumer confusion; absent evidence of consumer confusion, trademark infringement does not occur and a false advertising claim fails as a matter of law.

**Rule 3 (Copyright):** A plaintiff must present admissible evidence of a valid copyright and copying of the copyrighted work; without identifying the copyrighted work, or establishing that the work has been copied, a copyright claim cannot lie.

**Rule 4 (Copyright Misuse):** "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work"[1]; an effort to extend copyright protection into these enumerated unprotectable areas constitutes copyright misuse, and is a complete defense to infringement.

**Rule 5 (Laches):** A plaintiff cannot unduly delay filing suit to the detriment of the defendant; as a matter of law, a nine year delay is undue.

**Rule 6 (Speculative Damages):** While the plaintiff can speculate regarding the amount of its damages, the plaintiff must present proof of harm; absent proof of harm, a plaintiff cannot recover anything.

---

[1] 17 U.S.C. §102(b).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

**Rule 7 (Proof of Damages):** The plaintiff has the burden of proving its damages and those damages must be based on documents and information voluntarily produced during the course of litigation; a plaintiff cannot rely on undisclosed evidence, and its experts cannot assume facts not in evidence.

No one disputes these seven principles of law. As explained fully below, the application of these principles to the facts here mandates entry of summary judgment in favor of Defendants.

### Rule 1 (Evidence): In opposing summary judgment, AFL has not relied on admissible evidence; AFL's "evidence" is inadmissible and undisclosed.

As the plaintiff, AFL must come forth with admissible evidence to support its claims.[2] AFL has three claims: (1) Lanham Act unfair competition (relying on Fujikura's trademark); (2) Lanham Act false advertising; and (3) copyright infringement.[3] AFL has failed to offer admissible evidence sufficient to support the elements of any of these claims. In fact, significant portions of the record on summary judgment are inadmissible.

### a)   AFL cannot support its Lanham Act claims with inadmissible evidence.

It is settled law that to prevail on its Lanham Act claims, AFL must prove that consumers were confused by Defendants' actions.[4] But AFL did not conduct a consumer survey or disclose the identity of any consumer that actually purchased a SurplusEQ

---

[2] *See* Fed.R.Civ.P. 56(c); *see also Urbina v. Gilfilen*, 411 F.2d 546, 547-48 (9th Cir. 1969.)

[3] AFL's Amended Complaint alleges a claim for common law unfair competition, but AFL did not attempt to support that claim in response to Defendants' Motion for Summary Judgment ("Defendants' MSJ").

[4] *See Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577, 584 (9th Cir. 2005) ("[T]he ultimate issue in a trademark infringement suit against the importer of grey market imports is the factual question of likelihood of confusion of U.S. customers.") (quoting J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 29.46 (4th ed. 2005)); *see also Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.,* 299 F.3d 1242, 1250 (11th Cir. 2002) (holding that in a Lanham Act false advertising case, plaintiff must produce some evidence that the alleged statements influenced a consumer's purchasing decisions); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 312 n.10 (1st Cir. 2002) (same).

3

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

splicer believing it to be an authorized Fujikura fusion splicer. This is fatal to AFL's claim. In an effort to backfill, AFL repeatedly relies on the testimony of Entergy Mississippi, Inc.'s ("Entergy's") Region Telecom Manager, Douglas Winters.[5] But while Mr. Winters authorized Entergy's purchase of a fusion splicer from Defendants, Mr. Winters does not know if Entergy was misled or confused in any way.[6] He does not know if anyone from Entergy reviewed any of Defendants' blog entries before the purchase decision.[7] As a potential customer of both Defendants and AFL, Mr. Winters can certainly state whether his company would purchase from Defendants *in the future*, but this speculation isn't admissible and it doesn't establish whether any consumer was actually confused or whether any customer is likely to be confused or misled in the future.[8] In other words, Mr. Winters cannot testify about consumer confusion at all.

Furthermore, AFL must support its Lanham Act claims with admissible evidence that Defendants sold modified Fujikura fusion splicers.[9] But AFL could not uncover any modified splicers; it found only the Entergy unit, which had minor modifications done by an unnamed person at an unnamed time. AFL would like everyone to just assume the modifications were done by Defendants, or were present and known when Defendant sold the unit. But AFL has provided no evidence of either fact.

AFL also urges that the modifications were material, yet the evidence suggests otherwise. AFL did no testing of any kind to illustrate the effect of the modifications on the unit.[10] Without any direct evidence, AFL next argues instead that the unit would, sometime in the future, experience reliability issues. AFL never tested this hypothesis

---

[5] *See* AFL's Response to Defendants' Motion for Summary Judgment (Dkt.#174) ("MSJ Response") at 6:13-23, 7:5-10. 10:11-15. 18:3-20; *see also* AFL's Response to Defendants' Statement of Undisputed Material Facts (Dkt.#174-1) ("Response SOF") ¶¶ 72, 92.

[6] *See* Response SOF ¶¶ 69-71.

[7] Response SOF ¶ 67.

[8] *See* Fed.R.Evid. 602; *see also* Response SOF ¶ 92.

[9] *See Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001).

[10] *See* Response SOF ¶ A12.

4

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1  either; it didn't even disclose reliability statistics for off-the-shelf units. So AFL depends

2  instead on testimony from its disclosed "expert witness," AFL Senior Engineer Douglas

3  Duke. As fully explained by Defendants in their Motion to Exclude AFL's Expert

4  Witnesses,[11] Mr. Duke is not qualified to offer any opinion regarding the reliability of any

5  fusion splicer. His testimony here is based solely on assumptions, not evidence. AFL lacks

6  admissible evidence on this critical element as well.

7         Without admissible evidence of an undisclosed, material difference between the

8  splicer Defendants sell and the ones AFL sells, AFL attempts to support its Lanham Act

9  claims by relying on evidence relating to the performance of grey-market splicers that

10  were sold by FiberOptics Hardware—not Defendants.[12] Once again, this evidence is

11  inadmissible to support any claim that Defendants sold materially modified fusion

12  splicers.[13] Unless Defendants sold them, that evidence is not relevant to any issue in this

13  case.

14         Finally, AFL asserts that Defendants sold a splicer that reverted to the Chinese

15  language when updated over the internet.[14] In support of this contention, AFL relies on an

16  email from Simon Bolduc to AFL employee Greg Pickeral.[15] Mr. Bolduc's hearsay

17  statement is the sole evidence that this splicer exists, or that it is connected to Defendants

18  in any way. Mr. Bolduc has not been disclosed as a person with knowledge regarding this

19  matter and, even if he were, his email is hearsay and inadmissible for purposes of

20  summary judgment.[16] Even worse, none of this evidence was disclosed prior to the close

21  of discovery. For this reason, as well as the reasons previously stated, all evidence related

22  to Mr. Bolduc is inadmissible—particularly his undisclosed, hearsay statements.[17]

23  _____

24  [11] Dkt.# 182.

25  [12] *See* Response SOF ¶¶ 61-62.

26  [13] *See* Fed.R.Evid. 401-03.

    [14] *See* Response SOF ¶¶ 79, 115, A9-A10.

27  [15] *See* Response SOF Exhibit 11.

    [16] Fed.R.Evid. 801(c).

28  [17] *See* Fed.R.Civ.P. 37(c)(1).

**b)     AFL lacks admissible evidence to support its copyright infringement claim.**

In order to prevail on its copyright infringement claim, AFL must establish that AFL owns a valid copyright and that Defendants infringed that copyright.[18] In an effort to establish an original copyright here, AFL relies on declarations and testimony from Fujikura employees, Hiroshi Suguwara, Toshiki Kubo and Noriyuli Kawanishi.[19] But neither witness was disclosed by AFL in this action as having knowledge that AFL might rely upon to support its claims.[20] Accordingly, these witnesses cannot testify at trial.[21] Moreover, neither witness analyzed the software code on any machine that Defendants sold;[22] for this reason, even if AFL had properly disclosed these witnesses, they could only discuss Fujikura's copyrighted work—not the alleged infringement by the units sold

---

[18] *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.").

[19] *See* Response SOF ¶¶ 22, 79, 156, 177, A26-A27.

[20] *See* Defendants' Statement of Facts in Support of Motion for Summary Judgment ("Defendants' SOF") ¶ 174, Exhibit 32.  While Defendants deposed these individuals, AFL did not disclose the nature of the information they possessed. Courts have universally interpreted Rule 26(a)(1) to require both the identification of potential witnesses and the subject of their testimony. Defendants' independent discovery of these employees did not excuse AFL from complying with its Rule 26 obligations to identify the scope of their knowledge. *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1224 (D. Kan. 2010) ("That the other side may have known the identity of a possible witness 'is no substitute for compliance with Rule 26.'") (citation omitted); *see also Gustafson v. Am. Family Mut. Ins. Co.*, 2012 WL 5904048, *3 (D. Colo. Nov. 26, 2012); *Niles v. Am. Airlines Inc.*, 563 F. Supp. 2d 1208, 1212 (D. Kan. 2008); *Mehus v. Emporia State Univ.*, 326 F. Supp. 2d 1213, 1218-19 (D. Kan. 2004); *Sender v. Mann*, 225 F.R.D. 645, 650-54 (D. Colo. 2004).  With no notice regarding the issue upon which each of these witnesses would be relied upon, Defendants could not know that AFL intended to rely on these witnesses to prove up its copyright infringement claim (specifically, the fact that the software on Fujikura's fusion splicers was a foreign work).

