**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AFL Telecommunications LLC, | No. CV11-1086 PHX DGC |
| Plaintiff, | **ORDER** |
| v. | |
| SurplusEQ.com Incorporated; et. al., | |
| Defendants. | |

This case concerns claims by Plaintiff AFL Telecommunications LLC ("AFL") against Defendants Surplus EQ.Com Incorporated ("SurplusEQ"), Tech Sales LLC ("Tech Sales"), Daniel Parsons, and Lisa Parsons (collectively, "Defendants") for unfair competition, false advertising, and copyright infringement arising from Defendants' sale of fusion splicers (devices used to splice fiber optic cable) made by AFL's Japanese parent, Fujikura Ltd. ("Fujikura"). The parties have cross-moved for summary judgment. Docs. 147, 158. Also pending before the Court is the motion to seal documents filed by AFL (Doc. 155), and the motion to exclude AFL's expert opinions filed by Defendants (Doc. 190). The motions are fully briefed and no party has requested oral argument. For the reasons set forth below, the Court will deny AFL's motion for summary judgment, grant in part and deny in part Defendants' motion for summary judgment, grant in part and deny in part AFL's motion to seal, and deny Defendants' motion to exclude AFL's expert opinions.

**I.    Background.**

The following background facts are not disputed by the parties. AFL is a wholly-

owned subsidiary of Fujikura, a Japanese manufacturer of fiber optic equipment.  One of Fujikura's products is a fusion splicer, a device that is manufactured in Japan and made up of hardware and operating software.  Fujikura sells its splicers under the FUJIKURA trademark.  The "FUJIKURA plus stylized F" design was registered with the U.S. Patent and Trademark Office on March 21, 2000, for use with "OPTICAL FIBER SPLICERS." Doc. 147-1, ¶¶ 12-13; Doc. 169, ¶¶ 12-13.   The "FUJIKURA plus stylized F color" design was registered with the U.S. Patent and Trademark Office on April 13, 2010, for use with "OPTICAL FIBERS [and] OPTICAL FIBER FUSION SPLICERS."  Doc. 147-1, ¶ 14; Doc. 169, ¶ 14.  AFL sells splicers bearing the FUJIKURA mark in the United States, and, since 2003, has been the exclusive distributor of Fujikura splicers in North America.

Fujikura manufacturers a variety of splicers, including the FSM-50S, FSM-50R FSM-60S, FSM-60R, FSM-18S and FSM-18R models.  The hardware and software on every Fujikura splicer is identical, regardless of where Fujikura intends to sell the splicer. The software contains many available languages.  During the manufacturing process, Fujikura implements a lock that changes the splicer's settings to display only the language suited to the region where the splicer is intended to be sold.  Thereafter, changes must be made to the splicer's software settings to make another language available.  In 2006, Fujikura added a "splash screen" to its FSM-60 and FSM-18 series splicers which states that the unit is licensed for a particular country or region.

Fujikura employees, as part of their employment duties, developed the operating software for the FSM-18 and FSM-60 series in Japan.  Fujikura periodically upgrades the software, and each successive version contains substantial code from the preceding version and also incorporates some new content that the preceding version did not contain.  Doc. 147-1, ¶¶ 7-8; Doc. 169, ¶¶ 7-8.  Fujikura registered version 1.32b of the operating software for its FSM-60 series, and was granted a U.S. Copyright certificate of registration on March 26, 2011.  Doc. 147-1, ¶ 9; Doc. 169, ¶ 9.  The certificate's "Limitation of copyright claim" section states the following: "Material excluded from

1    this claim:  Previous version."  Doc. 151, ¶ 52; Doc. 174-1, ¶ 52.

2         SurplusEQ[1] is a Phoenix-based company that sells several manufacturer brands of

3    fiber optic equipment, including Fujikura products, over the Internet.    In 2005,

4    SurplusEQ began selling gray market Fujikura splicers that it had obtained from

5    companies in China and Hong Kong.  In an Internet blog post, SurplusEQ referred to its

6    splicers as "new," purchased directly from the manufacturer, and covered by a

7    manufacturer's warranty.  Doc. 147-1, ¶ 37; Doc. 169, ¶ 37.  On its website, SurplusEQ

8    advertised some of its Fujikura splicers as "new and unused" and "[g]uaranteed not

9    modified in any way."  Doc. 147-1, ¶¶ 42, 46; Doc. 169, ¶¶ 42.  SurplusEQ is not

10   authorized by AFL to sell Fujikura splicers.  In late October 2011, SurplusEQ stopped

11   selling gray market Fujikura splicers.

12        Fujikura splicers sold in the United States through authorized channels carry a

13   manufacturer's warranty that entitles the purchaser to obtain warranty service from AFL.

14   Those sold through unauthorized channels do not carry a manufacturer's warranty.

15   SurplusEQ offers a one-year warranty on its splicers.  In 2009, AFL began to offer an

16   additional year of warranty coverage for its FSM-60 series splicers.

17        In 2009, Entergy Mississippi Inc. ("Entergy") purchased a FSM-60S splicer (the

18   "818 splicer") from SurplusEQ.   After using the splicer for approximately one year,

19   Entergy contacted AFL for service.  AFL identified the 818 splicer as a gray market unit,

20   and offered Entergy a replacement splicer in exchange for the 818 splicer.   AFL's

21   inspection of the 818 splicer revealed the following alterations:  the 818 splicer's serial

22   number had been changed both on the outside of the unit and in a flash memory chip, the

23   splicer's flash memory chip had been replaced and nearby components had been

24

25        [1] Defendant Tech Sales is a company solely owned by Defendant Daniel Parsons
     that never developed.  Doc. 151, ¶ 1; Doc. 174-1, ¶ 1; Doc. 55, ¶¶ 4-6; Doc. 110, ¶¶ 4-6.
26   Any conduct related to Tech Sales is attributable to SurplusEQ.  Doc. 151, ¶ 1; Doc. 174-
     1, ¶ 1.   Daniel Parsons is the sole officer and director of SurplusEQ.   Doc. 55, ¶ 6;
27   Doc. 110, ¶6.   Defendant Lisa Parsons (previously named as Jane Doe Parsons) is
     married to Daniel Parsons.  Doc. 55, ¶ 8; Doc. 110, ¶ 8.