[21] *See* Fed. R. Civ. P. 37(c)(1); *see also Wallace v. U.S.A.A. Life General Agency Inc.*, 892 F.Supp.2d 1062, 1065-67 (D. Nev. 20120); *Huynh v. J.P. Morgan Chase & Co.*, 2008 WL 2789532, *23-25 (D.Ariz. July 17, 2008); *Gastelum v. Abbott Labs.*, 2006 WL 2456199, *2-3 (D.Ariz. Aug. 22, 2006); *Forbes v. 21st Century Ins. Co.*, 258 F.R.D. 335, 339 (2009).

[22] *See* Response SOF ¶ 179 ("Undisputed").

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

by Defendants.[23]

In addition to these two key witnesses, AFL relies on declarations and testimony from several other undisclosed witnesses in its summary judgment briefing. AFL failed to disclose Makaoto Itahashi and Paula Alls as persons with information that might be relied upon by AFL at trial.[24] For these reasons, the Court should strike the following portions of AFL's Response SOF: paragraphs 22, 79, 156, 177, A7, A26, A27, and A36-40 (relying on testimony from undisclosed witnesses); paragraphs 61-62, 79, 115, A9-A10 (discussing the late disclosed fusion splicer), paragraphs 72 and 92 (relying on speculation from Mr. Winters), and paragraph 84 (relying on Mr. Duke's expert opinion).

**c)    AFL's damage theories also rely on inadmissible evidence.**

AFL has also failed to disclose a damage theory that is based on admissible evidence. As fully explained in Defendants' Motion to Exclude AFL's Expert Witnesses and incorporated by reference here, AFL has offered its Chief Financial Officer Robert Crowder as its "expert" witness regarding damages.[25] But Mr. Crowder's opinion is not based on the evidence; it is based on assumptions that the evidence does not support. His opinion is not admissible and without it, AFL has no evidence to support its damages.

In an effort to rehabilitate Mr. Crowder's expert disclosure, AFL claims it served a supplemental expert disclosure on August 31, 2012.[26] But AFL sent the disclosure to the wrong addresses, serving it upon Defendants' counsel at 6236 North Scottsdale Road, Suite 320, instead of Defendants' counsel's correct address 6263 North Scottsdale Road.[27]

---

[23] Absent a review of the software code on the splicers Defendants sold, any statement regarding that software is pure speculation and inadmissible under Fed.R.Evid. 602. Moreover, even if, for purposes of this lawsuit, these employees had reviewed the software code on the fusion splicers sold by Defendants, their testimony is inadmissible on this point because they have not been disclosed as expert witnesses. Fed.R.Evid. 701 provides that if the witness is not testifying as an expert, the witness' testimony in the form of opinion cannot be based on scientific, technical or other specialized knowledge.

[24] *See* Defendants' SOF Exhibit 32.

[25] Dkt.#182.

[26] *See* Response SOF ¶¶ 190, Exhibit 1.

[27] *Id*.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Defendants did not receive the disclosure until Mr. Crowder's deposition began on September 27, 2012,[28] almost a month after the deadline for expert rebuttal reports.[29] While this may have been a simple mistake, had AFL filed a notice of its supplemental disclosure as required by L.R. 5.2, this would not be an issue. AFL did not properly serve Mr. Crowder's rebuttal expert disclosure, and did not follow the rules to alert Defendants it had been served; accordingly, this evidence is inadmissible as well.

In sum, AFL's Statement of Facts and Response Statement of Facts relies on inadmissible evidence. Once this information is struck, no evidence is left, and summary judgment must be entered in favor of Defendants.[30]

**Application of Rule 2 (Consumer Confusion): AFL has no evidence of consumer confusion to support its unfair competition and false advertising claims.**

As explained above, AFL's Lanham Act claims fail because AFL lacks admissible evidence to support the elements of its Lanham Act unfair competition and false advertising claims.  Even ignoring AFL's lack of evidence, the evidence that AFL has submitted, admissible or otherwise, simply does not support either of these claims.

a)    **Sales of grey-market products do not create consumer confusion when the nature of the grey-market good is disclosed.**

Defendants are not using Fujikura's trademarks to confuse customers. Defendants have purchased Fujikura fusion splicers and resold those splicers while accurately describing the nature of the product. The first sale doctrine allows Defendants to make such sales without infringing on Fujikura's trademarks—marks that AFL obtained an

---

[28] *See*  Response SOF Exhibit 6 (Deposition of R. Crowder) at 19:10-20.

[29] *See* Amended Case Management Order (Dkt.#95).

[30] AFL's Response SOF includes 45 paragraphs of additional facts.  Defendants have not substantively responded to these new allegations because, "Local Rule 56.1 does not provide for a reply statement of facts or a response to the non-moving party's separate statement of facts." *Kinnally v. Rogers Corp.,* 2008 WL 5272870, *1 (D. Ariz. Dec. 12, 2008) (striking reply statement of facts and supplemental statement of facts).  Where appropriate, Defendants have raised their evidentiary objections to these 45 paragraphs of additional facts here. But Defendants reserve the right to demonstrate to the Court that many of these facts are erroneous and supported by inadmissible evidence.

Kersmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1    interest in solely for purposes of this, and similar, lawsuits.

2        In order to overcome the first sale doctrine, AFL wholly misstates the law by

3    creating an exception that swallows the entire rule. AFL cites the Tenth Circuit's decision

4    in *Beltronics* for the overly-broad proposition that "[t]he first sale doctrine, which holds

5    that 'the right of a producer to control distribution of its trademarked product does not

6    extend beyond the first sale of the product,' is not applicable 'when an alleged infringer

7    sells trademarked goods that are materially different than those sold by the trademark

8    owner.'"[31] While AFL accurately states the ***result*** in the *Beltronics* case, it hardly

9    provides an accurate description of the law on the first sale doctrine. Instead, the Tenth

10   Circuit confirmed Defendants' point. As the *Beltronics* court stated, "[T]he central inquiry

11   in a trademark infringement case is the likelihood of consumer confusion."[32] Here, there is

12   simply no danger of customer confusion. Quoting the Tenth Circuit again, "[T]he fact that

13   'the resale of a trademarked product that is materially different ***can*** constitute a trademark

14   infringement,' . . . does not mean that it always does."[33]

15       Returning to the central inquiry, the Tenth Circuit held that "[t]he Lanham Act

16   does not proscribe material differences per se; it proscribes sales and offers for sale that

17   are 'likely to cause confusion, or to cause mistake, or to deceive.'"[34] The *Beltronics* court

18   concluded, "So long as resellers of materially different products take the necessary steps

19   to adequately alleviate this confusion and prevent injury to the trademark's goodwill—by,

20   for example, sufficiently disclosing that the product differs from the originally sold

21   product—those differences will be unlikely to trigger . . . liability . . . ."[35] In other words,

22   contrary to AFL's statement of the law, even material differences are irrelevant if those

23

24   ───────────────

[31] MSJ Response at 4:6-10 (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib.,
25   LLC*, 562 F.3d 1067, 1072 (10th Cir. 2009)).

[32] *Beltronics*, 562 F.3d at 1071.

26   [33] *Id.* at 1074 (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th
27   Cir. 2001)) (emphasis in original).

[34] *Id.* (quoting 15 U.S.C. § 1114(a)-(b)).
28
[35] *Id.*

differences are disclosed and do not result in customer confusion.

The Sixth Circuit reached the same conclusion. In *Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, decided in 2007, the court held that "there are two situations in which resale of a product does not fall under the first sale exception."[36] One "situation in which the first sale doctrine does not apply is 'when an alleged infringer sells trademarked goods that are *materially different* than those sold by the trademark owner.'"[37] In other words, AFL's proffered material difference test is only one situation that avoids the first sale doctrine. The other "situation is when the notice that the item has been repackaged is inadequate."[38] Notably, a defendant need not prove that it meets both "situations" because the "material differences" test would render the "notice" test moot.

This case law is based on well-settled Supreme Court precedent holding that "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo."[39] In that case, *Prestonettes, Inc. v. Coty*, the defendant rebottled and resold plaintiff's perfume in smaller bottles.[40] There, defendants provided a label stating: "Prestonettes, Inc., not connected with Coty, states that the contents are Coty's . . . independently rebottled in New York . . ."[41] The Supreme Court determined that because the labels were accurate and descriptive, the defendant did not infringe on the plaintiff's mark.[42] Twenty-three years later in *Champion Spark Plug Co. v. Sanders*, the Supreme Court reaffirmed the law in a case involving reconditioned spark plugs.[43] The Court determined that any differences in the condition of the product did not impact the mark holder: "The result is, of course, that the

---

[36] 474 F.3d 365, 369 (6th Cir. 2007).