28

1    subjected to heat damage, and the splicer's protective coating had been damaged.

2         AFL and Fujikura developed a plan to eliminate gray market competition in 2009.

3    As part of that plan, on February 17, 2011, AFL and Fujikura entered into a copyright

4    license agreement that provided AFL with the exclusive license to distribute the software

5    that is preloaded on Fujikura's splicers in North America and to register such rights with

6    the U.S. Copyright Office in AFL's name.   The agreement also assigned to AFL "all

7    claims for infringement of the right of distribution . . . that may exist as of the date of this

8    license."  Doc. 147-1, ¶¶ 15-16; Doc. 169, ¶¶ 15-16.  On March 14, 2011, AFL and

9    Fujikura entered into a trademark license agreement that gave AFL the exclusive right to

10   purchase and distribute splicers bearing the FUJIKURA mark in North America and to

11   use the FUJIKURA mark in connection with its advertising and sales.

12   **II.    AFL's Motion for Partial Summary Judgment.**

13        AFL's motion seeks summary judgment that SurplusEQ violated AFL's exclusive

14   right to use the Fujikura trademark in North America, that SurplusEQ falsely advertised

15   its gray market Fujikura splicers, and that SurplusEQ infringed AFL's exclusive right to

16   distribute copyright-protected software.[2]

17        **A.    Legal Standard.**

18        A party seeking summary judgment "bears the initial responsibility of informing

19   the district court of the basis for its motion, and identifying those portions of [the record]

20   which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

21   *Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

22   evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

23   no genuine issue as to any material fact and that the movant is entitled to judgment as a

24   matter of law."  Fed. R. Civ. P.  56(a).  Only disputes over facts that might affect the

25   outcome of the suit will preclude the entry of summary judgment, and the disputed

26   _____

27        [2]  In response, Defendants raise several evidentiary objections to evidence
     submitted by AFL in support of its motion.  Doc. 176 at 6-7.  Because the Court will
28   deny AFL's motion, it will not address these objections.

1   evidence must be "such that a reasonable jury could return a verdict for the nonmoving

2   party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

3       **B.    Count I.**

4       AFL's first claim for relief under Section 43 of the Lanham Act alleges unfair

5   competition in violation of 15 U.S.C. § 1125(a)(1)(A).  To prevail on this claim, AFL

6   must show that the use of the FUJIKURA mark by SurplusEQ is likely to cause

7   consumer confusion.  In the context of gray market goods – that is, foreign-manufactured

8   goods bearing a valid U.S. trademark that are imported without the consent of the mark

9   holder, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 285 (1988) – "the likelihood of

10  confusion relates to the existence of material differences between the allegedly infringing

11  good and the [mark holder's] product."  *Hokto Kinoko Co. v. Concord Farms, Inc.*,

12  810 F. Supp. 2d 1013, 1024 (C.D. Cal. 2011) (citation omitted).  Although gray market

13  goods "are authentic in the sense that they originated with the mark owner, they are not

14  considered 'genuine' within the meaning of the Lanham Act if they are not authorized for

15  sale in the United States and they differ materially from those that are."  *Zip Int'l Grp.,*

16  *LLC v. Trilini Imps., Inc.*, No. 09-CV-2437 (JG)(VVP), 2010 WL 648696, at *3

17  (E.D.N.Y. Feb. 22, 2010) (citations omitted).  "The sale of such goods is actionable by

18  the exclusive United States licensee not because consumers may be confused about the

19  manufacturer of the goods, but because consumers may unwittingly purchase the goods

20  on the basis of the domestic markholder's reputation only to be disappointed when the

21  product does not meet their expectations."  *Id.*  The parties agree that SurplusEQ sold

22  gray market Fujikura splicers.  Doc. 147-1, ¶ 21; Doc. 169, ¶ 21.

23      The sale of gray market goods under the same trademark as the authorized goods

24  is likely to cause consumer confusion, and thereby run afoul of Section 43 of the Lanham

25  Act, where the gray market goods differ materially from the authorized goods.

26  *See PepsiCo, Inc. v. Reyes*, 70 F. Supp. 2d 1057, 1059 (C.D. Cal. 1999).  "The threshold

27  of materiality 'is always quite low.'"  *Id.* (quoting *Societe Des Produits Nestle, S.A. v.*

28  *Casa Helvetia, Inc.,* 982 F.2d 633, 641 (1st Cir. 1992)).  "The existence of any difference

between [the trademark owner's] product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade-Mark Act claim." *Societe Des Produits Nestle, S.A.*, 982 F.3d at 641; *see Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,* 562 F.3d 1067, 1073 (10th Cir. 2009) (because many factors influence a consumer's decision to purchase a product, the materiality standard "must be kept low to include even subtle differences between products" (citation omitted)); *see also PepsiCo,* 70 F. Supp. 2d at 1059 (labeling and language differences were "material and demonstrate that there is a likelihood of confusion and deception concerning the nature and origin of the goods"); *Hokto Kinoko Co.*, 810 F. Sup. 2d at 1025 (material differences can relate to a product's labeling and quality control standards); *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.,* 425 F.3d 708, 721 (9th Cir. 2005) ("many cases have found a likelihood of confusion when a trademark owner was prevented from exercising quality control over the merchandise bearing its mark").