[37] *Id. at* 370 (quoting *Davidoff*, 263 F.3d at 1302).

[38] *Id*. at 369.

[39] *Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924).

[40] *Id*. at 366.

[41] *Id*. at 367.

[42] *Id*. at 369.

[43] 331 U.S. 125 (1947).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

second-hand dealer gets some advantage from the trade mark. But under the rule of *Prestonettes, Inc., v. Coty*, . . . that is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer. *Full disclosure gives the manufacturer all the protection to which he is entitled*."[44]

Here, SurplusEQ's customers have received exactly what they expected because SurplusEQ has taken the necessary steps to inform the consumer of what they are getting: grey-market goods from a seller unaffiliated with Fujikura. These warnings adequately alleviate any possible confusion and prevent injury to the mark holder's goodwill. AFL's rights in Fujikura's trademarks are unaffected by this commerce, and its claims under the Lanham Act must fail.

### 1. SurplusEQ has taken adequate steps to alleviate customer confusion.

AFL contends that "Defendants have not established that SurplusEQ sufficiently discloses the material differences between genuine and grey market products to avoid consumer confusion."[45] But as the plaintiff, AFL must prove its case first; it is not entitled to a presumption that customers were confused, and Defendants have no burden to prove that its disclosures were sufficient. AFL has the burden of demonstrating customer confusion.[46] AFL tries to shift this burden because it cannot point to *any* evidence that *any* SurplusEQ customer was confused about what they were buying from SurplusEQ. AFL did not conduct any customer surveys on any subject: nothing on SurplusEQ, nothing on SurplusEQ's advertising or disclaimers, and nothing on grey-market splicers generally.[47]

---

[44] *Id.* (emphasis added).

[45] MSJ Response at 12:11-12.

[46] *See Beltronics*, 562 F.3d at 1075 ("First, [defendant] contends that the court impermissibly shifted the burden of proof to [defendant] to demonstrate the effectiveness of its disclosure, as evidenced by the court's statement that it was 'unpersuaded' that the disclosures sufficiently ameliorated consumer confusion. The record, however, clearly shows that the court understood that [plaintiff], as the party seeking the preliminary injunction, bore the burden of proof.")

[47] *See* Response SOF ¶¶ 159-164.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

So what evidence does AFL have of customer confusion? Even though AFL claims damages from *every* grey-market sale SurplusEQ made, AFL has disclosed only one customer witness: Douglas Winters of Entergy. But Winters cannot possibly testify to any confusion on Entergy's part; he testified that he does not know anything about SurplusEQ and has never spoken to anyone at SurplusEQ.[48] Winters does not remember talking to anyone about buying the '818 splicer from SurplusEQ.[49] He has never reviewed any internet blogs associated with SurplusEQ and does not know of anyone at Entergy who did.[50] And because he never spoke with SurplusEQ, Winters does not know whether SurplusEQ disclosed to Entergy's buyer (whoever it was) that the '818 splicer had been altered, that the serial number had been changed, or that the splicer was licensed for use in the United States. Winters does not even know how the unit came to be part of this litigation. He testified that he did not know why the '818 splicer was sent to AFL for repair, instead of SurplusEQ.[51] He *guessed* it was because Entergy's technicians assumed that the splicer was from AFL, since many of Entergy's past purchases had been from AFL.[52] In other words, Winters has no information whatsoever regarding the unit Entergy purchased from SurplusEQ, and there is no evidence from anyone at Entergy involved in the actual purchase of the unit.[53]

Despite alleging hundreds of infringing sales for which it seeks damages, AFL has only disclosed one customer, Entergy, who bought a Fujikura fusion splicer from Defendants. And that customer was never confused. Desperate, AFL points to Defendants' blog posts—which make no mention of Fujikura or its trademarks. AFL also discloses websites—without any evidence that any customer ever looked at the blog. AFL cites sales that fully disclose relevant information regarding the origins of the fusion

---

[48] Response SOF ¶ 66 (undisputed).

[49] Response SOF 69 (undisputed).

[50] Response SOF 67 (undisputed).

[51] Response SOF ¶ 74 (undisputed).

[52] Response SOF ¶ 75 (undisputed).

[53] *See* Response SOF ¶ 71 (undisputed).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1    splicer. Where is the customer confusion? AFL has failed to satisfy the central inquiry of

2    an unfair competition case.

3         Although the Entergy splicer cannot show any consumer confusion even in the

4    isolated context, AFL nevertheless tries to argue it has far-reaching implications. First,

5    AFL entitles a section in its Response: "AFL's Claim is Not Limited to the Entergy

6    Unit."[54] Defendants are, of course, well aware that AFL's *claims* are not limited to the

7    Entergy Unit. The problem is that the evidentiary basis for all of AFL's claims rests

8    entirely on assumptions about the Entergy Unit that must then be extrapolated to every

9    single sale made by Defendants. AFL argues that all of the units sold by Defendants were

10   modified, and all of them had the same copyrighted software on them. Despite having the

11   burden to prove this claim as to each unit alleged to infringe, AFL can only point to one

12   sale to one customer—the Entergy Unit. But as demonstrated above, that sale lacks any

13   evidence of customer confusion.

14        The problem with AFL's reliance on the Entergy Unit becomes even more obvious

15   in the next section of the Response entitled, "The Entergy Unit Provides Direct Proof of

16   SurplusEQ's Infringing Sales."[55] As demonstrated above, the Entergy Unit provides no

17   such thing. But more importantly, AFL attempts to use that sale to provide ***indirect***—not

18   direct—evidence that ***every*** SurplusEQ sale is infringing. Even as indirect evidence, it

19   fails because no customer—***not one***—has ever testified to any confusion before, during or

20   after a sale by Defendants.

          **2.  Even if, *arguendo*, some differences were not disclosed, AFL cannot
21              prove those differences were material to the customer.**

22        AFL has not come up with any evidence showing the modifications that it alleged

23   are material. To muddy the waters, AFL simply argues that the burden is on SurplusEQ to

24   prove that it did ***not*** modify the fusion splicers, entitling a section of the Response:

25   "SurplusEQ Has Come Forward with no Evidence that it Did Not Sell Modified

26

27   _____

28   [54] MSJ Response at Sec. IV.A.2.

     [55] MSJ Response at Sec. IV.A.3.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1   Splicers."[56] But AFL provides no case law placing the burden on Defendants to prove the

2   splicers it sold years ago were "not modified," nor giving the plaintiff a presumption that

3   material differences exist. Instead, as plaintiff, AFL is required to prove its own case. It

4   cannot.

5        The only admissible evidence of *any* modification is the much-discussed Entergy

6   Unit.[57] But when Winters—the only disclosed Entergy witness—was questioned about

7   modifications, he could not identify any modifications.[58] Quite the opposite: he testified

8   that he was not aware of any of the alleged modifications before he was questioned about

9   them in the deposition, *and did not know whether anyone else at Entergy was aware of*

10  *them either.*[59] Winters did not know the condition of the splicer when it was purchased,

11  what SurplusEQ had told the person who purchased the unit, or even the performance of

12  the unit. He conceded that he did not know whether anyone at Entergy was aware of the

13  alleged modifications before Entergy purchased the splicer.[60] He also admitted that he did

14  not know how long the splicer worked for, and did not remember what the issue was that

15  caused Entergy to send the splicer in for repair.[61]

16       Considering both Winters and Entergy were wholly unaware of any

17  "modifications" before, during and after the unit was owned and used by Entergy, AFL

18  cannot  demonstrate that the alleged modifications were material. Faced with yet another

19  deficiency in its case, AFL once again reverts to its favored tactic in the Response:

20  flipping the burden to SurplusEQ. It argues, "Defendants have no evidence to refute

21  _____

22  [56] *See* MSJ Response at Sec. IV.A.4.

    [57] In its Additional Facts, AFL alleges that it "recently received documentation concerning
23  a splicer sold by SurplusEQ that reverted to the Chinese language upon upgrading the
    software." (Response SOF ¶¶ A9-A10.) But AFL has not disclosed any information
24  related to this email. Instead, the information is undisclosed hearsay. The fact that AFL is
    improperly using these allegations in its Additional Facts is a reflection of the paucity of
25  its evidence.

26  [58] Response SOF ¶ 86 (undisputed).

27  [59] Response SOF ¶ 87 (undisputed).

    [60] Response SOF ¶ 88 (undisputed).
28
    [61] SOF ¶ 90 (undisputed).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

testimony from actual customers that they consider physical modifications to a unit's hardware to be important and would not knowingly purchase a new unit that had been physically modified."[62] But "actual customers" have not said anything of the kind *about Defendants and their products*. In support of this dubious argument, AFL cites only Winters' testimony—a witness without any knowledge of the alleged modifications or any involvement in the actual purchase—and Michael Phillips, a witness in another case *who was never a SurplusEQ customer*. Yet based on this shaky evidentiary foundation, AFL asks this Court to deny Defendants' Motion for Summary Judgment and allow AFL to argue that every Fujikura fusion splicer that SurplusEQ ever sold was modified in the same way. There is absolutely no evidentiary basis to allow this case to move forward.[63]

---

[62] MSJ Response 10:10-13.