AFL contends that SurplusEQ's gray market splicers are materially different from its authorized splicers because of physical alterations, differences in warranty coverage, and software licensing issues.  As to the physical alterations, AFL points to the 818 splicer and changes that were made after its production by Fujikura.  AFL argues that the 818 splicer had been modified before it was sold by SurplusEQ, but presents no evidence of this fact.  And as SurplusEQ notes, witnesses in this case were unable to say when or by whom the splicer was modified.  AFL argues that SurplusEQ has not shown that the splicer was modified after its sale, but AFL has the burden of proof and has not shown that the splicer had been modified when sold by SurplusEQ.

As to the warranty coverage, it is undisputed that Fujikura splicers sold through authorized channels in the United States carry a manufacturer's warranty that entitles the purchaser to obtain warranty service from AFL, whereas those sold through unauthorized channels do not.  Defendants argue that they offered an identical warranty, but this

clearly is not the case.  The Fujikura warranty allowed the customer to return the splicer to AFL for repair by AFL, a Fujikura-authorized dealer; the SurplusEQ warranty required repair by SurplusEQ or, more likely, by whatever entity sold the splicer to SurplusEQ.

Defendants next contend that despite the difference between these warranties, there is no likelihood of consumer confusion because SurplusEQ fully disclosed the differences between the products.  "The alleged infringer, of course, may attempt to rebut this presumption, but in order to do so he must be able to prove by preponderant evidence that the differences are not of the kind that consumers, on average, would likely consider in purchasing the product."  *Societe Des Produits Nestle, S.A.*, 982 F.2d at 641; *Am. Circuit Breaker Corp. v. Or. Breakers Inc.*, 406 F.3d 577, 585-86 (9th Cir. 2005) (finding that there was no material fact as to infringement where customers who purchased the gray market product "get exactly what they expect" (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 303 (3d Cir. 1998)).  In support of this proposition, Defendants point to the deposition of Defendant Daniel Parsons who stated that "I always said make sure they say we're not authorized and that Fujikura won't repair them."  Doc. 151-1 at 31:15-19.  Defendants also point to the deposition of SurplusEQ employee Cody Wood, who stated that "Usually before they [customers] bought the unit from me, they would mention, oh this is a gray market unit, can I send it to AFL, and I would say no."  Doc. 152-7 at 14:6-9.  Wood also stated that "On the website it would say this is a non-AFL unit.  AFL will not service this unit.  You have to send it to SurplusEQ for service. . . . It would be on the invoice, and we also made stickers and put them right on the units and carrying case as well. . . . [the stickers say] this is a non-AFL unit.  It must be sent back to SurplusEQ.  AFL will not service this unit."  *Id.* at 21:10 - 22:3.  This evidence creates a genuine issue of fact as to whether the warranty differences were material to consumers and gave rise to consumer confusion.

As to software licensing, it is undisputed that SurplusEQ generally obtained Fujikura splicers from Asian distributors and resold the splicers in the United States.  It is also undisputed that Fujikura changes the language settings on its splicers depending on

where the units are to be sold and, starting in 2006, added to its units a "splash screen" stating that a unit was licensed for a particular region only.  AFL argues from these facts that its units sold in the United States were locked so that only the English language was available to the user, while SurplusEQ units originally destined for a country in Asia would be locked to display that country's language.  AFL also argues that the "splash screen" on its units said that the unit was licensed for sale in the United States, while SurplusEQ's units would not say this, and that purchasers would consider their possible copyright liability for using unauthorized software to be material.  Although the Court finds this to be a close question, it concludes that summary judgment should not be granted to AFL.  "[T]he question of likelihood of confusion is routinely submitted for jury determination as a question of fact." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1362 n.5 (9th Cir. 1985) (citations omitted).  Whether AFL has presented sufficient evidence to show that SurplusEQ sold units with altered language displays or splash screens, and whether software licensing issues were material, are questions best left to the jury to decide when the totality of the evidence in this case can be considered.

### C.     Count II.

AFL's second claim for relief under Section 43 of the Lanham Act alleges false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).  Doc. 55 at 14.  Section 43 of the Lanham Act "explicitly furnishes a private right of action 'against persons who make false and deceptive statements in a commercial advertisement[.]'" *PhotoMedex, Inc. v. Irwin,* 601 F.3d 919, 923 (9th Cir. 2010) (citation omitted).  The following five elements make up a false advertising claim under the Lanham Act:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citations omitted).  To constitute a statement made in a commercial advertisement, the statement must be:

> (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services.  While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citation omitted).

AFL alleges that SurplusEQ falsely advertised in a blog post that it sold Fujikura splicers that were "new," the "same machine" provided by authorized sellers, purchased "direct from the manufacturer," and sold with "a full Manufacturers [sic] warranty." Additionally, AFL alleges that SurplusEQ falsely advertised on its own website and its eBay store that it sold "new" and "guaranteed not modified in any way" Fujikura splicers. Doc. 147 at 13.  The Court will analyze each advertisement separately.

### 1.    The Blog Post.

Defendants argue that AFL has failed to establish that the blog post was sufficiently disseminated to constitute a commercial advertisement.  Doc. 176 at 14.  AFL does not respond to this argument.  The blog post is not a "classic advertising campaign," and thus without any evidence establishing that the blog was disseminated to the purchasing public, the Court cannot find that the post constitutes a commercial advertisement.   Accordingly, the Court denies AFL's motion for summary judgment on its false advertising claim with regards to the blog post.