[63] Even if the Court were to ignore Defendants' extensive disclaimers and AFL's complete lack of evidence of consumer confusion, AFL's evidence on modifications—the basis for its entire trademark claim—is either speculative or missing.  AFL points to modifications that are nothing more than speculation. AFL claims that units purchased from SurplusEQ:

  1) *may have been* physically modified to falsify the unit's serial number . . . 2) *may have* software modifications to allow them to display in the English language despite factory settings intended to limit the display language; 3) do not carry a manufacturer's warranty from Fujikura; and 4) contain operating software that is not licensed for use in the United States and *may* revert to a foreign language if updated remotely.

In other words, for three out of the four modifications alleged, AFL really doesn't have any idea what Defendants actually sold—only a guess as to what it might find if the units were examined. Of course, two of the alleged modifications relate to the software on the fusion splicer (numbers 2 and 4), even though AFL concedes that "[i]t is undisputed that . . . the software on a particular model of Fujikura splicer is the same no matter where it is sold." And "[e]ach FSM-60S fusion splicer Fujikura produces contains every language Fujikura offers globally, and Fujikura simply engages a region lock at the factory to set the language options that are available for a particular region of the world." In other words, calling this a "modification" is a misnomer; it is simply that some hidden aspects of the software can be accessed by the end user. Finally, AFL has produced no evidence that any of the fusion splicers sold by Defendants did not carry a Fujikura warranty. There is no evidence that Fujikura would refuse to warranty any splicer sold by Defendants.

15

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

b)    **AFL's false advertising claim fails because there is no evidence of consumer confusion, no evidence of sufficient dissemination, and no evidence of falsity.**

Predictably, AFL lacks any evidence that consumers were deceived by AFL's advertising. AFL concedes that, to prevail on its Lanham Act false advertising claim, AFL must show that the advertisements at issue were "material."[64] The Ninth Circuit noted in *Skydive Arizona, Inc. v. Quattrochi* earlier this year that materiality is "typically proven through consumer surveys."[65] At a minimum, plaintiff must produce some evidence that the alleged statements influenced a consumer's purchasing decision.[66]

AFL tacitly admits that it couldn't find a customer who read the ads, let alone relied on them. AFL's evidence is found in just four paragraphs of Plaintiff's Statement of Undisputed Facts, paragraphs 49-52. These statements are all taken from the deposition testimony of Michael Phillips. Mr. Phillips works for the Air National Guard, which purchased Fujikura fusion splicers from FiberOptics Hardware—not Defendants. More to the point, Mr. Phillips has never heard of SurplusEQ.[67]  He cannot possibly testify whether any statement on the Defendants' blog was material to his buying decision because, quite simply, he never purchased a Fujikura fusion splicer from Defendants—or read the blog.  Accordingly, AFL has no evidence that any statement on Defendants' blog was material to anyone's buying decision. Absent evidence of consumer deception, AFL's false advertising claim fails as a matter of law.

Nor does AFL have evidence of sufficient dissemination. With no evidence that any customer actually viewed Defendants' blog, AFL attempts to avoid this element of its claim altogether. AFL relies on *Bolger v. Youngs Drug Prods. Corp.*, a Supreme Court case from 1983, to support its argument that Defendants' blog constitutes commercial

---

[64] MSJ Response at 26:20-28.

[65] 673 F.3d 1105, 1111-12 (9th Cir. 2012).

[66] *Id.*; *accord Johnson & Johnson Vision Care, Inc. v. 1-800-Contracts, Inc.,* 299 F.3d 1242, 1250 (11th Cir. 2002); *Cashmere & Camel Hair Mfts. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 312 n.10 (1st Cir. 2002).

[67] Deposition of M. Phillips, attached as Exhibit 1, at 78:17-22.

speech.[68] But *Bolger* hinged on whether the defendant's promotional materials were "commercial speech." The United States Supreme Court never had to determine whether materials must be disseminated to a sufficient portion of the buying public for a false advertising claim to lie against a competitor.

Since *Bolger*, the Ninth Circuit Court of Appeals and district courts within the Ninth Circuit have consistently held that in order for advertising materials to be actionable under the Lanham Act, the plaintiff must prove that the material was sufficiently disseminated to the relevant public.[69] AFL has no evidence that a sufficient portion—or even a single member—of the fusion splicer buying public ever viewed Defendants' blog. Frankly, it is very likely that almost no one ever looked at the blog. Either way, no one will ever know, since AFL has not provided any evidence of dissemination. And under settled Ninth Circuit law, AFL's false advertising claim cannot move forward without this evidence.

With the Court having at least two separate and distinct reasons to enter judgment in favor of Defendants on AFL's false advertising claim, the Court need not reach the

---

[68] MSJ Response at 15:15-16:23.

[69] *See Coastal Abstract*, 173 F.3d 725, 735 (9th Cir.1999). (stating that in order for a statement to be actionable under the Lanham Act it was must be disseminated to a sufficient portion of the potential customers); *see also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 58 (2d Cir. 2002) (entering summary judgment on the plaintiff's claims because the plaintiff failed to show sufficient dissemination of the alleged false statements); *Auto-Chlor Sys. of Minn. Inc. v. Johson Diversey,* 328 F.Supp.2d 980, 1019-20 (D. Minn. 2004) ("The complained-representations consist, at best, of three statements by [defendant's] representatives to three customers in a marketplace of hundreds of customers. Such evidence is insufficient to satisfy the requirement that representations be disseminated widely in order to constitute 'commercial advertising or promotion' under the Lanham Act."); *Prof'l Sound Servs., Inc. v. Guzzi,* 329 F.Supp.2d 722, 720 (S.D.N.Y. 2004) ("Dissemination of a statement to one customer out of 364 simply does not meet this standard."); *Optimum Techs. Inc. v. Home Depot USA, Inc.,* 78 U.SP.Q.2d 1801 (N.D. Ga. 2005) ("Unless the relevant purchasing market is particularly limited, which is not the case here, isolated statements by sales personal to individual customers do not satisfy the requirement of sufficient dissemination."); *Sports Unlimited, Inc. v. Lankford Enters. Inc.,* 275 F.3d 996 (10th Cir. 2002).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

issue of whether any of Defendants' statements are false. But the statements are unquestionably true. While Defendants' do not buy direct from AFL, they do buy direct from other manufactures;[70] AFL cannot and does not allege otherwise.[71] There is no evidence in the record that Defendants' products do not come with a manufacturer's warranty, be those products from Fujikura or another manufacturer.[72]  And Defendants do sell new products. Finally, while AFL has identified one ad where Defendants advertised one of its fusion splicers as "guaranteed not modified in anyway," AFL has no evidence that the specific splicer sold in that advertisement was modified—or that it even ended up in the hands of a North American customer.

In sum, AFL's unfair competition claim and false advertising claim fail. The Lanham Act makes actionable a competitor's efforts to confuse consumers. There is no evidence of confusion here from either Defendants' sales of grey-market Fujikura fusion splicers or from Defendants' blog. With no evidence of a confused public (or even a single consumer), AFL cannot meet the other elements of these claims, which require sufficient distribution of the allegedly false statements and proof that the grey-market products are inferior. The Court should enter summary judgment on these claims.

**Application of Rule 3 (Copyright): AFL has no evidence of a valid copyright, and no evidence that Defendants infringed that copyright.**

Since the inception of this case, Defendants have questioned exactly what "work" AFL asserts has been copyrighted and infringed. AFL was evasive. After reading AFL's Response, this question is still unanswered. Accordingly, summary judgment is necessary.

On May 26, 2011, Fujikura registered U.S. Copyright Registration No. TX-7-400-942.[73]  This registration references version 01.32b of "Fujikura's Arc Fusion Splicer

---

[70] Defendants' SOF ¶¶ 17-18;

[71] Response SOF ¶ 18 (admitting that Defendants' have bought directly from Jilong Fiberoptics).

[72] Defendants' SOF ¶¶ 17, 19, 119; *see also* Response SOF ¶¶ 119 (failing to dispute that all Fujikura fusion splicers come with a one year warranty).

[73] Response SOF ¶ 180.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Software, FSM-60 Series."[74] The registration specifically *disclaims* registration of "previous version[s]" of the software.[75] The question becomes, which version of the software was on the fusion splicers that Defendants sold?  AFL has identified only one allegedly modified splicer that in this litigation; it was sold by Defendants to Entergy in 2009. Yet there is no evidence in the record stating which version of the software was loaded onto the Entergy splicer. The Entergy splicer is an FSM-60 series splicer—but did it have version 01.32b of that software, or one of the earlier, disclaimed versions? Given the long history of the splicer—it was sold by Fujikura in India though its affiliate, resold to a local company, then made its way through an unknown number of hands to SurplusEQ, who later sold it to Entergy—it is very possible that this splicer had a prior version of the software. It is AFL's burden to demonstrate that the Entergy splicer software infringes its copyright; absent any admissible evidence proving that the Entergy unit had the copyrighted version of the software on it (version 01.32b), AFL cannot meet this burden. And to the extent AFL asserts that Defendants' other fusion splicer sales infringe AFL's copyright, AFL must show which version of the software —a copyrighted one or an unprotected one—is installed on the fusion splicer in question. AFL has simply made no effort to meet this burden.