### 2.    SurplusEQ's Website and eBay Store.

Unlike the blog post, the statements on SurplusEQ's website and on its eBay webpage appear to constitute a classic advertising campaign.  The speech is made for the purpose of influencing customers to purchase a splicer and includes direct purchasing

information.  AFL asserts that the eBay materials claimed the splicers were "new" and "not modified."  Doc. 147-1, ¶¶ 44, 46.  As found above with respect to the unfair competition claim, however, genuine issues of material fact remain as to whether the splicers sold by SurplusEQ had been modified at the time they were sold.  The Court therefore cannot grant AFL summary judgment on its false advertisement claim with regards to the statements made by SurplusEQ on its website and eBay store.

### D.    Count IV.

Registration of a copyright is a prerequisite to filing a civil action for copyright infringement of a U.S. work; there is no registration requirement if it is not a "United States work."  17 U.S.C. § 411(a); *see also Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615 (9th Cir. 2010).   To establish a prima facie case of copyright infringement, a plaintiff must show (1) ownership of the allegedly infringed material and (2) a violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.  *See A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

#### 1.    Registration.

AFL submits that the registration requirement is satisfied because either (1) Fujikura's software is a non-U.S. work (Doc. 147 at 15) or (2) Fujikura's registration of version 1.32b is sufficient because the registered version is a derivative work of earlier versions (*id.*).  Whether a work is a non-U.S. work depends largely on whether the work has been published.  *See* 17 U.S.C. § 101.  In its motion for summary judgment, AFL has cited no evidence on the issue of publication (Doc. 147 at 15), and AFL's conclusory assertion that Fujikura's software is a "non-U.S. work" (*see* Doc. 147-1, ¶ 10; Doc. 169, ¶ 10) will not suffice at the summary judgment phase.  AFL has not established that the registration requirement does not apply to its infringement claim.

It is undisputed that Fujikura obtained U.S. Copyright Registration No. TX 7-400-942, which covers version 1.32b, the operating software for its FSM-60 series (Doc. 147-1, ¶ 9; Doc. 169, ¶ 9), but it is not clear – contrary to what AFL submits (Doc. 147 at 15) – that this registration is sufficient to maintain AFL's action for infringement of all earlier

versions.  Under the effective registration doctrine, the registration of a derivative work satisfies the registration requirement for an infringement action based on preexisting work not separately registered.  *See Streetwise Maps v. Vandam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998) (holding that "the registration certificate relating to the derivative work . . . will suffice to permit [the plaintiff] to maintain an action for infringement based on defendants' infringement of the preexisting work"); *Salestraq Am., LLC v. Zyskowski*, 635 F. Supp. 2d 1178, 1181 (D. Nev. 2009) (holding that a registration of a 2008 version of a compilation of floor plans and locations was sufficient to maintain an action for infringement of the 2007 unregistered version).  AFL submits that version 1.32b is a derivative work in that "Fujikura upgrades [its] operating software from time to time . . . [and] each successive version incorporates some original, copyrightable content not included in the preceding version, and each new version contains substantial code from the original version."  Doc. 147-1, ¶ 7.

Defendants argue that AFL has failed to establish that version 1.32b is a derivative work because AFL has not produced any evidence showing how Fujikura modified its operating software over time.  Doc. 176 at 19.  Defendants argue that without this evidence, AFL has failed to show that the registration of version 1.32b is sufficient to register all related preexisting works.  *Id.*  Additionally, Defendants contend that the effective registration doctrine is inapplicable because Fujikura's registration specifically excludes any "[p]revious version" from its claim (Doc. 151, ¶ 52; Doc. 174-1, ¶ 52), and the registration does not otherwise reference preexisting versions as required by *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1229-30 (11th Cir. 2008) (holding that when the registration of a work fails to identify the unregistered preexisting work, an action for infringement of the unregistered work fails) (Doc. 176 at 19-20).

At the motion to dismiss phase, the Court found that the effective registration doctrine, as stated in *Streetwise* and *Salestraq*, applied in this case because the Court found it reasonable to infer from the complaint that each successive software version incorporates the preceding versions.  Doc. 64 at 4.  The Court found that AFL's

infringement claim was analogous to the claim in *Streetwise*, where the plaintiff had asserted infringement of prior unregistered street maps based on a registration of a later version of the same map.  159 F.3d at 747.  The Court distinguished *Oravec* because the plaintiff in that case sought to assert copyright infringement of unregistered three-dimensional models of an architectural work based on registration of architectural drawings, 527 F.3d at 1230, which was not a derivative work that incorporated material from unregistered preexisting works as did the splicer software.

It is now evident, however, that Fujikura's registration specifically disclaims previous versions.  The copyright application identifies the "[p]revious version" of the software as "[m]aterial excluded from this claim[.]"  Doc. 151, ¶ 52; Doc. 174-1, ¶ 52.  This situation is unlike *Streetwise*, where the plaintiff's registration certificate stated that the work for which it sought protection was derivative of previous versions of the map.  159 F.3d at 746-47.  It is undisputed that Fujikura registered version 1.32b, but for purposes of its summary judgment motion, AFL has failed to satisfy the registration requirement with regard to any previous version of the software.

### 2.   Ownership and Infringement.

As to the ownership element, AFL argues that Fujikura owns the software preloaded on its splicers as a work made for hire, and that Fujikura granted AFL the exclusive right to distribute the copyrighted work in the United States under a written licensing agreement.  As to infringement, AFL contends that SurplusEQ sold Fujikura FSM-60 series splicers in the United States without AFL's permission.  According to AFL, these sales constitute unauthorized distribution of copyrighted software and violated AFL's exclusive right to distribute.  Since the Court has found that AFL has presented evidence establishing only that Fujikura registered version 1.32b, to succeed on its motion for summary judgment, AFL must point to evidence showing that SurplusEQ sold splicers loaded with this software version.  The record does not contain any evidence regarding the software version loaded on the Fujikura splicers sold by SurplusEQ.