AFL offers two arguments in response. First, AFL asserts that registration of one version of the software is sufficient to register prior versions. Ordinarily, perhaps. But none of the cases AFL cites involve a copyright registration that *specifically disclaims registrations of the prior versions of the software at issue*. AFL is bound by its own disclaimer here. Furthermore, even if AFL could somehow avoid the effects of its own disclaimer (and it cannot), there are no facts in evidence to support AFL's contention that the Entergy splicer contains an "infringing derivative work" of AFL's registered software.[76]

---

[74] Defendants' SOF Exhibit 17.

[75] *Id.*

[76] AFL relies on *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.* to support the

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Second, AFL argues that the prior versions of its fusion splicer software need not be registered to maintain this lawsuit because the software is a foreign work under 17 U.S.C. § 101.[77] But AFL has made no effort to prove that its software is not a U.S. work. Contrary to AFL's argument, it is impossible to determine whether a work is a foreign work without knowing when and where the work was first published. As the Eleventh Circuit Court of Appeals held in *Kernal Records Oy v. Mosley,* on September 12, 2012:

> [T]o proceed with a copyright infringement action, a plaintiff that claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad. This requires the plaintiff to first prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. Once the plaintiff has proven publication, he must then prove that the publication was, in fact, the first publication, and that the geographic extent of this first publication diverges from the statutory definition of a "United States work."[78]

Because the plaintiff in *Kernal Records* made no effort define for the appellate court when

---

contention that registration of a derivative work can effectively register an earlier unregistered work based solely on common ownership. 923 F. Supp. 1231 (N.D. Cal. 1995). In *Religious Tech.*, the court held that because the same author wrote the underlying works and a subsequent compilation that included the original underlying works, registration of the collection was sufficient to register the underlying works for the purpose of establishing ownership of a valid copyright. *Id.* at 1241. As admitted by AFL, the registered software code "incorporates the prior version, with modifications." (Plaintiff's MSJ p. 15.) But here, there are no facts in evidence—none—to establish what "modifications" might have been made to the original software code. AFL has not produced any witness that can testify regarding the software code at all. (Defendants' SOF ¶ 174.) No witness has compared the software code on the fusion splicers that SurplusEQ sold and the code that AFL asserts is protected by a valid copyright, and AFL refused to produce the code so that Defendants could make such a comparison. (Defendants' SOF ¶ 179.) Moreover, unlike the unmodified underlying works in *Religious Tech.*, the derivative software code version 01.32b does *not* include the underlying work in its original form. As such, the record is insufficient to determine what the original work is, what has been altered or deleted, or what underlying elements may be protected copyright. AFL simply insists everyone must take AFL's word for it. This is the epitome of failing to meet the burden of proof, however. The registration of version 01.32b of the software code cannot be used as the sole evidence to establish ownership of a valid copyright in any earlier version of that software.

[77] MSJ Response at 20:3-21:25.

[78] 694 F.3d 1294, 1304-05 (11th Cir. 2012).

Kersmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

the alleged copyright work was first published, the Eleventh Circuit affirmed summary judgment in favor of the defendant.[79] As the court explained, "If a reasonable fact-finder, under any theory, could find by a preponderance of the evidence (1) that [the work] was published; (2) when that first publication occurred; and (3) in what countries that first publication occurred, we would be required to remand the case to the district court. However, on this record, no reasonable fact-finder could possibly determine by a preponderance of the evidence those essential facts."[80]

Application of *Kernal Records* here dooms AFL's copyright infringement claim. Although AFL and Fujikura employees attest that the work is a "work for hire" and that the previous versions of the software were incorporated into later versions of the software,[81] AFL fails to present any evidence regarding when and where the work was first published, calling this inquiry "a difficult legal issue."[82] But without an answer to this difficult legal issue, AFL cannot meet its burden of establishing that the software is not a U.S. work.

There is no evidence to support AFL's contention that any splicer Defendants sold included the registered software, particularly where that registration disclaimed prior version, and where AFL refused to produce any source code for inspection. Lacking any evidence on these critical points, AFL cannot prove its claim for copyright infringement and summary judgment is appropriate.

**Application of Rule 4 (Copyright Misuse): AFL's copyright claim runs afoul of the copyright misuse doctrine by trying to protect the unprotectable.**

17 U.S.C. §102(b) states, "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described,

---

[79] *Id*. at 1310-11.

[80] *Id*. at 1311.

[81] *See* Response SOF ¶ 26; *see also* MSJ Response at 21:10-20.

[82] MSJ Response at 20:15-20.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

explained, illustrated, or embodied in such work…." In other words, copyright protects works of authorship, not the things that happen to contain the authored work. In direct violation the statute, AFL is attempting to use its copyrighted software to bar the resale of Fujikura fusion splicers—the things that contain the protected work. This is textbook copyright misuse.

Unable to dispute the general statutory principle, AFL takes issue with the fact that Defendants were unable to find a case applying copyright misuse in this context. As AFL notes, in *Costco S.A. v. Costco Wholesale, Corp.,* 2011 WL 8492716 (C.D. Cal. Nov.9, 2011), the copyright work was an Omega symbol engraved on the backside of the Omega watch. The court ruled that resales of the watch—the thing containing the authored work—could not be restricted through copyright law. Likewise, in *Lasercomb Am., Inc. v. Reynolds,* the copyrighted work was software, and the court found the copyright license at issue unduly restrictive.[83] These cases apply what Section 102(b) requires: that only the intangible authored work is protected, not the vessel that carries the work.

As the Ninth Circuit stated in *A & M Records, Inc. v. Napster, Inc.,* "copyright misuse prevents copyright holders from leveraging their limited monopoly to allow them to control areas outside of their monopoly."[84] This is exactly what AFL's copyright infringement claim seeks here: to restrict sales of the otherwise-unprotected fusion splicers by arguing that Defendants have infringed a copyrighted work contained within the splicers. In the same way that car manufacturers cannot prevent resales of their cars despite the many copyrights over the navigation software in the cars, AFL cannot use copyright law to effectively obtain patent protection over the Fujikura fusion splicers they sell.

---

[83] 911 F.2d 970, 978 (4th Cir. 1990).

[84] *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1026 (9th Cir. 2001); *see also Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516, 521 (9th Cir. 1997).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

**<u>Application of Rule 5 (Laches)</u>: AFL unduly delayed filing this lawsuit.**

AFL does not dispute that "'the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period.'"[85] It concedes that it knew about Defendants' sales of Fujikura fusion splicers prior to the beginning of the limitations period.[86] AFL even seeks damages for sales that occurred before the limitations period. But AFL insists that the Court should only start the laches period in 2008, when AFL became aware of the Entergy Unit. As demonstrated above, AFL wants to use the Entergy Unit as dispositive evidence that every one of Defendants' sales of grey-market splicers—even those occurring prior to 2008, and those outside of the laches/limitations period—are infringing sales. But at the same time, AFL would like to argue that Defendants' sales prior to the laches period, while actionable, cannot form the basis for its claims.[87]

If AFL's claims have any merit whatsoever, then AFL should have brought the claims far earlier than it did. But AFL delayed bringing its claims, and Defendants continued to engage in business and continued to invest money in that business. AFL's belated complaint, after years of knowingly allowing Defendants to sell goods with Fujikura's mark without ever warning Defendants, has caused severe prejudice. Accordingly, laches serves as a bar to the present suit.

**a)      AFL delayed suit for years.**

AFL does not dispute the law on laches and agrees that a three-year limitations period is the proper time period to evaluate the laches defense. Nor does AFL deny knowing about SurplusEQ's sales of Fujikura fusion splicers for almost a decade. The disagreement rests on AFL's insistence that it did not delay "from 2003" in deciding to

---

[85] MSJ Response at 24:1-27:17; *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002).

[86] *See* Response SOF ¶ 185.

[87] *See* MSJ Response at 25:4-8 ("SurplusEQ's early sales involved used splicers and other products intended for the U.S. market that are not at issue in this case. (C-SMF at ¶ 184.)").