1   Accordingly, the Court denies AFL's motion for summary judgment on its copyright
2   infringement claim.

3   **III.    Defendants' Motion for Summary Judgment.**

4       **A.    Laches.**

5       Defendants argue that the doctrine of laches bars all AFL claims.  "Laches is an
6   equitable time limitation on a party's right to bring suit, resting on the maxim that one
7   who seeks the help of a court of equity must not sleep on his rights."  *Jarrow Formulas,*
8   *Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (internal quotation marks
9   and citations omitted).  "It is well established that laches is a valid defense to Lanham
10  Act claims[.]"  *Id.*  Laches is also a defense to claims for copyright infringement.  *See*
11  *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 950-51 (9th Cir. 2001).  "In order to succeed
12  on a defense of laches, a defendant must prove both:  (1) an unreasonable delay by
13  plaintiff in bringing suit, and (2) prejudice to himself."  *Miller v. Glenn Miller Prods.,*
14  *Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (citation omitted).  "In considering whether a
15  plaintiff's delay was unreasonable, courts consider:  (1) the length of the delay, measured
16  from the time the plaintiff knew or should have known about his potential cause of
17  action, and (2) whether the plaintiff's delay was reasonable, including whether the
18  plaintiff has proffered a legitimate excuse for his delay."  *Id.*

19      Defendants rely on certain portions of Daniel Parson's deposition as evidence that
20  AFL has been aware of SurplusEQ's sale of Fujikura splicers since at least 2003, but the
21  record does not include the cited pages of the deposition.  *See* Doc. 158 at 31 (citing
22  Doc. 151, ¶ 184 (citing Ex. 1, which does not contain the cited pages)).  As a result,
23  Defendants have not identified any portion of the record demonstrating the absence of a
24  genuine issue of material fact as to when AFL learned that Defendants advertised and
25  sold Fujikura splicers.

26      **B.    Count I.**

27      Defendants argue they are entitled to summary judgment on AFL's Lanham Act
28  unfair competition claim because SurplusEQ fully disclosed the nature of the product it

1  sold, negating any claim of consumer confusion.  As found by the Court above, however,
2  a genuine issue of material fact exists as to whether SurplusEQ sold splicers that were
3  materially different from the authorized units sold by AFL.[3]  Defendants argue that it is
4  undisputed that SurplusEQ disclosed all relevant information regarding any material
5  difference to customers, but Defendants have not pointed to any evidence establishing
6  that SurplusEQ disclosed to its customers the differences related to software licensing
7  and language settings.  Defendants have failed to establish as a matter of undisputed fact
8  that there were no material differences between the splicers, or that even if there were
9  differences, that all differences were disclosed.[4]

10        **C.     Count II.**

11        Defendants argue that summary judgment is appropriate on AFL's false
12  advertising claim because the record lacks evidence that any of SurplusEQ's statements
13  constitute a commercial advertisement under the Lanham Act.  Specifically, Defendants
14  contend that the record lacks evidence showing that SurplusEQ's blog post was
15  disseminated.  In response, AFL submits that the blog post discusses the products
16  SurplusEQ sells online and in-stores and that SurplusEQ used the blog to announce the
17  arrival of Fujikura FSM-60 series splicers – an announcement that directed potential
18  customers to a hyperlink to purchase a splicer – and another blog post that thanked
19  customers for their patronage.  AFL has failed, however, to point to any evidence that the

20        [3] For this same reason, the Court cannot find that the first sale doctrine applies to
21  AFL's Lanham Act unfair competition claim.  Issues of material fact remain as to
   whether SurplusEQ sold "genuine" Fujikura splicers or "materially different" splicers.
22  *See, e.g.*, *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir.
   1995) ("It is the essence of the 'first sale' doctrine that a purchaser who does no more
23  than stock, display and resell a producer's product under the producer's trademark
   violates no right conferred upon the producer by the Lanham Act.  When a purchaser
24  resells a trademarked article under the producer's trademark, and nothing more, there is
   no actionable misrepresentation under the statute.").

25        [4] Defendants contend that they are entitled to summary judgment on AFL's
26  common law unfair competition claim for the same reasons they are entitled to summary
   judgment on AFL's Lanham Act claims.  Because the Court denied Defendants' motion
27  for summary judgment on AFL's Lanham Act unfair competition claim, the Court also
   will deny Defendants' motion on the common law unfair competition claim.

28

blog post was disseminated.  The record lacks evidence showing that anyone actually saw the blog post, or, more importantly, that anyone responded to it and was influenced to purchase a splicer.  Without this evidence, the Court cannot infer from the blog post's content alone that the blog was sufficiently disseminated.  Accordingly, the Court will grant Defendants' motion for summary judgment on AFL's Lanham Act false advertising claim as it pertains to the blog post.

Unlike the blog post, the statements made on SurplusEQ's website and its eBay store webpage constitute a "classic advertising campaign."  As the Court found above, material factual disputes remain as to whether SurplusEQ sold "new" or "not modified" splicers.  These disputes foreclose the entry of summary judgment with respect to the website and eBay store advertisements.

### D.   Count IV.

Defendants submit that they are entitled to summary judgment on AFL's copyright infringement claim under the first sale doctrine, because AFL's claim is barred by copyright misuse, and because AFL has failed to present evidence establishing ownership of an infringed copyright.