23

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1  assert these claims."[88] Instead, AFL argues that "SurplusEQ's early sales involved used

2  splicers and other products intended for the U.S. market that are not at issue in this

3  case."[89] But Ninth Circuit law is clear that "in determining the presumption for laches, the

4  limitations period runs from the time the plaintiff **knew or should have known about his**

5  **§ 43(a) cause of action**."[90] Here, AFL admits it knew of SurplusEQ's sales in 2003, and

6  specifically, about grey-market sales as soon as 2005: it is "[u]ndisputed that SurplusEQ

7  began selling grey market Fujikura fusion splicers in about 2005."[91] And: "It is undisputed

8  that in about 2005, SurplusEQ began selling Fujikura fusion splicers obtained from

9  vendors in Asia."[92] Yet AFL and Fujikura took absolutely no action to protect the

10 trademark until *2008*. Importantly, it is well-settled that "the presumption of laches is

11 triggered if **any part** of the claimed wrongful conduct occurred beyond the limitations

12 period. To hold otherwise would 'effectively swallow the rule of laches, and render it a

13 spineless defense.'"[93]

14        AFL's own case law, distinguished below on other grounds, undermines AFL's

15 flawed argument. The Ninth Circuit wrote in *Internet Specialties W., Inc. v. Milon-*

16 *DiGiorgio Enterprises, Inc.*, "A prudent business person should recognize the likelihood

17 of confusion to consumers under such circumstances as existed in [2003]."[94] In *Internet*

18 *Specialties*, the plaintiff made a similar argument to AFL— essentially that the defendant

19 wasn't encroaching, until plaintiff decided it was. The Ninth Circuit held that plaintiff's

20 "argument that [defendant] 'progressively encroached' on its market when it shifted from

21 offering dial-up access to DSL access is without merit. Offering DSL was not an

---

[88] MSJ Response at 25:4-5.

[89] MSJ Response at 35:4-8 (citing Response SOF¶ 184).

[90] *Jarrow Formulas*, 304 F.3d at 838 (emphasis added).

[91] Response SOF ¶ 9.

[92] Response SOF ¶ 22.

[93] *Id*. (quoting *Danjaq*, 263 F.3d at 953) (emphasis added).

[94] 559 F.3d 985, 990-91 (9th Cir. 2009).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

expansion into a new market, but rather a natural growth of its existing business."[95] The Ninth Circuit rejected the argument that a plaintiff may unilaterally determine when the defendant's alleged wrongdoing was serious enough to warrant a lawsuit, *ipso facto* preserving its claims: "where the plaintiff knew of the potential conflict several years before bringing suit; the fact that it chose to wait until the conflict was actual, versus potential, was not an excuse . . . ."[96]

AFL knew about SurplusEQ's resale of products bearing Fujikura's marks for years before it did anything about it. It even seeks damages for sales that occurred prior to the three-year limitations period. It cannot now make the circular argument that the activity was not "serious enough" to be actionable until it decided to bring this action. SurplusEQ is entitled to the presumption of laches and AFL has done nothing to overcome that presumption.

b)      **AFL's delay in filing suit caused prejudice.**

AFL also argues that Defendants cannot demonstrate prejudice. It contends, "a defendant cannot establish prejudice simply by showing that it incurred expenses in promoting products bearing a plaintiff's mark."[97] But SurplusEQ has demonstrated far more than simple promotional expenses of the products in dispute. Instead, SurplusEQ has made substantial investments in its business during the time that AFL sat on its hands (those investments are not limited to selling Fujikura products, of course).[98] Furthermore, SurplusEQ's owner has declared under penalty of perjury that, "If SurplusEQ.com, Inc. and Tech Sales, LLC are not permitted to sell Fujikura products, they will likely be unable to continue to operate, causing SurplusEQ.com Inc. and Tech Sales, LLC to lay off their seven employees."[99] Also: "Any injunction preventing SurplusEQ.com Inc. and Tech

---

[95] *Id*. at 991.

[96] *Id*.

[97] MSJ Response at 26:22-25 (citing *Internet Specialties*, 559 F.3d at 991).

[98] *See* Defendants' SOF ¶ 185.

[99] Opposition to Motion for Preliminary Injunction Exhibit A (Dkt.#23), Declaration of D. Parsons (7/20/11), at ¶ 7.

Sales, LLC from selling Fujikura products, even an injunction barring only the sale of Fujikura fusion splicers, will substantially and negatively impact both SurplusEQ.com, LLC and Tech Sales, LLC."[100]   Accordingly, Defendants have made an ample demonstration of prejudice.[101]

AFL cites *Internet Specialties* for the assertion that "a defendant must establish that it built its business around its use of the plaintiff's mark."[102] But *Internet Specialties* is easily distinguished from this case. In that case, the two companies had trademarked very similar domain names, and provided the same services: "Internet Specialties West ('Internet Specialties') and MDE are both internet service providers offering substantially similar services, including internet access, e-mail, and web-hosting. Internet Specialties uses the domain name 'ISWest.com', which it registered in May of 1996. MDE uses the domain name 'ISPWest.com', which it registered in July of 1998."[103] Contrary to AFL's argument that the focus is on the defendant's (mis-)use of the ***plaintiff's*** mark, the *Internet Specialties* Court focused on defendant's expenditures promoting its own mark: "Laches is meant to protect an infringer whose efforts have been aimed at 'build[ing] a valuable business ***around its trademark***' and 'an important reliance ***on the publicity of [its] mark***.'"[104] SurplusEQ's own mark is not at issue in this case.

Another court distinguished *Internet Specialties* on yet another ground. Less than four months ago, the Northern District of California in *RSI Corp. v. Int'l Bus. Machines*

---

[100] *Id.* at ¶ 8.

[101] *See Jarrow Formulas*, 304 F.3d at 840 ("[defendant] has made the challenged claims a central part of [product's] identity in the minds of the public. . . . [Defendant] would be prejudiced if forced to abandon its long-term investment in its presentation of [the product] to the public. Therefore, laches bars [plaintiff's] claim for prospective injunctive relief"); *see also Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) ("defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights").

[102] MSJ Response at 27:1-2.

[103] *Internet Specialties*, 559 F.3d at 988.

[104] *Id.* at 991-92 (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:12) (emphasis in original).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

*Corp.*, held that "*Internet Specialties* concerned only a claim for injunctive relief, not damages. Therefore, the possibility that the defendant might incur increased liability as a result of the plaintiff's delay . . . was simply not an issue in that case. The court thus finds that *Internet Specialties* is inapposite, and concludes that [defendant] has met its burden to show prejudice."[105] In *RSI*, the trial court found prejudice because, "had [plaintiff] raised a challenge to [defendant's] use of the [plaintiff's trademark] … [defendant] would have had an opportunity to change course, substantially reducing its potential liability."

Here, AFL seeks damages—including for sales that occurred outside of the limitations period. Without knowing it, Defendants expended more and more money developing a business, all the while as AFL waited to bring this lawsuit. This is the same type of prejudice the *RSI* court found sufficient to bar the plaintiff's claims.  Defendants have shown prejudice, and laches should bar all the claims brought in this case.

**Application of Rule 6 (Speculative Damages): AFL has no evidence that it would have made any sale that Defendants made.**

The principle failing in AFL's damages theory is that AFL lacks any evidence that it would have made any of the sales Defendants made. It did not conduct a market study and did not find a single customer to testify about confusion between AFL's and Defendants' products. Absent some proof of actual harm, AFL cannot disgorge SurplusEQ's profits. This basic lack of proof mandates summary judgment on AFL's damages claims.

In arguing that AFL is entitled to recover lost profits—even though AFL has failed to identify a single customer that would have purchased from AFL but-for SurplusEQ's conduct—AFL relies on a cursory reading of the relevant statutes and completely ignores the holdings of the cases it cites. In *Lindy Pen Co., Inc. v. Bic Pen Corp.,* the Ninth Circuit applied 15 U.S.C. § 1117 to determine whether the district court properly denied an award of lost profits and disgorgement of the defendant's profits in a Lanham Act

---

[105] 2012 WL 3277136 (N.D. Cal. Aug. 9, 2012).

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

unfair competition case.[106] The court first held that Section 1117 must be interpreted consistent with well-settled tort principles.[107] And although Section 1117 specifically authorizes an award of lost profits and disgorgement of the defendant's profits, "the equitable limitation of granting monetary awards … would seem to make clear that such a remedy should not be granted as a matter of right."[108] Accordingly, because the plaintiff in *Lindy Pen* had no evidence that it had lost sales as a result of the defendant's infringement, the Ninth Circuit affirmed the district court's denial of an award of lost profits.[109] There is more to Section 1117's application than AFL wants to acknowledge.[110]

Incredibly, AFL cites *Lindy Pen* several times but fails to acknowledge its holding. AFL goes a step further, though, and asserts that cases that squarely apply *Lindy Pen*, like *Rolex Watch U.S.A., Inc. v. Michel Co.,* 179 F.3d 704, 712 (9th Cir. 1999), somehow don't apply here because "all of" Defendants' sales infringe (once again, AFL has no evidence of this premise, as shown above). But whether or not all of Defendants' sales infringe, AFL must still prove its damages. Courts have consistently held that any argument that lost profits can be recovered absent proof of injury "is without merit."[111] Consistent with general tort principles, unless AFL can show proof of damages, it is not entitled to recover.