### 1.   The First Sale Doctrine.

Under the first sale doctrine, "once a copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."  *Quality King Distribs., Inc. v. L'anaza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998).  "[T]he 'first sale' doctrine applies to copies of a copyrighted work lawfully made abroad."  *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1355-56 (2013).  Defendants assert that the first sale defense protects SurplusEQ's sale of any Fujikura splicers containing the copyright protected software.  The parties agree that SurplusEQ sold Fujikura splicers that were manufactured and first sold outside the United States.  Fujikura's authorization of that initial foreign sale triggered the first sale doctrine, which qualified its otherwise "exclusive rights" "to distribute copies . . . of [a] copyrighted work."  17 U.S.C. § 106(3).  All subsequent owners of those Fujikura

splicers, including SurplusEQ, were "entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy[.]"  *Id.* § 109(a). Accordingly, Fujikura, and AFL via the copyright license agreement, do not have a valid copyright infringement claim against Defendants.

### E.    Damages.

Defendants argue that AFL's damage theory is "pure speculation" and cannot withstand summary judgment.  Defendants contend that AFL's request for damages "for sales occurring prior to the licensing agreements" fails as a matter of law.  Defendants submit that AFL has standing only to pursue damages that occurred after Fujikura granted it an exclusive license in 2011.  The Court does not agree.

### 1.    Lanham Act Damages.

Section 43 of the Lanham Act allows "any person who believes that he or she is likely to be damaged" by the proscribed conduct to bring a civil action.  15 U.S.C. § 1125(a).  In the Ninth Circuit, "different causes of action alleged pursuant to the different subsections of 15 U.S.C. § 1125(a) have different standing requirements." *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005) (citation omitted).  "[F]or standing pursuant to the 'false advertising' prong of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a plaintiff must show: (1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant." *Id.* (citation omitted).  "[W]hen plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011); *see, e.g.*, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1109 (9th Cir. 1992) (noting that a plaintiff bringing a false advertising suit has to show a "discernibly competitive injury," and giving the example of a film distributor with a PG-rated film having standing to bring a claim against a competitor who wrongfully indicated that a film was PG-rated when it should have been R-rated).  In addition, "parties with a commercial interest in the product

wrongfully identified with another's mark . . . or with a commercial interest in the misused mark" have standing to bring a Lanham Act unfair competition claim. *Waits*, 978 F.2d at 1109; *see also Halicki Films, LLC v. Sanderson Sales and Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008).

AFL has been Fujikura's exclusive splicer distributor in North America since 2003. This commercial interest in the FUJIKURA mark is sufficient to give AFL standing to raise a Lanham Act unfair competition claim. Accordingly, the Court denies Defendants' motion for summary judgment on AFL's claims for damages relating to sales predating the 2011 license agreement. *See, e.g., Halicki v. Carroll Shelby Int'l, Inc.,* No. CV 04 8813 SJO, 2005 WL 5253338, at *11 (C.D. Cal. Nov. 11, 2005) (noting that "the question of ownership is immaterial to standing," and that to maintain a § 1125(a) claim a plaintiff "must show that it has a commercial interest in the allegedly misused mark that is likely to be damaged" (quotation marks and citations omitted)).

Under the Lanham Act, when "a violation under section 43(a) . . . ha[s] been established in any civil action . . . , the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). In this action, AFL seeks to recover lost profits for every infringing sale made by Defendants and all of Defendants' profits on such sales. Doc. 174 at 28. Given that AFL has standing to assert a Lanham Act unfair competition claim for every gray market Fujikura splicer sold by Defendants, and that the claim has withstood cross-motions for summary judgment, Defendants have not demonstrated that AFL's damages claim is purely speculative or otherwise subject to summary judgment.

Defendants also argue that AFL lacks standing to pursue damages for sales that occurred outside of the territorial limits of its exclusive trademark license. AFL submits that, under the Lanham Act, it is entitled to recover for all of SurplusEQ's allegedly infringing conduct that occurred in the United States, including conduct that resulted in a Fujikura splicer being shipped outside of the United States. The Court agrees. A

commercial interest, not an ownership interest, is necessary for standing under the Lanham Act.  Defendants have failed to establish that AFL cannot recover under the Lanham Act for these sales.

### 2.  Damages Disclosure.

The Federal Rules of Civil Procedure require "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including material bearing on the nature and extent of injuries suffered."   Fed. R. Civ. P. 26(a)(1)(A)(iii).  Defendants argue that AFL has failed to produce a computation of damages for each of its four claims and instead disclosed an insufficient lump sum statement of damages.   AFL has disclosed a damages calculation for its unfair competition and false advertising claims (Doc. 174-2 at 15), and a separate calculation for its copyright damages claim (*id.* at 16).   Additionally, AFL disclosed a detailed damages calculation showing Defendants' profits and AFL's lost profits.  Doc. 153-1 ("Doc. 153-1") at 2-11; Doc. 174-2 at 17-24.

The Court disagrees with Defendants' argument that these disclosures should be excluded for violation of Rule 26(a)(1)(A)(iii).  Rule 26 provides that disclosures under subpart (a) must be supplemented unless "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."   Fed. R. Civ. P. 26(e)(1)(A).  AFL made additional damages disclosures in writing during the discovery process related to expert opinions, satisfying Rule 26(e)(1)(A) and AFL's disclosure obligations.  Moreover, evidence not disclosed under Rule 26(a) may be excluded only if its lack of disclosure was not substantially justified or harmless (Fed. R. Civ. P. 37(c)(1)), standards not addressed by Defendants.

Defendants also argue that AFL failed to disclose documents that underlie its disclosed damages.  Defendants do not claim that they served a Rule 34 document production request for this information, arguing instead that the documents should have

1   been disclosed under Rule 26(a)(1)(A)(iii).  As noted above, however, evidence will be

2   precluded for failure to disclose under Rule 26(a) only if the failure is not substantially

3   justified or harmless, standards Defendants fail to address.  In addition, AFL asserts that

4   information about the relevant figure – the material margin used to compute lost profits –

5   was derived from an internal computer report and was incorporated into its damages

6   expert's report.  Defendants reviewed the report and deposed the expert, and yet never

7   sought the Court's assistance in obtaining more complete disclosures if any were needed.