Recognizing this, AFL argues that even if it is not entitled to an award of lost profits, it is entitled to disgorge Defendants' profits. *Lindy Pen* answers this argument too: absent a finding of willful infringement, if AFL cannot establish its lost profits, it

---

[106] 982 F.2d 1400, 1405 (9th Cir. 1993).

[107] *Id*. at 1408.

[108] *Id*. at 1407.

[109] *Id*.

[110] Awards in copyright infringement cases are also limited by general damage principles. *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505 (9th Cir. 1985)

[111] *Hansen Beverage Co. v. Vital Pharm, Inc.,* 2010 WL 3069690 (S.D. Cal. Aug. 3, 2010).

cannot disgorge Defendants' profit either.[112] District courts within this circuit have consistently applied *Lindy Pen* to bar disgorgement of a defendant's profits absent proof of actual harm on the part of the plaintiff. Recently, in *Pom Wonderful, LLC v. Welch Foods, Inc*., the California district court was asked to award defendant's profits to a Lanham Act plaintiff after the jury determined the plaintiff "failed to prove injury."[113] Citing *Lindy Penn*, the court denied the plaintiff's request: "To allow a plaintiff to require a defendant to disgorge its profits after a failure to prove its *prima facie* case at trial would be antithetical to the general principles of liability and recovery."[114] The Ninth Circuit summarily affirmed the district court's decision in *Pom*.[115]

AFL's failure to prove lost sales—i.e., lost profits—also bars disgorgement of Defendants' profits, because any recovery here would result in a windfall to AFL. Summarizing AFL's damages theory, Defendants' expert witness stated, "[AFL] assumed that but-for [Defendants'] actions, all of [Defendants'] sales would have been sold by AFL."[116] What could AFL have done to remedy this? "[AFL] fails to perform any evaluation of the fusion splicer market and does not consider whether any of [Defendants'] alleged infringing sales would have been made by other market competitors."[117] Instead of coming forward with evidence, AFL simply assumed it lost sales. There is no admissible evidence in the record to support a damage award in favor of AFL here, and absent some proof of damage, AFL cannot recover Defendants' profits.

---

[112] 982 F.2d at 1408.

[113] 2010 WL 4794235 (C.D. Cal. Nov. 18, 2010).

[114] *Id*.; *accord Hansen Beverage Co.,* 2010 WL at *9; *see also Card Tech Int'l, LLP v. Provenzano,* 2012 WL 2135357 (C.D. Cal June 7, 2012) ("To support an award of profits, a plaintiff must prove that the defendant's infringement was willful.")

[115] 468 F. App'x 688 (9th Cir. 2012).

[116] Defendants' SOF Exhibit 35 at p. 4.

[117] *Id*.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1
2

**<u>Application of Rule 7 (Proof of Damages)</u>: Because AFL relies on undisclosed evidence and seeks to recover for sales that AFL could not have made, its damages theory must be excluded.**

3
4
5
6

As explained above, AFL's damage theory is fundamentally erroneous; it cannot recover lost profits absent proof that it actually lost sales. But in addition, AFL's damages are improperly disclosed, and they rely on evidence not in the record. This lack of evidence on damages is fatal to AFL's claims.

7

a)      **AFL utterly failed to disclose a claim-by-claim computation of its damages.**

8
9
10
11
12
13
14
15
16
17

With AFL claiming that every single sale of a new Fujikura fusion splicer infringed Fujikura's intellectual property rights, it is not surprising that AFL failed to disclose a claim-by-claim computation of their damages. "Rule 26(a) requires more than providing-without any explanation-undifferentiated financial statements; it requires a 'computation' supported by documents."[118] As it must, AFL tacitly concedes that its initial damages disclosure failed to meet this standard. In an effort to save its claims, AFL points the Court to a supplemental expert report.[119] But as explained in section Rule 1(c) above, the supplemental report was not timely disclosed and must be excluded. With no claim-by-claim analysis of its damages, summary judgment is appropriate on all of AFL's damage theories.

18
19

b)      **AFL also failed to disclose the documents upon which its damages computation is based.**

20
21
22
23
24
25

Even if the tardiness of the supplemental damages disclosure were excused by the Court, AFL nevertheless failed to produce documents for inspection upon which its damages are based, in violation of Rule 26(a)(1)(A)(iii).  The undisclosed documents are the only evidence of AFL's historical sales of fusion splicers and AFL's costs related to its past sales of fusion splicers. Because AFL asserts that it is entitled to recover its hypothetical lost profits for each and every sale that Defendants made, these documents

26

27
28
[118] *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006); *accord City & County of San Fransico v. Tutor-Saliba Corp.,* 218 F.R.D. 219, 221 (N.D. Cal. 2003).
[119] MSJ Response at 32:1-9.

are highly relevant to determining the alleged lost profits over the relevant time period. Rule 26 requires their disclosure.

In response, AFL does not dispute that Defendants are entitled to inspect all documents underlying AFL's damage theories.[120] But AFL contends that its expert did not rely on these documents to support his damages computation.[121] Instead, according to AFL, its in-house expert "relied on an internal computer report to determine the material margin for each line of fusion splicers at issue in this case, and the information provided from that report is incorporated in [its expert's] report as the table showing material margin."[122] AFL's argument raises serious concerns regarding its production of documents in this case. Since the computer age, no court has questioned whether a computer report is a document.[123] The computer report—the very foundation of AFL's expert report and his calculation of AFL's damages—had to be produced to Defendants. Further, if the computer report is part of a larger computer program, as Defendants' expert witness testified,[124] the computer program and its data also should have been produced.[125] Defendants are not forced to take the word of AFL or its CFO-turned-

---

[120] MSJ Response at 34:21-35:20.

[121] *Id.* at 35:5-13.

[122] *Id.*

[123] *See Anti-Monopoly, Inc. v. Hasbro, Inc.*, 1995 WL 649934 at *2 (S.D.N.Y. Nov. 3, 1995) ("[T]oday it is black letter law that computerized data is discoverable if relevant."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1995 WL 360526 (N.D. Ill. June 15, 1995); *Bills v. Kennecott Corp.*, 108 F.R.D. 459 (D. Utah 1985).

[124] *See* Defendants' SOF Exhibit 12 (Deposition of R. Crowder) at 55:8-56:20 (stating that the information included on Mr. Crowder's expert report was generated by AFL's "Oracle" computer program, which has not been produced).

[125] *See Williams v. E.I. du Pont de Nemours & Co.*, 119 F.R.D. 648, 651 (W.D. Ky. 1987) ("[D]efendant may discover... copies of the 'computerized database in the form of the computer storage disk,' the 'codebooks,' the 'user's manual' and 'all documents used in encoding the database.'"); *Dunn v. Midwestern Indem.*, 88 F.R.D. 191, 194 (S.D. Ohio 1980) ("In many instances, it will be essential for the discovering party to know the underlying theory and procedures employed in preparing and storing [electronically stored information]. When this is true, litigants should be allowed to discover any materials relating to the record holder's computer hardware, the programming techniques employed

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

31

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1    expert.[126] As a sanction for AFL's failure to disclose, AFL's damage calculation must be

2    excluded.[127]

3        c)    **AFL failed to disclose Fujikura's profits and, therefore, its damages are**
            **wholly speculative.**

4

5        Similar to AFL's failure to produce the computer report that its in-house

6    expert/CFO relied on to calculate AFL's damages here, AFL admits that it failed to

7    produce any information regarding its parent company's profits and costs.[128] With no

8    information regarding Fujikura's profit in the record, AFL contends that "Defendants'

9    argument regarding Fujikura's profits represents a transparent attempt to complicate the

10   calculation to the degree that AFL could never demonstrate lost profits."[129] But it is not

11   Defendants' fault that AFL is unable to calculate its true lost profits because it cannot (or

12   will not) access Fujikura's records. Those records might show that Fujikura sells to AFL

13   at a loss ("dumping"), to bump up AFL's profit for competitive or taxation purposes.

14   AFL's CFO, who served as AFL's expert witness on damages here, freely admitted that

15   as a wholly owned subsidiary of Fujikura, Fujikura could fold AFL at anytime and take

16   every penny AFL earned—suggesting that AFL really has no profit (and no damages) of

17   its own.[130] Moreover, it was Fujikura's wholly owned Asian subsidiaries that originally

18   sold each and every fusion splicer that Defendants resold in the United States—so

19   Fujikura already profited from every one of Defendants' sales. How much profit is

20   unclear, but AFL now seeks to double that profit in this lawsuit, then send that money

21

22   in connection with the relevant data, the principles governing the structure of the stored
     data, and the operation of the data processing system.").

23   [126] *See U.S. v. Sierra Pacific Industries,* 2011 WL 5508864, *8 (D. Ariz. 2011) ("[I]t is
     not enough for an expert to say that he did not consider a document in his analysis … .

24   Rather, the other side ought to be able to test an expert's opinions against documents that
     he could have, but did not consider in his analysis.)

25   [127] *See* Fed.R.Civ.P. 37(c)(1) ("If a party fails to provide information … as required by

26   Rule 26(a) or (e), the party is not allowed to use that information … .")

27   [128] *See* MSJ Response at 36:3-20.