8   The Court will not preclude AFL's damages claims on the ground of non-disclosure.[5]

9   **IV.   AFL's Motion to Seal.**

10      AFL asks the Court to seal the following documents:  (1) its damages expert report

11   (Doc. 153-1), (2) a memorandum discussing strategies for combating gray market sales

12   (Doc. 152-1 at 55-57), and (3) portions of the deposition transcript of Stephen Althoff

13   (Doc. 152-1 at 26-36) that concern the strategies in item two (Doc. 155 at 4-5).[6]  The

14   documents were attached to dispositive motions:  Defendants' motion for summary

15   judgment (Doc. 151) and Defendants' motion to exclude expert opinions (Doc. 190).  The

16   federal common law right "to inspect and copy public records and documents" extends to

17   materials submitted in connection with dispositive motions.  *San Jose Mercury News,*

18   *Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir. 1999) (quoting *Nixon v. Warner*

19   *Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).  This right is not absolute, however, and can

20

21      [5] The Court is also unpersuaded by Defendants' arguments regarding AFL's
22   failure to disclose profit information from Fujikura.  The profit claim in this case is made
     by AFL, not Fujikura, and the Court therefore is not persuaded that any such disclosure
23   was required under Rule 26(a)(1)(A)(iii).  Nor have Defendants addressed the
     requirements for exclusion under Rule 37(c)(1), as noted above.  To the extent
24   Defendants believe that AFL's profit calculation is rendered unreliable by undisclosed
     information about Fujikura's finances, it can make this assertion through cross-
25   examination at trial.

26      [6] Defendants assert that AFL also seeks to seal Defendants' expert report
     (Doc. 154-12) and excerpts from the deposition transcript of AFL expert witness Robert
27   Crowder (Doc. 152-9), but AFL withdrew its request to seal these exhibits in its motion
     to seal.  Doc. 155 at 5.

28

be overcome if compelling reasons supported by specific factual findings outweigh the general history of access and the public policies favoring disclosure. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178, 1178-79 (9th Cir. 2006)); *see also See San Jose Mercury News*, 187 F.3d at 1102.

"Under the 'compelling reasons' standard, the Court must weigh 'relevant factors,' base its decision 'on a compelling reason,' and 'articulate the factual basis for its ruling, without relying on hypothesis or conjecture.'" *Pintos*, 605 F.3d at 679 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)). "'Relevant factors' include the 'public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets.'" *Id.*, 679 n.6 (quoting *Hagestad,* 49 F.3d at 1434).

AFL submits that its damages expert report (Doc. 153-1) should not be made publicly available because it contains information setting out AFL's material margin – "the excess of its average sales price over its incremental costs of sale of an additional Fujikura fusion splicer." Doc. 155 at 5. AFL argues that this is the sort of business information that might harm its competitive standing because a competitor could use it to strategically price its units to AFL's detriment or a customer could use it to effectively negotiate a desired price. Defendants argue that AFL has no compelling reason to seal the exhibit because the report does not disclose the names of specific AFL customers or any trade secret. The Court disagrees with Defendants. *See In re Elec. Arts, Inc.*, 298 Fed. Appx. 568, 569-70 (9th Cir. 2008) (finding that information related to "pricing terms, royalty rates, and guaranteed minimum payment terms" is "the precise sort of information" that might harm a litigant's competitive standing. (citation omitted)). After carefully reviewing this exhibit and the record, the Court notes, however, that this material margin data is similar to the information contained in the expert rebuttal report (Doc. 174-2 at 8-24), and, if anything, that the information contained in the rebuttal report is more detailed and could be used to inflict even more harm onto AFL than the

1    original report (Doc. 153-1).  AFL has not moved to seal the rebuttal report.  Because the

2    public already has access to AFL's material margin information, the Court cannot find

3    that a compelling reason exists to seal the original report.

4         As to the documents and deposition testimony relating to AFL's efforts to combat

5    gray market sales (Doc. 152-1 at 26-36, 55-57), AFL argues that if this information were

6    made publicly available, "gray market sellers could gain valuable information about what

7    has been done and what might be done in the future," and that "[a]nything that assists

8    gray market sellers in avoiding efforts by Fujikura and AFL to prevent such infringing

9    sales is detrimental to AFL's business."  Doc. 155 at 6.  After carefully reviewing each

10   exhibit, the Court agrees, for reasons stated by AFL, that these exhibits contain

11   information that could cause competitive harm if publicly divulged.  Accordingly, the

12   Court grants AFL's motion to seal with respect to the memorandum discussing strategies

13   for combating gray market sales (Doc. 152-1 at 55-57) and portions of the Althoff

14   deposition transcript (Doc. 152-1 at 26-36).

15   **V.    Defendants' Motion to Exclude Expert Testimony.**

16        An expert may offer "scientific, technical, or other specialized knowledge" if it

17   "will assist the trier of fact to understand the evidence," provided the testimony rests on

18   "sufficient facts or data" and "reliable principles and methods," and "the witness has

19   reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

20   The trial court acts as a "gatekeeper for expert testimony to assure that it is both relevant

21   and reliable," *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir.