     [129] *Id.*

28   [130] *See* Defendants' SOF Exhibit 12 (Deposition of R. Crowder) at 95:1-7.

1    back to its parent company in Japan.

2        Absent disclosure of Fujikura's books, there is a real possibility here that any

3    award to AFL will result in double-dipping to Fujikura. This is just common sense. For

4    this reason as well, AFL's disclosures are deficient and summary judgment should be

5    entered.

6    **d)    AFL cannot recover for sales shipped to customers outside of North**
        **America.**

7

8        AFL also wants to disgorge Defendants' profits earned on sales to customers

9    located outside North America. But under the terms of AFL's agreements with Fujikura,

10   AFL only owns the exclusive right to sell Fujikura fusion splicers in North America.[131]

     Therefore, it could not have made the sales that Defendants made to customers located

11   outside of North America. In response, AFL argues that each of the sales was shipped

12   "from the U.S."—making the redundant argument that the sales were infringing. But this

13   is a question of damages, not liability. Even if a sale infringed AFL's rights, if the

14   infringement did not damage AFL, it is not actionable (and cannot be part of a larger

15   damages award, either). So for those sales that were made by Defendants outside North

16   America, infringement is irrelevant; that sale would not have been made by AFL, and

17   therefore did not harm AFL. Non-North American sales are not part of any damages

18   claim AFL can assert, and AFL lacks standing to recover anything for these sales—no

19   matter where these sales originally shipped from.

20   **e)    AFL improperly seeks to recover for infringement that occurred before it**
        **owned an exclusive right in the intellectual property at issue.**

21

22       AFL can recover damages for copyright infringement that occurred before the

23   copyright was registered. But AFL cannot recover damages for infringement that

24   occurred before AFL owned an exclusive right in the copyrighted work. Under 17 U.S.C.

25   § 501(b), only "[t]he legal or beneficial owner of an exclusive right under a copyright is

26   entitled ... to institute an action for any infringement of that particular right committed

27

28   ───────────────────

     [131] Defendants' SOF ¶ 6.

Kersmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1   while he or she is the owner of it." Under Section 501(b), a non-exclusive licensee has no

2   right to bring an infringement lawsuit.[132]

3          Here, AFL did not acquire an exclusive right to the copyright at issue until

4   February 17, 2011.[133] Under the plain language of Section 501(b), AFL cannot seek

5   damages for infringement that occurred before AFL "was the owner of an exclusive right

6   . . . ." This analysis does not change simply because AFL obtained, at the same time, the

7   right to bring suit for "all claims for infringement of the right of distribution …. that may

8   exist as of the date of this license." This contract provision cannot change the fact that

9   AFL was not an owner of an exclusive license before February 2011. Nor did AFL obtain

10  the right from Fujikura to sue for infringement that occurred *prior* to the date of the

11  license.[134] Finally, AFL does not claim any rights in the copyright separate and apart

12  from the license agreement.[135] Accordingly, AFL cannot maintain an infringement suit to

13  recover for infringement that occurred prior February 17, 2011—the date it acquired "an

14  exclusive right" in the copyright for the first time.

15      **f)      AFL's expert testimony fails the *Daubert* standard.**

16         AFL has also failed to provide admissible expert testimony in this matter.  On

17  November 28, 2012, Defendants filed their Motion to Exclude AFL's Expert

18  Witnesses.[136]   As set forth in Defendants' motion, AFL has disclosed that its Chief

19  Financial Officer, Robert Crowder, and Senior Engineer, Douglas Duke, will provide

20  expert testimony at trial.   But both "experts" rely extensively on unwarranted

21  assumptions to reach their conclusions, and their opinions are not based upon sufficient

22  facts or data.  Mr. Crowder based his damages calculation on documents that AFL

23

24  [132] *Nafal v. Carter,* 540 F. Supp. 2d 1128, 1140 (C.D. Cal. 2007) aff'd, 388 F. App'x 721
    (9th Cir. 2010); *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1146 (9th Cir.
25  2008).

    [133] Defendants' SOF ¶¶ 38-39.
26
    [134] *See id.*
27
    [135] Defendants' SOF ¶ 39; *see also* Stipulation Regarding Copyright and Trademark
    Licenses and Certain Depositions (Dkt.#142) ¶ 1.
28
    [136] Dkt.#182.

refused to disclose in this litigation.   Mr. Crowder also assumed that AFL would make every sale that SurplusEQ without any evidence to support this assumption.  Mr. Duke— AFL's only technical expert—admitted under oath that he is not qualified to offer an opinion on the reliability of any circuit board found within Fujikura's products—the very products at issue here.  As fully explained in Defendants' Motion to Exclude AFL's Expert Witnesses, the Court should exclude both expert reports and should refuse to allow Mr. Crowder and Mr. Duke to testify at trial.  Without expert testimony, AFL cannot prove its claims and summary judgment is appropriate for this reason as well.

### CONCLUSION

To decide this case, the Court need not determine the boundaries of the first-sale doctrine.  Seven well-settled legal principles mandate entry of summary judgment in favor of Defendants.  Summary judgment is appropriate because: 1) AFL has failed to support its claims with admissible evidence; 2) AFL has no evidence of consumer confusion; 3) AFL can't establish a valid copyright or that the Defendants copied AFL's copyrighted work; 4) AFL cannot protect the sale of an unpatented fusion splicer by relying on its allegedly copyrighted software; 5) AFL is not permitted to file suit nine years after it should have known about Defendants' allegedly tortious conduct; 6) AFL can't recover damages it didn't suffer; and 7) AFL hasn't disclosed its damages and the documentary support for its damages.

AFL lacks any evidence to support its claims, which should never have been brought in the first instance.  AFL pursued this case nine years after Defendants started selling grey-market fusion splicers without evidence that any consumer was deceived by the quality of Defendants' products and without any evidence of harm to its parent company's brand.  The Court should end AFL's quest to preserve its two-tiered pricing structure through the application of intellectual property rights conveyed to AFL for the sole purpose of filing lawsuits.

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

1

RESPECTFULLY SUBMITTED this 6th day of December 2012.

2

3

KERCSMAR & FELTUS PLLC

4

5

*s/ Greg Collins*

6

Geoffrey S. Kercsmar

Gregory B. Collins

7

Jenessa G. B. Coccaro

KERCSMAR & FELTUS PLLC

8

6263 North Scottsdale Road, Suite 320

Scottsdale, Arizona 85250

9

10

11

12

**CERTIFICATE OF SERVICE**

13

I hereby certify that on December 6, 2012, I electronically transmitted the foregoing

14

document to the U.S. District Court Clerk's Office using the CM/ECF System for filing

15

and transmittal of Notices of Electronic Filing to the following CM/ECF registrants:

16

Joel T. Beres

17

John W. Scruton

STITES & HARBISON PLLC

18

400 West Market Street, Suite 1800

19

Louisville, Kentucky 40202

*Attorneys for Plaintiff*

20

21

Sean D. Garrison

Shane E. Olafson

22

LEWIS & ROCA LLP

40 North Central Avenue

23

Phoenix, Arizona 85004

24

*Attorneys for Plaintiff*

25

26

*s/ Greg Collins*

27

28

Kercsmar & Feltus PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*AFL Telecommunications LLC v. SurplusEQ.com Inc., et al.*

Case No. 2:11-cv-01086

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Exhibit 1 – Deposition Excerpt of Michael Phillips

UNITED STATES DISTRICT COURT

for the

DISTRICT OF MINNESOTA

---

AFL Telecommunications, LLC,

                          Civil No. 2:11-cv-01081-DGC
      Plaintiff,

vs.

FiberOptic Hardware, LLC,

      Defendant.


DEPOSITION


      The following is the deposition of

MICHAEL PHILLIPS, taken before Laurie Webster,

RPR, Notary Public, pursuant to Notice of

Taking Deposition, at the Best Western Plus


Kelly Inn, 161 St. Anthony Avenue, St. Paul,


Minnesota, commencing at approximately


12:58 p.m., on April 27, 2012.

```
 1            Q.  And eventually AFL did send you four
 2    fusion splicers, is that right --
 3            A.  They did.
 4            Q.  -- to replace the -- the ones that you
 5    returned to them?
 6            A.  That -- they did.
 7            Q.  Were those new, to your knowledge?
 8            A.  Yes, they were.
 9            Q.  And have they worked according to your
10    expectations?
11            A.  Flawlessly.
12            Q.  Since receiving those fusion splicers,
13    have you had any communications with AFL?
14            A.  None.
15            Q.  Do you know if anyone else has?
16            A.  No one else has.
17            Q.  Are you familiar at all with Surplus EQ?
18            A.  Never heard of them.
19            Q.  Or Tech Sales?
20            A.  Never heard of them.
21            Q.  Or Daniel Parsons?
22            A.  No.
23            Q.  All right.  I'm almost done, but I just
24    want to go back to a couple of the exhibits quickly
25    and ask you a few questions of those.
```