22   2011), an exercise that "entails a preliminary assessment of whether the reasoning or

23   methodology is scientifically valid and of whether that reasoning or methodology

24   properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509

25   U.S. 579, 592-93 (1993).

26   **A.    Robert Crowder.**

27        Robert Crowder is AFL's chief financial officer ("CFO"), a position he has held

28   since December 2007.  Crowder is also a certified public accountant with more than 20

1  years of experience in accounting and business administration.  According to AFL, "[a]s
2  a result of his education and experience, Crowder is quite familiar with the methodology
3  of calculating a company's profits."  Doc. 192 at 3.  Crowder's testimony relates to
4  AFL's damages claim, and specifically, AFL's lost profits and SurplusEQ's profits.

5        Defendants ask the Court to exclude Crowder's testimony because it is based on
6  the erroneous assumption that every Fujikura splicer sold by SurplusEQ was an
7  infringing sale and that AFL would have made all of these sales.  In response, AFL
8  submits that "[b]ecause Mr. Crowder has provided detailed calculations, the numbers can
9  be adjusted according to the findings of the trier of fact with regard to lost sales."
10  Doc. 192 at 9.  Crowder's opinion goes to the calculation of profits, an area of his
11  expertise as AFL's CFO, and Defendants can challenge the assumptions underlying that
12  opinion at trial.  As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination,
13  presentation of contrary evidence, and careful instruction on the burden of proof are the
14  traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S.
15  at 596.

16        Defendants also argue that Crowder's testimony should be excluded because his
17  math is incorrect.  There appears to have been a miscalculation in Crowder's original
18  report (Doc. 153-1), but this error was corrected in the rebuttal report (Doc. 174-2 at 7-
19  24).  This is not a basis to exclude Crowder's testimony.

20        Defendants submit that Crowder's opinion is inadmissible because it relies on
21  documents AFL failed to produce.  Specifically, Defendants point to AFL's failure to
22  produce internal documents about its material margin.  In calculating AFL's lost profits,
23  Crowder relies on the material margin, AFL's average selling price for the particular
24  model in that year less its average cost in that year.  The material margin for each
25  Fujikura splicer model from 2007 through 2011 was provided with Crowder's expert
26  report.  Doc. 153-1 at 2. Subsequently, AFL submitted Crowder's rebuttal report, which
27  provided an expanded chart showing how the material margin was calculated for each
28  model and year.  Doc. 174-2 at 14.  Crowder is not a witness "whose duties as the party's

- 22 -

employee regularly involve giving expert testimony," and thus a written expert report was not required under Rule 26(a)(2)(B).  Instead, AFL was required to provide a summary of the facts and opinions to which the witness is expected to testify.  Fed. R. Civ. P. 26(a)(2)(C).  Defendants have not shown that AFL's disclosure failed to satisfy this more limited obligation.  To the extent Defendants contend that Crowder's testimony should be excluded because AFL failed to make the document disclosures required by Rule 26(a)(1)(A)(iii), the Court has rejected this argument above.

## B.   Douglas Duke.

Douglas Duke is a mechanical engineer who has been employed by AFL since 1991.  He began his career as a splicing applications engineer.  Since then, he has helped AFL diagnose and repair problems on splicers and has assisted with the development of new splicer technology.  Duke will testify about alterations found in the 818 splicer and about what problems these modifications may cause in the future.

Defendants argue that Duke is not qualified to offer an opinion regarding the quality of the repair made to the 818 splicer's circuit board because only electrical engineers are qualified and authorized by AFL to perform work on splicer software and hardware.  AFL responds that Duke is qualified not only because of his engineering education and training, "but because of his long relevant work experiences, including as a member of AFL's engineering team for 20 years – sometimes as the only engineer." Doc. 192 at 4.  The Court agrees.  Rule 702 permits expert testimony based not only on training, but also on experience.  Defendants can cross-examine Duke on his qualifications at trial and argue that his testimony should be accorded less weight because he lacks an electrical engineering degree.

According to Defendants, Duke's opinion relating to the alleged effects of the modifications found on the 818 is inadmissible.  Defendants point to Duke's lack of experience in testing the reliability of Fujikura splicers.  In their reply, Defendants concede that Duke is qualified to provide an opinion regarding the modifications found in the 818 splicer, but not to opine about the "'possible' effects of any of the alleged

modifications," an opinion that Defendants argue is based only on Duke's "*ispse dixit*." Doc. 194 at 8, 10.  The Court does not agree.  Duke's opinion about the possible effects of the modifications found in the 818 splicer is based on his experience repairing splicers, not on "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 589.  The shortcomings identified by Defendants go to the weight and not the admissibility of Duke's opinion, and Defendants will be fully capable at trial of pointing out the weaknesses in his opinion so a jury can hear Duke's response and decide what weight to accord his opinions.

**IT IS ORDERED:**

1.    AFL's motion for summary judgment (Doc. 147) is **denied**.

2.    Defendants' motion for summary judgment (Doc. 158) is **granted** with respect to AFL's copyright infringement claim and false advertising  claim as it pertains to the blog post, and is otherwise **denied**.

3.    AFL's motion to seal (Doc. 155) is **granted** with respect to the material relating to AFL's efforts to combat gray market sales (Doc. 152-1 at 26-36, 55-57) and **denied** with respect AFL's damages expert report (Doc. 153-1).

4.    The Clerk shall file the material relating to AFL's efforts to combat gray market sales (Doc. 152-1 at 26-36 and 55-57) **under seal** and shall accept for filing the remainder of the document lodged as Doc. 152 on the docket.

5.    The Clerk shall accept for filing Doc. 151 with all attachments, Doc. 153 with all attachments; Doc. 154 with all attachments; Doc. 169 with all attachments; Doc. 185 with all attachments.

6.    Defendants' motion to exclude AFL's expert opinions (Doc. 190) is **denied**.

1       7.    The Court shall set a Final Pretrial Conference by separate order.

2   Dated this 20th day of May, 2013.

David G. Campbell
United States District Judge